**MARDAN CORPORATION, Plaintiff,**

v.

**C.G.C. MUSIC, LTD. and MacMillan, Inc., Defendant.**

**No. Civ 83–707 TUC–WDB.**

United States District Court,
D. Arizona.

Dec. 6, 1984.

1050

John Lindberg, Tucson, Ariz., Renee R. Mawhinney, Indianapolis, Ind., for plaintiff.

Leo N. Smith, Tucson, Ariz., Warren Radler, Chicago, Ill., for defendant.

## ORDER

BROWNING, District Judge.

This case presents complex and novel issues regarding environmental law, statutory construction, contract law, and remedies. The principal statutory authorities involved in this case are the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.* The entire text of each of the Acts is attached to this Order as Exhibit "A."

CERCLA represents a relatively new body of law. It was enacted hastily in the wake of publicity surrounding the Love Canal controversy. *See United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249, 1253, 20 E.R.C. 1353, 1357 (S.D.Ill.1984). Accordingly, the legislative history with respect to some of CERCLA's provisions is sketchy. With respect to still others, a clear expression of legislative intent is non-existent. For the foregoing reasons, many of the issues raised by the parties' cross

motions for summary judgment have yet to be squarely addressed by the courts. Because of the unsettled nature of the law in this area, the Court has decided to publish its Order in this matter.

## Background

This lawsuit stems from the operation of a musical instrument manufacturing business in Nogales, Arizona. The business is currently owned by the plaintiff in this action, Mardan Corporation. Mardan's president, Daniel J. Henkin, purchased the Nogales facility from C.G.C. Conn, Ltd., a subsidiary of Macmillan, Inc. Following the sale, Macmillan, Inc. changed the name of its subsidiary from C.G.C. Conn, Ltd. to C.G.C. Music Ltd. and subsequently dissolved C.G.C. Music Ltd. on October 31, 1980.[1]

Prior to its sale on September 5, 1980, the Nogales facility was used by C.G.C. Conn, Ltd. to manufacture musical instruments. Electroplating processes utilized in the manufacturing process resulted in the generation of waste streams consisting of heavy metals, solvents, and cyanide. These wastes were deposited by C.G.C. into a settling pond or lagoon located on the facility property. Following the sale, Mardan continued to manufacture musical instruments at the Nogales facility, generating many of the same waste by-products as those previously generated by C.G.C.[2] Mardan also continued to use the settling pond for waste storage purposes.

Following the sale of the Nogales facility, Mardan applied for a federal hazardous waste disposal permit pursuant to RCRA § 3005 and the regulations promulgated thereunder. See 42 U.S.C. § 6925; 40 C.F.R. part 265 et seq.[3] The State of Arizona also granted Mardan temporary approval to operate the facility pursuant to Arizona Code of Rules and Regulations R9–8–1820.H.1. The state's temporary approval was conditioned upon Mardan's compliance with EPA interim status standards then in effect. Mardan did not, however, comply with those standards. On two different occasions, the EPA notified Mardan that it was in violation of federal and state requirements. The EPA also proposed that civil penalties in the amount of $36,000 be assessed against Mardan.

Mardan determined that the cost of bringing the waste disposal operation at the Nogales facility up to EPA standards was too high to justify continued use of the lagoon for waste storage purposes. Therefore, Mardan decided instead to "close" the settling pond.[4] On September 30, 1983, Mardan entered into a Consent Agreement and Final Order with the EPA in which Mardan agreed, inter alia, to close the settling pond in lieu of operating it under an EPA permit.

## Law and Discussion

 Mardan's lawsuit is based primarily upon Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA").[5] § 107(a) provides, in pertinent part:

facility which has filed an application under Section 3005(b) to "be treated as having been issued such permit until such time as final administrative disposition of such application is made ...."

---

1. Pursuant to 8 Del.C. §§ 259, 278, claims against C.G.C. Music Ltd. had to be commenced within three years of the dissolution, or by October 31, 1983. The present action was filed on October 24, 1983.

2. Mardan points out that during the time defendants held title to the Nogales facility, wastes deposited in the settling pond included cyanides, nickel, copper, trichloroethylene and cadmium. The latter two substances were never used by Mardan after it acquired the facility from C.G.C.

3. Mardan obtained "interim status" by filing a permit application pursuant to Section 3005(e) of RCRA. That section allows a pre-existing

4. Closure of a facility includes either 1) proper containment of the waste materials combined with long-term monitoring and maintenance, or 2) removal of all hazardous wastes and contaminated soil.

5. Plaintiff's complaint also includes Counts based upon such theories as: 1) unjust enrichment, see Count IV; 2) indemnity, see Count III; and subrogation, see Count II. The thrust of plaintiff's moving papers has been directed at its

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section

\* \* \* \* \* \*

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

\* \* \* \* \* \*

shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

Mardan characterizes its cost of complying with RCRA as CERCLA "response costs." [6] It seeks to recover those costs from de-fendants pursuant to Section 107(a)(4)(B). As a first line of defense, C.G.C. and Macmillan argue that costs of complying with RCRA requirements cannot be considered "response costs" under CERCLA. Therefore, the first question which must be addressed is whether the monies expended by Mardan in order to fulfill its obligations under the 1983 Consent Agreement and Final Order with the EPA constitute "response costs" under CERCLA.

Defendants argue that the provisions of CERCLA were not intended to apply to an ongoing and useful disposal site such as the Nogales facility operated by Mardan. It is defendants' position that CERCLA was enacted to "address the complex problems posed by *abandoned* and *inactive* hazardous waste disposal sites." See Memorandum in Support of Defendants' Motion for Summary Judgment (hereinafter "Defendants Memorandum") at 25–26. Accordingly, defendants contend that CERCLA has no application to the Nogales facility. Instead, defendants claim that the provisions of RCRA should govern the operation of such an active site. Implicit in

---

Section 107 claim, however. Plaintiff's claims for indemnity and subrogation can be disposed of summarily. Under Arizona law it is well settled that there may be no indemnity among joint tortfeasors. *DePinto v. Landoe*, 411 F.2d 297 (9th Cir.1969). Because Mardan was responsible for depositing at least some of the hazardous wastes in the settling pond it is not entitled to indemnity.

Mardan's subrogation claim must also be dismissed. Section 112(c)(2) provides that

[a]ny person, including the Fund, who pays compensation pursuant to this Act to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of action or such damages and costs of removal that the claimant has under this Act or any other law.

42 U.S.C. § 9612(c)(2).

Section 112(c)(2) applies only where a "release" of hazardous waste has caused someone to incur costs or damages. In the present case, there is no evidence that there was any such "release." In addition, Mardan has not paid compensation to "any claimant." Instead, Mardan has merely incurred costs itself in conjunction with the closure of the lagoon.

**6.** As noted by the Court in *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1429 (S.D.Ohio 1984):

The phrase "response costs" is nowhere defined in the Act, and the word "response" is defined only as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). Subsection (23) of this section defines "remove" and "removal" to include actions necessary to clean up or remove hazardous substances, to monitor, assess, and evaluate a release, to dispose of removed material, or to prevent, minimize, or mitigate damage to the public or the environment. Specific examples given include security fencing, alternative water supplies, temporary evacuation and housing, and other emergency assistance. Subsection (24) defines "remedy" and "remedial action" as actions consistent with a permanent remedy to prevent or minimize the release of hazardous substances. Specific examples given include containment actions, treatment or incineration, provision of alternate water supplies, and any monitoring reasonably required to assure that the action taken protect the public and the environment.

Mardan's RCRA compliance costs indubitably fall under the rubric of "response costs" as that term is derived from the above-quoted language in *Jones v. Inmont.*

defendants' argument is the notion that RCRA and CERCLA are mutually exclusive. But such a conclusion is supported by neither the language nor the legislative history of CERCLA.

■ That CERCLA was intended to operate independently of and in addition to RCRA is indicated by the first clause of Section 107 of CERCLA which provides: "Notwithstanding any other provision or rule of law ... [liability may be established]." Similarly, the fact that RCRA facilities were specifically exempted from the *notice* requirements of Section 103(c), but not the *liability* provisions of Section 107(a) suggest that RCRA and CERCLA were intended to be cumulative. *See also Jones v. Inmont Corp., supra* note 6, 584 F.Supp. at 1430–35 (holding that RCRA applies to both active *and inactive* hazardous waste disposal sites). Finally, the exemption from CERCLA's notice requirements applies only to facilities which have been issued "a legally enforceable final permit issued pursuant to [RCRA]." The committee report accompanying the Senate version of CERCLA contained the following statement regarding the "federally permitted release" exemption:

> The reported bill tightly limits the types of disposal site releases that would be covered by this [federally permitted release] definition. First, only final [RCRA] permits are included. *Sites or facilities which have interim status under [RCRA] do not adequately utilize acceptable levels of technology, and do not qualify for this exclusion.*
> S.Rep. No. 848, 96 Cong. 2nd Sess. 48 (1980) (emphasis added).

Hence, it appears that the Nogales facility was not even exempted from the notice requirements of CERCLA let alone the Act's liability provisions. From the foregoing it is evident that CERCLA applies both to active and inactive waste disposal sites

and that Mardan's RCRA compliance costs may also be considered "response costs" under CERCLA.

■ But CERCLA requires not only that funds expended by the plaintiff be characterizable as "costs of response," but also that they be "incurred ... consistent with the national contingency plan ...." See Section 107(a)(4)(B). Defendant contends that in order to meet this requirement, it is necessary for the plaintiff to show that its clean-up effort was government approved and that it followed some enforcement activity initiated by the federal government. In defendants' words,

> many of the decisions addressing the question have limited private cost recovery actions under CERCLA because of concerns over opening the door to a proliferation of such actions absent some standards or guidelines set by the government. Despite CERCLA's policy for swift and voluntary clean-up activities, these decisions emphasize the need for governmental activity and supervision under CERCLA. *See, e.g., Bulk Distribution Centers, Inc. v. Monsanto Co.,* No. 83–6805 [589 F.Supp. 1437] (S.D. Fla. June 19, 1984); *Wickland Oil Terminals v. ASARCO, Inc.,* 590 F.Supp. 72 (N.D.Cal.1984); *Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* Cv. Nos. 83–7996 and 83–8034 (C.D.Cal. March 5, 1984).
> See Defendants' Reply Memorandum at 13.

While it is true that virtually every reported decision or order addressing the issue has found some degree of governmental involvement or supervision to be a prerequisite to a private cause of action under Section 107(a) of CERCLA, those courts have done so on the ground that to hold otherwise could lead to haphazard and ineffectual clean-up efforts by private parties.[7]

---

7. *See, e.g., Bulk Distribution Centers, Inc. v. Monsanto Co., supra,* 589 F.Supp. 1437 at 1446 (asking the question "[i]f the court permitted Bulk to begin clean-up operations without prior government approval, then what assurance would there be that the plan was extensive

enough to alleviate the danger given Bulk's limited resources?"); *Wickland Oil Terminals v. ASARCO, Inc., supra,* 590 F.Supp. 72 at 78 ("[t]he response powers authorized by CERCLA and the [National Contingency Plan] contemplate governmental supervision over, and initiation of,

In the present case, Mardan's activities in closing the settling pond are under the supervision of the EPA and pursuant to a Consent Agreement and Final Order with EPA. Therefore, the danger that Mardan's efforts will be "haphazard and ineffectual" does not exist.

■ Having determined that Mardan's claim against C.G.C. and Macmillan is authorized by Section 107(a) of CERCLA, it becomes necessary to examine the various defenses to plaintiff's claim which have been raised by defendants. Defendants' first argument is that Section 8.4 of the Purchase Agreement between Mardan and C.G.C. precludes plaintiff's recovery.[8] Section 8.4 provides:

> Purchaser acknowledges that neither Conn nor Macmillan is making any representations or warranties, expressed or implied, about the condition of the Assets (including the Fee Simple Assets) or the Leased Assets, and that the sale and/or Sublease thereof will be strictly "AS IS". Conn and Macmillan EXPRESSLY DISCLAIM ALL WARRANTIES AS TO THE ASSETS, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

Defendants argue that the effect of Section 8.4 is "to negative the existence of any representations by the seller as to the particular condition, fitness, type of construction, etc., of the premises sold." See Defendants' Memorandum at 18, citing *Approved Properties, Inc. v. City of New York*, 52 Misc.2d 956, 277 N.Y.S.2d 236, 238 (Sup.Ct. Richmond Co. 1966). As Mardan correctly points out, the warranty disclaimer is effective to preclude only causes of action which are based upon breach of warranty theory. Mardan's lawsuit is based not upon warranty theory but rather upon the statutory cause of action created by Section 107(a) of CERCLA. Therefore, Section 8.4 of the Purchase Agreement does not defeat plaintiff's recovery.

■ A distinct but related argument raised by the defendants is that the Settlement Agreement and Release executed by the parties in November of 1981 prevents Mardan from asserting any cause of action it might otherwise have under CERCLA. In the Memorandum of Points and Authorities accompanying their Motion for Summary Judgment, defendants recount the sequence of events which led to the execution of the Settlement Agreement and Release. See Defendants' Memorandum at 5–9, 18–23. Defendants capsulize those developments thusly:

> After eleven months of extensive negotiations, in November 1981 Mardan and Macmillan executed the Settlement Agreement and Release. During that time, both parties brought to the bargaining table each and every claim which they deemed in dispute. Mardan raised, discussed, pressed and eventually conceded its hazardous waste disposal claim. All Mardan claims, including its hazardous waste disposal claim, were ultimately resolved with the execution of the Settlement Agreement and Release.

Defendants' Memorandum at 18.

Mardan argues that the Settlement Agreement and Release have no effect on its right to recover. According to Mardan and the express language of the Release, Mardan released only those claims

> based upon, arising out of or in any way relating to the Purchase Agreement (including, without limitation, Article 7 thereof), the Assignment Agreement, the

---

hazardous waste cleanup"); *Cadillac Fairview/California, Inc. v. Dow Chemical Co., supra*, Nos. 83–7996 and 83–8034, transcript of record at 23 (to permit private suits prior to any government initiated response would "frustrate the intent behind the Act, which is to establish a program to deal with [hazardous waste] sites").

**8.** It is defendants' contention that the Purchase Agreement as well as the Settlement Agreement

and Release executed by the parties should be interpreted in accordance with the laws of the State of New York. Defendants' position is based upon the choice of laws provision found in Section 8.8 of the Purchase Agreement. Because the parties have agreed that New York law should control, this Court is bound to give effect to that intent. *See Schram v. Smith*, 97 F.2d 662, 664 (9th Cir.1938).

Severance Escrow Agreement or any other agreement or transaction pursuant to any of such agreements.

See Exhibit 11 to Naughton Aff.

Defendants contend that Mardan's lawsuit is inextricably bound up with the Purchase Agreement, as evidenced by the fact that Mardan, in its Notice of Claim to defendants, referred to both Section 107(a) of CERCLA and the Purchase Agreement. Plaintiff strenuously urges the Court to find that its cause of action "did not arise out of the purchase agreement, is not connected therewith, and was in no way contemplated thereby." See Plaintiff's Memorandum at 28. Instead, Mardan claims that its lawsuit is grounded solely upon the statutory cause of action created by Section 107(a) of CERCLA. In Mardan's words:

> While Macmillan's and C.G.C's prior ownership and operation of the Nogales site are necessary elements of this case (and the fact of those elements is undisputed), the existence of a purchase agreement is not a necessary element, and Mardan's claim in no way is premised or dependent upon the Purchase Agreement. If the exchange of ownership of the Nogales site had taken place in the absence of any purchase agreement whatsoever, Mardan's CERCLA Section 107 action would still stand. Section 107(a) does not require the existence of a purchase agreement, and Section 107(b) does not allow the use of a purchase agreement as a defense.[9] The purchase Agreement,

and its mention in Mardan's Notice of Claim, are merely surplussage—above and beyond the requirements of a Section 107 case.

Plaintiff's Reply Memorandum at 13.

 It appears that the nexus between Mardan's cause of action and the Purchase Agreement is sufficiently close to justify a finding that the Settlement Agreement and Release are applicable in the present situation. The broad language of the Release covers not only those claims *based upon* the Purchase Agreement, but also all claims "in any way relating to the Purchase Agreement . . . ." If Mardan had not acquired an ownership interest in the property by virtue of the Purchase Agreement, it would have not have incurred "response costs" pursuant to the EPA Consent Agreement and Final Order and would not have acquired a cause of action under Section 107(a) of CERCLA. The fact that Mardan could have acquired title to the property "in the absence of any purchase agreement whatsoever" is irrelevant. It *was* the Purchase Agreement in this case that transferred title to the Nogales facility to Mardan. Therefore, the Settlement Agreement and Release are effective to bar all claims which the parties reasonably contemplated and intended to dispose of at the time the Settlement and Release were executed. *See Cahill v. Regan*, 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505 (1959).

As to what claims were contemplated by the parties when the Settlement and Re-

---

**9.** Mardan makes the argument that defendants' contractual defenses are inapposite in this action because such defenses are not enumerated in Section 107(b). That section provides, in pertinent part:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party [not affiliated with the defendant];
>
> (4) any combination of the foregoing paragraphs.

Because subsection (a) of Section 107 states that liability is "subject only to the defenses set forth in subsection (b) of this section," Mardan contends that the defenses listed in subsection (b) are exclusive.

Mardan's argument does not withstand close analysis. As defendants have suggested, Mardan's interpretation would result in defendants being held liable even if they had already paid Mardan's Section 107(a) claim in a prior lawsuit since res judicata, payment, and accord and satisfaction are not listed as defenses in subsection (b). Similarly under Mardan's interpretation of the statute, defendants would not be able to raise such defenses as statute of limitations, waiver, laches, etc. For the foregoing reasons, the defenses listed in subsection (b) cannot be considered as exclusive.

lease were executed, plaintiff and defendants sharply disagree. The primary purpose of the release, according to Mardan, was to settle severance pay and accounts receivable issues. See Affidavit of Joseph D. Sharp ¶ 6. Nevertheless, it is undisputed that both the existence of the settling pond and the nature of the substances stored in the pond were known to all parties at the time they were negotiating the settlement. In the course of those negotiations the parties specifically addressed the possible need for a waste pretreatment system at the Nogales facility. Price Aff. at 2–3. Likewise, the parties agree that CERCLA had been in existence for nearly a year at the time the Settlement Agreement and Release were executed. Therefore, Mardan had at least constructive knowledge of its potential claim under Section 107(a). Given the broad and unambiguous language of the general release involved in this case, it must be concluded that Mardan intended to give up all claims which it had or might someday have against C.G.C. and Macmillan in exchange for approximately $995,000.

Mardan claims that the response costs which it incurred "were totally unanticipated at the time the release was executed." Plaintiff's Memorandum at 29. This statement is not supported by the facts, however. Throughout settlement negotiations Mardan was aware of RCRA's requirements, the same requirements which ultimately led to Mardan's incurrence of "response costs." Furthermore, as mentioned above, CERCLA was enacted before the

parties finally reached a settlement and executed the Release here in question.

■■■■■■ Defendants raise the additional, equitable defense of unclean hands. Citing *City of Philadelphia v. Stepan Chemical,* 544 F.Supp. 1135 (E.D.Pa.1982), defendants argue that one "responsible party" may sue another "responsible party" under Section 107(a) only where the first is merely a passive party who did not participate in the creation of the hazardous waste site.[10] In the *Stepan Chemical* case, the plaintiff City of Philadelphia owned a landfill on which third parties had illegally dumped certain hazardous wastes. When the city became aware of the illegal dumping, it brought suit under Section 107(a) of CERCLA against the generators of the hazardous waste material. The defendants brought a motion for judgment on the pleadings, arguing, *inter alia,* that Section 107(a) of CERCLA did not authorize suits by one "responsible party" against another. The court denied defendants' motion, finding that nothing in CERCLA precluded the city's cause of action. The court, however, made specific mention of the fact that "the City ... did not voluntarily allow the placement of the hazardous substances on its property and ... sustained damages as the result of their illegal disposal ...." *Id.*

C.G.C. and Macmillan argue that *Stepan Chemical* restricts private causes of action under CERCLA to those in which the plaintiff is not himself responsible in some way for the creation of the hazardous condition.[11] It has been held that actions based

---

**10.** Responsible parties are those listed in subsection (a) of Section 107. They include:
(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or attanged with a transporter for transpost for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party

or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, form which there is a release, or à threatened release which causes the incurrence of response costs, of a hazardous substance ....

**11.** Subsequent cases support defendants' position. For instance, in *Velsicol Chemical Corp. v. Reilly Tar & Chemical Corp.,* No. 1–81–389 (E.D. Tenn. August 16, 1984) the court had the following to say:

upon Section 107 are actually equitable actions in the nature of restitution. *United States v. Northeastern Pharmaceutical and Chemical Co., Inc.*, 579 F.Supp. 823, 19 E.R.C. 2186 (W.D. Missouri 1983). Therefore, the equitable defense of unclean hand is applicable in a private response cost recovery action under CERCLA. See D. Dobbs, *Remedies* Section 2.4 at 45–47 (1973).

In the present case Mardan operated the Nogales facility for approximately three years before it was required by the EPA to close the settling pond on the property. During that time Mardan continued to deposit electroplating byproducts in the pond. Thus, Mardan actively participated in the creation of the hazardous waste site. The fact that defendants may have been responsible for producing the majority of the hazardous waste material in the pond is not important. Mardan contributed to some degree to the creation of the hazardous waste site.

Contrary to Mardan's assertion, application of the clean hands doctrine in CERCLA cases will not defeat the intent and purpose of the Act nor will it contravene public policy. Defendants' remain liable to the state or federal government in an action based upon Section 107(a)(4)(A) of the Act. Neither defendants' contractual defenses nor the unclean hands doctrine would present a bar to recovery if such an action were brought. Hence, the public policy of assuring that responsible parties bear the costs of hazardous waste clean-up is not defeated by application of the clean hands doctrine in a private recovery action under Section 107(a)(4)(B).[12]

## CONCLUSION

Mardan's claim for response costs, although authorized by Section 107(a)(4)(B)

> [P]laintiff is correct in insisting that the dispositive consideration in *Stepan* was that the plaintiff City "did not operate a hazardous waste disposal facility on the premises and it asserts that it did not voluntarily permit the placement of the hazardous substances on its property."
> Slip op. at 12–13.
> Similarly, in *D'Imperio v. United States*, 575 F.Supp. 248 (D.N.J.1983), the held that "[i]n

of CERCLA, is barred by both the Release and the doctrine of clean hands. Therefore, it is ORDERED that defendants' motion for summary judgment is GRANTED.

## EXHIBIT A

## COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980

**(Enacted by Public Law 96–510, December 11, 1980, 94 Stat. 2767; 42 USC 9601 *et seq.;* Amended by Public Law 97–272, September 30, 1982; PL 98–45, July 12, 1983; 98–80, August 23, 1983)**

## TITLE I—HAZARDOUS SUBSTANCES RELEASES, LIABILITY, COMPENSATION

### DEFINITIONS

SEC. 101. For purpose of this title, the term—

(1) "act of God" means an unanticipated grave natural disaster or other natural phenomenon of· an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight;

(2) "Administrator" means the Administrator of the United States Environmental Protection Agency;

(3) "barrel" means forty-two United States gallons at sixty degrees Fahrenheit;

(4) "claim" means a demand in writing for a sum certain;

(5) "claimant" means any person who presents a claim for compensation under this Act;

> order to seek recovery under Section 107(a)(4)(B), it is necessary for the plaintiff to prove that he himself is not liable for these costs."

**12.** The same analysis is equally applicable to Mardan's claim for unjust enrichment in Count IV of the Complaint.

(6) "damages" means damages for injury or loss of natural resources as set forth in section 107(a) or 111(b) of this Act;

(7) "drinking water supply" means any raw or finished water source that is or may be used by a public water system (as defined in the Safe Drinking Water Act) or as drinking water by one or more individuals;

(8) "environment" means (A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Fishery Conservation and Management Act of 1976, and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States;

(9) "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel;

(10) "federally permitted release" means (A) discharges in compliance with a permit under section 402 of the Federal Water Pollution Control Act, (B) discharges resulting from circumstances identified and reviewed and made part of the public record with respect to a permit issued or modified under section 402 of the Federal Water Pollution Control Act and subject to a condition of such permit, (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 402 of the Federal Water Pollution Control Act, which are caused by events occurring within the scope of relevant operating or treatment systems, (D) discharges in compliance with a legally enforceable permit under section 404 of the Federal Water Pollution Control Act, (E) releases in compliance with a legally enforceable final permit issued pursuant to section 3005(a) through (d) of the Solid Waste Disposal Act from a hazardous waste treatment, storage, or disposal facility when such permit specifically identifies the hazardous substances and makes such substances subject to a standard of practice, control procedure or bioassay limitation or condition, or other control on the hazardous substances in such releases, (F) any release in compliance with a legally enforceable permit issued under section 102 of section 103 of the Marine Protection, Research, and Sanctuaries Act of 1972, (G) any injection of fluids authorized under Federal underground injection control programs or State programs submitted for Federal approval (and not disapproved by the Administrator of the Environmental Protection Agency) pursuant to part C of the Safe Drinking Water Act, (H) any emission into the air subject to a permit or control regulation under section 111, section 112, title I part C, title I part D, or State implementation plans submitted in accordance with section 110 of the Clean Air Act (and not disapproved by the Administrator of the Environmental Protection Agency), including any schedule or waiver granted, promulgated, or approved under these sections, (I) any injection of fluids or other materials authorized under applicable State law (i) for the purpose of stimulating or treating wells for the production of crude oil, natural gas, or water, (ii) for the purpose of secondary, tertiary, or other enhanced recovery of crude oil or natural gas, or (iii) which are brought to the surface in conjunction with the production of crude oil or natural gas and which are reinjected, (J) the introduction of any pollutant into a publicly owned treatment works when such pollutant is specified in and in compliance with applicable pretreatment standards of section 307(b) or (c) of the Clean Water Act and enforceable requirements in a pretreatment program submitted by a State or municipality for Federal approval under section 402 of such Act, and (K) any release of source, special nuclear, or byproduct material, as those terms

are defined in the Atomic Energy Act of 1954, in compliance with a legally enforceable license, permit, regulation, or order issued pursuant to the Atomic Energy Act of 1954;

(11) "Fund" or "Trust Fund" means the Hazardous Substance Response Fund established by section 221 of this Act or, in the case of a hazardous waste disposal facility for which liability has been transferred under section 107(k) of this Act, the Post-closure Liability Fund established by section 232 of this Act;

(12) "ground water" means water in a saturated zone or stratum beneath the surface of land or water;

(13) "guarantor" means any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator under this Act;

(14) "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas);

(15) "navigable waters" or "navigable waters of the United States" means the waters of the United States, including the territorial seas;

(16) "natural resources" means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Fishery Conservation and Management Act of 1976), any State or local government, or any foreign government;

(17) "offshore facility" means any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel;

(18) "onshore facility" means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land or nonnavigable waters within the United States;

(19) "otherwise subject to the jurisdiction of the United States" means subject to the jurisdiction of the United States by virtue of United States citizenship, United States vessel documentation or numbering, or as provided by international agreement to which the United States is a party;

(20)(A) "owner or operator" means (i) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and (iii) in the case of any abandoned facility, any person who owned, operated, or otherwise controlled activities at such facility immediately prior to such abandonment. Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility;

(B) in the case of a hazardous substance which has been accepted for transportation by a common or contract carrier and except as provided in section 107(a)(3) or (4) of this Act, (i) the term "owner or operator" shall mean such common carrier or other bona fide for hire carrier acting as an independent contractor during such transportation, (ii) the shipper of such hazardous substance shall not be considered to have caused or contributed to any release during such transportation which resulted solely from circumstances or conditions beyond his control;

(C) in the case of a hazardous substance which has been delivered by a common or contract carrier to a disposal or treatment facility and except as provided in section 107(a)(3) or (4)(i) the term "owner or operator" shall not include such common or contract carrier, and (ii) such common or contract carrier shall not be considered to have caused or contributed to any release at such disposal or treatment facility resulting from circumstances or conditions beyond its control;

(21) "person" means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body;

(22) "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act, or, for the purposes of section 104 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978, and (D) the normal application of fertilizer;

(23) "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of this Act, and any emergency assistance which may be provided under the Disaster Relief Act of 1974;

(24) "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, re-

pair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare. The term does not include offsite transport of hazardous substances, or the storage, treatment, destruction, or secure disposition offsite of such hazardous substances or contaminated materials unless the President determines that such actions (A) are more cost-effective than other remedial actions, (B) will create new capacity to manage, in compliance with subtitle C of the Solid Waste Disposal Act, hazardous substances in addition to those located at the affected facility, or (C) are necessary to protect public health or welfare or the environment from a present or potential risk which may be created by further exposure to the continued presence of such substances or materials;

(25) "respond" or "response" means remove, removal, remedy, and remedial action;

(26) "transport" or "transportation" means the movement of a hazardous substance by any mode, including pipeline (as defined in the Pipeline Safety Act), and in the case of a hazardous substance which has been accepted for transportation by a common or contract carrier, the term "transport" or "transportation" shall include any stoppage in transit which is temporary, incidental to the transportation movement, and at the ordinary operating convenience of a common or contract carrier, and any such stoppage shall be considered as a continuity of movement and not as the storage of a hazardous substance;

(27) "United States" and "State" include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction;

(28) "vessel" means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water;

(29) "disposal", "hazardous waste", and "treatment" shall have the meaning provided in section 1004 of the Solid Waste Disposal Act;

(30) "territorial sea" and "contiguous zone" shall have the meaning provided in section 502 of the Federal Water Pollution Control Act.

(31) "national contingency plan" means the national contingency plan published under section 311(c) of the Federal Water Pollution Control Act or revised pursuant to section 105 of this Act; and

(32) "liable" or "liability" under this title shall be construed to be the standard of liability which obtains under section 311 of the Federal Water Pollution Control Act.

#### REPORTABLE QUANTITIES AND ADDITIONAL DESIGNATIONS

SEC. 102. (a) The Administrator shall promulgate and revise as may be appropriate, regulations designating as hazardous substances, in addition to those referred to in section 101(14) of this title, such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment, and shall promulgate regulations establishing that quantity of any hazardous substance the release of which shall be reported pursuant to section 103 of this title. The Administrator may determine that one single quantity shall be the reportable quantity for any hazardous substance,

regardless of the medium into which the hazardous substance is released.

(b) Unless and until superseded by regulations establishing a reportable quantity under subsection (a) of this section for any hazardous substance· as defined in section 101(14) of this title, (1) a quantity of one pound, or (2) for those hazardous substances for which reportable quantities have been established pursuant to section 311(b)(4) of the Federal Water Pollution Control Act, such reportable quantity, shall be deemed that quantity, the release of which requires notification pursuant to section 103(a) or (b) of this title.

## NOTICES, PENALTIES

SEC. 103. (a) Any person in charge of a vessel or an offshore or an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such vessel or facility in quantities equal to or greater than those determined pursuant to section 102 of this title, immediately notify the National Response Center established under the Clean Water Act of such release. The National Response Center shall convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State.

(b) Any person—

(1) in charge of a vessel from which a hazardous substance is released, other than a federally permitted release, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or

(2) in charge of a vessel from which a hazardous substance is released, other than a federally permitted release, which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Fishery Conservation and Management Act of 1976), and who is otherwise subject to the jurisdiction of the United States at the time of the release, or

(3) in charge of a facility from which a hazardous substance is released, other than a federally permitted release, in a quantity equal to or greater than that determined pursuant to section 102 of this title who fails to notify immediately the appropriate agency of the United States Government as soon as he has knowledge of such release shall, upon conviction, be fined not more than $10,-000 or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

(c) Within one hundred and eighty days after the enactment of this Act, any person who owns or operates or who at the time of disposal owned or operated, or who accepted hazardous substances for transport and selected, a facility at which hazardous substances (as defined in section 101(14)(C) of this title) are or have been stored, treated, or disposed of shall, unless such facility has a permit issued under, or has been accorded interim status under, subtitle C of the Solid Waste Disposal Act, notify the Administrator of the Environmental Protection Agency of the existence of such facility, specifying the amount and type of any hazardous substance to be found there, and any known suspected, or likely releases of such substances from such facility. The Administrator may prescribe in greater detail the manner and form of the notice and the information included. The Administrator shall notify the affected State agency, or any department designated by the Governor to receive such notice, of the existence of such facility. Any person who knowingly fails to notify the Administrator of the existence of any such facility shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. In addition, any such person who knowingly fails to provide the notice required by this subsection shall not be entitled to any limitation of liability or to any defenses to liability set out in sec-

tion 107 of this Act: *Provided, however,* That notification under this subsection is not required for any facility which would be reportable hereunder solely as a result of any stoppage in transit which is temporary, incidental to the transportation movement, or at the ordinary operating convenience of a common or contract carrier, and such stoppage shall be considered as a continuity of movement and not as the storage of a hazardous substance. Notification received pursuant to this subsection or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

(d)(1) The Administrator of the Environmental Protection Agency is authorized to promulgate rules and regulations specifying, with respect to—

(A) the location, title, or condition of a facility, and

(B) the identity, characteristics, quantity, origin, or condition (including containerization and previous treatment) of any hazardous substances contained or deposited in a facility;

the records which shall be retained by any person required to provide the notification of a facility set out in subsection (c) of this section. Such specification shall be in accordance with the provisions of this subsection.

(2) Beginning with the date of enactment of this Act, for fifty years thereafter or for fifty years after the date of establishment of a record (whichever is later), or at any such earlier time as a waiver if obtained under paragraph (3) of this subsection, it shall be unlawful for any such person knowingly to destroy, mutilate, erase, dispose of, conceal, or otherwise render unavailable or unreadable or falsify any records identified in paragraph (1) of this subsection. Any person who violates this paragraph shall, upon conviction, be fined not more than $20,000, or imprisoned for not more than one year, or both.

(3) At any time prior to the date which occurs fifty years after the date of enact-

ment of this Act, any person identified under paragraph (1) of this subsection may apply to the Administrator of the Environmental Protection Agency for a waiver of the provisions of the first sentence of paragraph (2) of this subsection. The Administrator is authorized to grant such waiver if, in his discretion, such waiver would not unreasonably interfere with the attainment of the purposes and provisions of this Act. The Administrator shall promulgate rules and regulations regarding such a waiver so as to inform parties of the proper application procedure and conditions for approval of such a waiver.

(4) Notwithstanding the provisions of this subsection, the Administrator of the Environmental Protection Agency may in his discretion require any such person to retain any record identified pursuant to paragraph (1) of this subsection for such a time period in excess of the period specified in paragraph (2) of this subsection as the Administrator determines to be necessary to protect the public health or welfare.

(e) This section shall not apply to the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act or to the handling and storage of such a pesticide product by an agricultural producer.

(f) No notification shall be required under subsection (a) or (b) of this section for any release of a hazardous substance—

(1) which is required to be reported (or specifically exempted from a requirement for reporting) under subtitle C of the Solid Waste Disposal Act or regulations thereunder and which has been reported to the National Response Center, or

(2) which is a continuous release, stable in quantity and rate, and is—

(A) from a facility for which notification has been given under subsection (c) of this section, or

(B) a release of which notification has been given under subsections (a) and (b) of this section for a period sufficient to establish the continuity,

quantity, and regularity of such release:

*Provided,* That notification in accordance with subsections (a) and (b) of this paragraph shall be given for releases subject to this paragraph annually, or at such time as there is any statistically significant increase in the quantity of any hazardous substance or constituent thereof released, above that previously reported or occurring.

## RESPONSE AUTHORITIES

SEC. 104. (a)(1) Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment, unless the President determines that such removal and remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party.

(2) For the purposes of this section, "pollutant or contaminant" shall include, but not be limited to, any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring. The term does not include petroleum, including crude oil and any fraction thereof which is not otherwise specifically listed or designated as hazardous substances under section 101(14)(A) through (F) of this title, nor does it include natural gas, liquefied natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas).

(b) Whenever the President is authorized to act pursuant to subsection (a) of this section, or whenever the President has reason to believe that a release has occurred or is about to occur, or that illness, disease, or complaints thereof may be attributable to exposure to a hazardous substance, pollutant, or contaminant and that a release may have occurred or be occurring, he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this Act.

(c)(1) Unless (A) the President finds that (i) continued response actions are immediately required to prevent, limit, or mitigate an emergency, (ii) there is an immediate risk to public health or welfare or the environment, and (iii) such assistance will not otherwise be provided on a timely basis, or (B) the President has determined the appropriate remedial actions pursuant to paragraph (2) of this subsection and the State or States in which the source of the release is located have complied with the requirements of paragraph (3) of this subsection, obligations from the Fund, other than

those authorized by subsection (b) of this section, shall not continue after $1,000,000 has been obligated for response actions or six months has elapsed from the date of initial response to a release or threatened release of hazardous substances.

(2) The President shall consult with the affected State or States before determining any appropriate remedial action to be taken pursuant to the authority granted under subsection (a) of this section.

(3) The President shall not provide any remedial actions pursuant to this section unless the State in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that (A) the State will assure all future maintenance of the removal and remedial actions provided for the expected life of such actions as determined by the President; (B) the State will assure the availability of a hazardous waste disposal facility acceptable to the President and in compliance with the requirements of subtitle C of the Solid Waste Disposal Act for any necessary offsite storage, destruction, treatment, or secure disposition of the hazardous substances; and (C) the State will pay or assure payment of (i) 10 per centum of the costs of the remedial action, including all future maintenance, or (ii) at least 50 per centum or such greater amount as the President may determine appropriate, taking into account the degree of responsibility of the State or political subdivision, of any sums expended in response to a release at a facility that was owned at the time of any disposal of hazardous substances therein by the State or a political subdivision thereof. The President shall grant the State a credit against the share of the costs for which it is responsible under this paragraph for any documented direct out-of-pocket non-Federal funds expended or obligated by the State or a political subdivision thereof after January 1, 1978, and before the date of enactment of this Act for cost-eligible response actions and claims for damages compensable under section 111 of this title relating to the specific release in question: *Provided, however,* That in no

event shall the amount of the credit granted exceed the total response costs relating to the release.

(4) The President shall select appropriate remedial actions determined to be necessary to carry out this section which are to the extent practicable in accordance with the national contingency plan and which provide for that cost-effective response which provides a balance between the need for protection of public health and welfare and the environment at the facility under consideration, and the availability of amounts from the Fund established under title II of this Act to respond to other sites which present or may present a threat to public health or welfare or the environment, taking into consideration the need for immediate action.

(d)(1) Where the President determines that a State or political subdivision thereof has the capability to carry out any or all of the actions authorized in this section, the President may, in his discretion, enter into a contract or cooperative agreement with such State or political subdivision to take such actions in accordance with criteria and priorities established pursuant to section 105(8) of this title and to be reimbursed for the reasonable response costs thereof from the Fund. Any contract made hereunder shall be subject to the cost-sharing provisions of subsection (c) of this section.

(2) If the President enters into a cost-sharing agreement pursuant to subsection (c) of this section or a contract or cooperative agreement pursuant to this subsection, and the State or political subdivision thereof fails to comply with any requirements of the contract, the President may, after providing sixty days notice, seek in the appropriate Federal district court to enforce the contract or to recover any funds advanced or any costs incurred because of the breach of the contract by the State or political subdivision.

(3) Where a State or a political subdivision thereof is acting in behalf of the President, the President is authorized to provide technical and legal assistance in the admin-

istration and enforcement of any contract or subcontract in connection with response actions assisted under this title, and to intervene in any civil action involving the enforcement of such contract or subcontract.

(4) Where two or more noncontiguous facilities are reasonably related on the basis of geography, or on the basis of the threat, or potential threat to the public health or welfare or the environment, the President may, in his discretion, treat these related facilities as one for purposes of this section.

(e)(1) For purposes of assisting in determining the need for response to a release under this title or enforcing the provisions of this title, any person who stores, treats, or disposes of, or, where necessary to ascertain facts not available at the facility where such hazardous substances are located, who generates, transports, or otherwise handles or has handled, hazardous substances shall, upon request of any officer, employee, or representative of the President, duly designated by the President, or upon request of any duly designated officer, employee, or representative of a State, where appropriate, furnish information relating to such substances and permit such person at all reasonable times to have access to, and to copy all records relating to such substances. For the purposes specified in the preceding sentence, such officers, employees, or representatives are authorized—

(A) to enter at reasonable times any establishment or other place where such hazardous substances are or have been generated, stored, treated, or disposed of, or transported from;

(B) to inspect and obtain samples from any person of any such substance and samples of any containers or labeling for such substances. Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee, or representative obtains any samples, prior to leaving the premises, he shall give to the owner, operator, or person in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume of weight to the portion retained. If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or person in charge.

(2)(A) Any records, reports, or information obtained from any person under this section (including records, reports, or information obtained by representatives of the President) shall be available to the public, except that upon a showing satisfactory to the President (or the State, as the case may be) by any person that records, reports, or information, or particular part thereof (other than health or safety effects data), to which the President (or the State, as the case may be) or any officer, employee, or representative has access under this section if made public would divulge information entitled to protection under section 1905 of title 18 of the United States Code, such information or particular portion thereof shall be considered confidential in accordance with the purposes of that section, except that such record, report, document or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this Act, or when relevant in any proceeding under this Act.

(B) Any person not subject to the provisions of section 1905 of title 18 of the United States Code who knowingly and willfully divulges or discloses any information entitled to protection under this subsection shall, upon conviction, be subject to a fine of not more than $5,000 or to imprisonment not to exceed one year, or both.

(C) In submitting data under this Act, a person required to provide such data may (i) designate the data which such person believes is entitled to protection under this subsection and (ii) submit such designated data separately from other data submitted under this Act. A designation under this paragraph shall be made in writing and in such manner as the President may prescribe by regulation.

(D) Notwithstanding any limitation contained in this section or any other provision of law, all information reported to or otherwise obtained by the President (or any representative of the President) under this Act shall be made available, upon written request of any duly authorized committee of the Congress, to such committee.

(f) In awarding contracts to any person engaged in response actions, the President or the State, in any case where it is awarding contracts pursuant to a contract entered into under subsection (d) of this section, shall require compliance with Federal health and safety standards established under section 301(f) of this Act by contractors and subcontractors as a condition of such contracts.

(g)(1) All laborers and mechanics employed by contractors or subcontractors in the performance of construction, repair, or alteration work funded in whole or in part under this section shall be paid wages at rates not less than those prevailing on projects of a character similar in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act. The President shall not approve any such funding without first obtaining adequate assurance that required labor standards will be maintained upon the construction work.

(2) The Secretary of Labor shall have, with respect to the labor standards specified in paragraph (1), the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 64 Stat. 1267) and section 276c of title 40 of the United States Code.

(h) Notwithstanding any other provision of law, subject to the provisions of section 111 of this Act, the President may authorize the use of such emergency procurement powers as he deems necessary to effect the purpose of this Act. Upon determination that such procedures are necessary, the President shall promulgate regulations prescribing the circumstances under which such authority shall be used and the procedures governing the use of such authority.

(i) There is hereby established within the Public Health Service an agency, to be known as the Agency for Toxic Substances and Disease Registry, which shall report directly to the Surgeon General of the United States. The Administrator of said Agency shall, with the cooperation of the Administrator of the Environmental Protection Agency, the Commissioner of the Food and Drug Administration, the Directors of the National Institute of Medicine, National Institute of Environmental Health Sciences, National Institute of Occupational Safety and Health, Centers for Disease Control, the Administrator of the Occupational Safety and Health Administration, and the Administrator of the Social Security Administration, effectuate and implement the health related authorities of this Act. In addition, said Administrator shall—

(1) in cooperation with the States, establish and maintain a national registry of serious diseases and illnesses and a national registry of persons exposed to toxic substances;

(2) establish and maintain inventory of literature, research, and studies on the health effects of toxic substances;

(3) in cooperation with the States, and other agencies of the Federal Government, establish and maintain a complete listing of areas closed to the public or otherwise restricted in use because of toxic substance contamination;

(4) in cases of public health emergencies caused or believed to be caused by exposure to toxic substances, provide medical care and testing to exposed individuals, including but not limited to tissue sampling, chromosomal testing, epidemiological studies, or any other assistance appropriate under the circumstances; and

(5) either independently or as part of other health status survey, conduct periodic survey and screening programs to determine relationships between exposure to toxic substances and illness. In cases of public health emergencies, exposed persons shall be eligible for admis-

sion to hospitals and other facilities and services operated or provided by the Public Health Service.

NATIONAL CONTINGENCY PLAN

SEC. 105. Within one hundred and eighty days after the enactment of this Act, the President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances, originally prepared and published pursuant to section 311 of the Federal Water Pollution Control Act, to reflect and effectuate the responsibilities and powers created by this Act, in addition to those matters specified in section 311(c)(2). Such revision shall include a section of the plan to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants, which shall include at a minimum:

(1) methods for discovering and investigating facilities at which hazardous substances have been disposed of or otherwise come to be located;

(2) methods for evaluating, including analyses of relative cost, and remedying any releases or threats of releases from facilities which pose substantial danger to the public health or the environment;

(3) methods and criteria for determining the appropriate extent of removal, remedy, and other measures authorized by this Act;

(4) appropriate roles and responsibilities for the Federal, State, and local governments and for interstate and nongovernmental entities in effectuating the plan;

(5) provision for identification, procurement, maintenance, and storage of response equipment and supplies;

(6) a method for and assignment of responsibility for reporting the existence of such facilities which may be located on federally owned or controlled properties and any releases of hazardous substances from such facilities;

(7) means of assuring that remedial action measures are cost-effective over the period of potential exposure to the hazardous substances or contaminated materials;

(8)(A) criteria for determining priorities among releases or threatened releases throughout the United States for the purpose of taking remedial action and, to the extent practicable taking into account the potential urgency of such action, for the purpose of taking removal action. Criteria and priorities under this paragraph shall be based upon relative risk or danger to public health or welfare or the environment, in the judgment of the President, taking into account to the extent possible the population at risk, the hazard potential of the hazardous substances at such facilities, the potential for contamination of drinking water supplies, the potential for direct human contact, the potential for destruction of sensitive ecosystems, State preparedness to assume State costs and responsibilities, and other appropriate factors;

(B) based upon the criteria set forth in subparagraph (A) of this paragraph, the President shall list as part of the plan national priorities among the known releases or threatened releases throughout the United States and shall revise the list no less often than annually. Within one year after the date of enactment of this Act, and annually thereafter, each State shall establish and submit for consideration by the President priorities for remedial action among known releases and potential releases in that State based upon the criteria set forth in subparagraph (A) of this paragraph. In assembling or revising the national list, the President shall consider any priorities established by the States. To the extent practicable, at least four hundred of the highest priority facilities shall be designated individually and shall be referred to as the "top priority among known response targets", and, to the extent practicable, shall include among the one hundred highest priority facilities at

least one such facility from each State which shall be the facility designated by the State as presenting the greatest danger to public health or welfare or the environment among the known facilities in such State. Other priority facilities or incidents may be listed singly or grouped for response priority purposes; and

(9) specified roles for private organizations and entities in preparation for response and in responding to releases of hazardous substances, including identification of appropriate qualifications and capacity therefor.

The plan shall specify procedures, techniques, materials, equipment, and methods to be employed in identifying, removing, or remedying releases of hazardous substances comparable to those required under section 311(c)(2)(F) and (G) and (j)(1) of the Federal Water Pollution Control Act. Following publication of the revised national contingency plan, the response to and actions to minimize damage from hazardous substances releases shall, to the greatest extent possible, be in accordance with the provisions of the plan. The President may, from time to time, revise and republish the national contingency plan.

### ABATEMENT ACTION

SEC. 106. (a) In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

(b) Any person who willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $5,000 for each day in which such violation occurs or such failure to comply continues.

(c) Within one hundred and eighty days after enactment of this Act, the Administrator of the Environmental Protection Agency shall, after consultation with the Attorney General, establish and publish guidelines for using the imminent hazard, enforcement, and emergency response authorities of this section and other existing statutes administered by the Administrator of the Environmental Protection Agency to effectuate the responsibilities and powers created by this Act. Such guidelines shall to the extent practicable be consistent with the national hazardous substance response plan, and shall include, at a minimum, the assignment of responsibility for coordinating response actions with the issuance of administrative orders, enforcement of standards and permits, the gathering of information, and other imminent hazard and emergency powers authorized by (1) sections 311(c)(2), 308, 309, and 504(a) of the Federal Water Pollution Control Act, (2) sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act, (3) sections 1445 and 1431 of the Safe Drinking Water Act, (4) sections 113, 114, and 303 of the Clean Air Act, and (5) section 7 of the Toxic Substances Control Act.

### LIABILITY

SEC. 107. (a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

(b) There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

(c)(1) Except as provided in paragraph (2) of this subsection, the liability under this section of an owner or operator or other responsible person for each release of a hazardous substance or incident involving release of a hazardous substance shall not exceed—

(A) for any vessel which carries any hazardous substance as cargo or residue, $300 per gross ton, or $5,000,000, whichever is greater;

(B) for any other vessel, $300 per gross ton, or $500,000, whichever is greater;

(C) for any motor vehicle, aircraft, pipeline (as defined in the Hazardous Liquid Pipeline Safety Act of 1979), or rolling stock, $50,000,000 or such lesser amount as the President shall establish by regulation, but in no event less than $5,000,000 (or, for releases of hazardous substances as defined in section 101(14)(A) of this title into the navigable waters, $8,000,000). Such regulations shall take into account the size, type, location, storage, and handling capacity and other matters relating to the likelihood of release in each such class and to the economic impact of such limits on each such class; or

(D) for any facility other than those specified in subparagraph (C) of this paragraph, the total of all costs of response plus $50,000,000 for any damages under this title.

(2) Notwithstanding the limitations in paragraph (1) of this subsection, the liability of an owner or operator or other responsible person under this section shall be the

full and total costs of response and damages, if (A)(i) the release or threat of release of a hazardous substance was the result of willful misconduct or willful negligence within the privity or knowledge of such person, or (ii) the primary cause of the release was a violation (within the privity or knowledge of such person) of applicable safety, construction, or operating standards or regulations; or (B) such person fails or refuses to provide all reasonable cooperation and assistance requested by a responsible public official in connection with response activities under the national contingency plan with respect to regulated carriers subject to the provisions of title 49 of the United States Code or vessels subject to the provisions of title 33 or 46 of the United States Code, subparagraph (A)(ii) of this paragraph shall be deemed to refer to Federal standards or regulations.

(3) If any person who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon order of the President pursuant to section 104 or 106 of this Act, such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action. The President is authorized to commence a civil action against any such person to recover the punitive damages, which shall be in addition to any costs recovered from such person pursuant to section 112(c) of this Act. Any moneys received by the United States pursuant to this subsection shall be deposited in the Fund.

(d) No person shall be liable under this title for damages as a result of actions taken or omitted in the course of rendering care, assistance, or advice in accordance with the national contingency plan or at the direction of an onscene coordinator appointed under such plan, with respect to an incident creating a danger to public health or welfare or the environment as a result of any release of a hazardous substance or the threat thereof. This subsection shall

not preclude liability for damages as the result of gross negligence or intentional misconduct on the part of such person. For the purposes of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.

(e)(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

(2) Nothing in this title, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

(f) In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State: *Provided, however,* That no liability to the United States or State shall be imposed under subparagraph (C) of subsection (a), where the party sought to be charged has demonstrated that the damages to natural resources complained of were specifically identified as an irreversible and irretrievable commitment of natural resources in an environmental impact statement, or other comparable environment analysis, and the decision to grant a permit or license authorizes such commitment of natural resources, and the facility or project was otherwise operating within the terms of its permit or license. The President, or the authorized representative of any State, shall act on behalf of the

public as trustee of such natural resources to recover for such damages. Sums recovered shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government or the State government, but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources. There shall be no recovery under the authority of subparagraph (C) of subsection (a) where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act.

(g) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government shall be subject to, and comply with, this Act in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under this section.

(h) The owner or operator of a vessel shall be liable in accordance with this section and as provided under section 114 of this Act notwithstanding any provision of the Act of March 3, 1851 (46 U.S.C. 183ff).

(i) No person (including the United States or any State) may recover under the authority of this section for any response costs or damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance.

(j) Recovery by any person (including the United States or any State) for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance. In addition, costs of response incurred by the Federal Government in connection with a discharge specified in section 101(10)(B) or (C) shall be recoverable in an action brought under section 309(b) of the Clean Water Act.

(k)(1) The liability established by this section or any other law for the owner or operator of a hazardous waste disposal facility which has received a permit under subtitle C of the Solid Waste Disposal Act, shall be transferred to and assumed by the Post-closure Liability Fund established by section 232 of this Act when—

(A) such facility and the owner and operator thereof has complied with the requirements of subtitle C of the Solid Waste Disposal Act and regulations issued thereunder, which may affect the performance of such facility after closure; and

(B) such facility has been closed in accordance with such regulations and the conditions of such permit, and such facility and the surrounding area have been monitored as required by such regulations and permit conditions for a period not to exceed five years after closure to demonstrate that there is no substantial likelihood that any migration offsite or release from confinement of any hazardous substance or other risk to public health or welfare will occur.

(2) Such transfer of liability shall be effective ninety days after the owner or operator of such facility notifies the Administrator of the Environmental Protection Agency (and the State where it has an authorized program under section 3006(b) of the Solid Waste Disposal Act) that the conditions imposed by this subsection have been satisfied. If within such ninety-day period the Administrator of the Environmental Protection Agency or such State

determines that any such facility has not complied with all the conditions imposed by this subsection or that insufficient information has been provided to demonstrate such compliance, the Administrator or such State shall so notify the owner and operator of such facility and the administrator of the Fund established by section 232 of this Act, and the owner and operator of such facility shall continue to be liable with respect to such facility under this section and other law until such time as the Administrator and such State determines that such facility has complied with all conditions imposed by this subsection. A determination by the Administrator or such State that a facility has not complied with all conditions imposed by this subsection or that insufficient information has been supplied to demonstrate compliance, shall be a final administrative action for purposes of judicial review. A request for additional information shall state in specific terms the data required.

(3) In addition to the assumption of liability of owners and operators under paragraph (1) of this subsection, the Post-closure Liability Fund established by section 232 of this Act may be used to pay costs of monitoring and care and maintenance of a site incurred by other persons after the period of monitoring required by regulations under subtitle C of the Solid Waste Disposal Act for hazardous waste disposal facilities meeting the conditions of paragraph (1) of this subsection.

(4)(A) Not later than one year after the date of enactment of this Act, the Secretary of the Treasury shall conduct a study and shall submit a report thereon to the Congress on the feasibility of establishing or qualifying an optional system of private insurance for postclosure financial responsibility for hazardous waste disposal facilities to which this subsection applies. Such study shall include a specification of adequate and realistic minimum standards to assure that any such privately placed insurance will carry out the purposes of this subsection in a reliable, enforceable, and practical manner. Such a study shall include an examination of the public and private incentives, programs, and actions necessary to make privately placed insurance a practical and effective option to the financing system for the Post-closure Liability Fund provided in title II of this Act.

(B) Not later than eighteen months after the date of enactment of this Act and after a public hearing, the President shall by rule determine whether or not it is feasible to establish or qualify an optional system of private insurance for postclosure financial responsibility for hazardous waste disposal facilities to which this subsection applies. If the President determines the establishment or qualification of such a system would be infeasible, he shall promptly publish an explanation of the reasons for such a determination. If the President determines the establishment or qualification of such a system would be feasible, he shall promptly publish notice of such determination. Not later than six months after an affirmative determination under the preceding sentence and after a public hearing, the President shall by rule promulgate adequate and realistic minimum standards which must be met by any such privately placed insurance, taking into account the purposes of this Act and this subsection. Such rules shall also specify reasonably expeditious procedures by which privately placed insurance plans can qualify as meeting such minimum standards.

(C) In the event any privately placed insurance plan qualifies under subparagraph (B), any person enrolled in, and complying with the terms of, such plan shall be excluded from the provisions of paragraphs (1), (2), and (3) of this subsection and exempt from the requirements to pay any tax or fee to the Post-closure Liability Fund under title II of this Act.

(D) The President may issue such rules and take such other actions as are necessary to effectuate the purposes of this paragraph.

FINANCIAL RESPONSIBILITY

Sec. 108. (a)(1) The owner or operator of each vessel (except a non-self-propelled

barge that does not carry hazardous substances as cargo) over three hundred gross tons that uses any port or place in the United States or the navigable waters or any offshore facility, shall establish and maintain, in accordance with regulations promulgated by the President, evidence of financial responsibility of $300 per gross ton (or for a vessel carrying hazardous substances as cargo, or $5,000,000, whichever is greater). Financial responsibility may be established by any one, or any combination, of the following: insurance, guarantee, surety bond, or qualification as a self-insurer. Any bond filed shall be issued by a bonding company authorized to do business in the United States. In cases where an owner or operator owns, operates, or charters more than one vessel subject to this subsection, evidence of financial responsibility need be established only to meet the maximum liability applicable to the largest of such vessels.

(2) The Secretary of the Treasury shall withhold or revoke the clearance required by section 4197 of the Revised Statutes of the United States of any vessel subject to this subsection that does not have certification furnished by the President that the financial responsibility provisions of paragraph (1) of this subsection have been complied with.

(3) The Secretary of Transportation, in accordance with regulations issued by him, shall (A) deny entry to any port or place in the United States or navigable waters to, and (B) detain at the port or place in the United States from which it is about to depart for any other port or place in the United States, any vessel subject to this subsection that, upon request, does not produce certification furnished by the President that the financial responsibility provisions of paragraph (1) of this subsection have been complied with.

(b)(1) Beginning not earlier than five years after the date of enactment of this Act, the President shall promulgate requirements (for facilities in addition to those under subtitle C of the Solid Waste Disposal Act and other Federal law) that

classes of facilities establish and maintain evidence of financial responsibility consistent with the degree and duration of risk associated with the production, transportation, treatment, storage, or disposal of hazardous substances. Not later than three years after the date of enactment of the Act, the President shall identify those classes for which requirements will be first developed and publish notice of such identification in the Federal Register. Priority in the development of such requirements shall be accorded to those classes of facilities, owners, and operators which the President determines present the highest level of risk of injury.

(2) The level of financial responsibility shall be initially established, and, when necessary, adjusted to protect against the level of risk which the President in his discretion believes is appropriate based on the payment experience of the Fund, commercial insurers, courts settlements and judgments, and voluntary claims satisfaction. To the maximum extent practicable, the President shall cooperate with and seek the advice of the commercial insurance industry in developing financial responsibility requirements.

(3) Regulations promulgated under this subsection shall incrementally impose financial responsibility requirements over a period of not less than three and no more than six years after the date of promulgation. Where possible, the level of financial responsibility which the President believes appropriate as a final requirement shall be achieved through incremental, annual increases in the requirements.

(4) Where a facility is owned or operated by more than one person, evidence of financial responsibility covering the facility may be established and maintained by one of the owners or operators, or, in consolidated form, by or on behalf of two or more owners or operators. When evidence of financial responsibility is established in a consolidated form, the proportional share of each participant shall be shown. The evidence shall be accompanied by a statement authorizing the applicant to act for

and in behalf of each participant in submitting and maintaining the evidence of financial responsibility.

(5) The requirements for evidence of financial responsibility for motor carriers covered by this Act shall be determined under section 30 of the Motor Carrier Act of 1980, Public Law 96–296.

(c) Any claim authorized by section 107 or 111 may be asserted directly against any guarantor providing evidence of financial responsibility as required under this section. In defending such a claim, the guarantor may invoke all rights and defenses which would be available to the owner or operator under this title. The guarantor may also invoke the defense that the incident was caused by the willful misconduct of the owner or operator, but such guarantor may not invoke any other defense that such guarantor might have been entitled to invoke in a proceeding brought by the owner or operator against him.

(d) Any guarantor acting in good faith against which claims under this Act are asserted as a guarantor shall be liable under section 107 or section 112(c) of this title only up to the monetary limits of the policy of insurance or indemnity contract such guarantor has undertaken or of the guaranty of other evidence of financial responsibility furnished under section 108 of this Act, and only to the extent that liability is not excluded by restrictive endorsement: *Provided,* That this subsection shall not alter the liability of any person under section 107 of this Act.

#### PENALTY

SEC. 109. Any person who, after notice and an opportunity for a hearing, is found to have failed to comply with the requirements of section 108, the regulations issued thereunder, or with any denial or detention order shall be liable to the United States for a civil penalty, not to exceed $10,000 for each day of violation.

#### EMPLOYEE PROTECTION

SEC. 110. (a) No person shall fire or in any other way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of the fact that such employee or representative has provided information to a State or to the Federal Government, filed, instituted, or caused to be filed or instituted any proceeding under this Act, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this Act.

(b) Any employee or a representative of employees who believes that he has been fired or otherwise discriminated against by any person in violation of subsection (a) of this section may, within thirty days after such alleged violation occurs, apply to the Secretary of Labor for a review of such firing or alleged discrimination. A copy of the application shall be sent to such person, who shall be the respondent. Upon receipt of such application, the Secretary of Labor shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing at the request of any party to such review to enable the parties to present information relating to such alleged violation. The parties shall be given written notice of the time and place of the hearing at least five days prior to the hearing. Any such hearing shall be of record and shall be subject to section 554 of title 5, United States Code. Upon receiving the report of such investigation, the Secretary of Labor shall make findings of fact. If he finds that such violation did occur, he shall issue a decision, incorporating an order therein and his findings, requiring the party committing such violation to take such affirmative action to abate the violation as the Secretary of Labor deems appropriate, including, but not limited to, the rehiring or reinstatement of the employee or representative of employees to his former position with compensation. If he finds that there was no such violation, he shall issue an order denying the application. Such order issued by the Secretary of Labor under this subparagraph shall be subject to judicial review in the same manner as or-

ders and decisions are subject to judicial review under this Act.

(c) Whenever an order is issued under this section to abate such violation, at the request of the applicant a sum equal to the aggregate amount of all costs and expenses (including the attorney's fees) determined by the Secretary of Labor to have been reasonably incurred by the applicant for, or in connection with, the institution and prosecution of such proceedings, shall be assessed against the person committing such violation.

(d) This section shall have no application to any employee who acting without discretion from his employer (or his agent) deliberately violates any requirement of this Act.

(e) The President shall conduct continuing evaluations of potential loss of shifts of employment which may result from the administration or enforcement of the provisions of this Act, including, where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement. Any employee who is discharged, or laid off, threatened with discharge or layoff, or otherwise discriminated against by any person because of the alleged results of such administration or enforcement, or any representative of such employee, may request the President to conduct a full investigation of the matter and, at the request of any party, shall hold public hearings, require the parties, including the employer involved, to present information relating to the actual or potential effect of such administration or enforcement on employment and any alleged discharge, layoff, or other discrimination, and the detailed reasons or justification therefore. Any such hearing shall be of record and shall be subject to section 554 of title 5, United States Code. Upon receiving the report of such investigation, the President shall make findings of fact as to the effect of such administration or enforcement on employment and on the alleged discharge, layoff, or discrimination and shall make such recommendations as he deems appro-

priate. Such report, findings, and recommendations shall be available to the public. Nothing in this subsection shall be construed to require or authorize the President or any State to modify or withdraw any action, standard, limitation, or any other requirement of this Act.

USES OF FUND

SEC. 111. (a) The President shall use the money in the Fund for the following purposes:

(1) payment of governmental response costs incurred pursuant to section 104 of this title, including costs incurred pursuant to the Intervention on the High Seas Act;

(2) payment of any claim for necessary response costs incurred by any other person as a result of carrying out the national contingency plan established under section 311(c) of the Clean Water Act and amended by section 105 of this title: *Provided, however,* That such costs must be approved under said plan and certified by the responsible Federal official;

(3) payment of any claim authorized by subsection (b) of this section and finally decided pursuant to section 112 of this title, including those costs set out in subsection 112(c)(3) of this title; and

(4) payment of costs specified under subsection (c) of this section.

The President shall not pay for any administrative costs or expenses out of the Fund unless such costs and expenses are reasonably necessary for and incidental to the implementation of this title.

(b) Claims asserted and compensable but unsatisfied under provisions of section 311 of the Clean Water Act, which are modified by section 304 of this Act may be asserted against the Fund under this title; and other claims resulting from a release or threat of release of a hazardous substance from a vessel or a facility may be asserted against the Fund under this title for injury to, or destruction or loss of, natural resources, including cost for damage assessment: *Provided, however,* That any such claim may be asserted only by the President, as

trustee, for natural resources over which the United States has sovereign rights, or natural resources within the territory or the fishery conservation zone of the United States to the extent they are managed or protected by the United States, or by any State for natural resources within the boundary of that State belonging to, managed by, controlled by, or appertaining to the State.

(c) Uses of the Fund under subsection (a) of this section include—

(1) the costs of assessing both short-term and long-term injury to, destruction of, or loss of any natural resources resulting from a release of a hazardous substance;

(2) the costs of Federal or State efforts in the restoration, rehabilitation, or replacement or acquiring the equivalent of any natural resources injured, destroyed, or lost as a result of a release of a hazardous substance;

(3) subject to such amounts as are provided in appropriation Acts, the costs of a program to identify, investigate, and take enforcement and abatement action against releases of hazardous substances;

(4) the costs of epidemiologic studies, development and maintenance of a registry of persons exposed to hazardous substances to allow long-term health effect studies, and diagnostic services not otherwise available to determine whether persons in populations exposed to hazardous substances in connection with a release or a suspected release are suffering from long-latency diseases;

(5) subject to such amounts as are provided in appropriation Acts, the costs of providing equipment and similar overhead, related to the purposes of this Act and section 311 of the Clean Water Act, and needed to supplement equipment and services available through contractors or other non-Federal entities, and of establishing and maintaining damage assessment capability, for any Federal agency involved in strike forces, emergency task

forces, or other response teams under the national contingency plan; and

(6) subject to such amounts as are provided in appropriation Acts, the costs of a program to protect the health and safety of employees involved in response to hazardous substance releases. Such program shall be developed jointly by the Environmental Protection Agency, the Occupational Safety and Health Administration, and the National Institute for Occupational Safety and Health and shall include, but not be limited to, measures for identifying and assessing hazards to which persons engaged in removal, remedy, or other response to hazardous substances may be exposed, methods to protect workers from such hazards, and necessary regulatory and enforcement measures to assure adequate protection of such employees.

(d)(1) No money in the Fund may be used under subsection (c)(1) and (2) of this section, nor for the payment of any claim under subsection (b) of this section, where the injury, destruction, or loss of natural resources and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act.

(2) No money in the Fund may be used for the payment of any claim under subsection (b) of this section where such expenses are associated with injury or loss resulting from long-term exposure to ambient concentrations of air pollutants from multiple or diffuse sources.

(e)(1) Claims against or presented to the Fund shall not be valid or paid in excess of the total money in the Fund at any one time. Such claims become valid only when additional money is collected, appropriated, or otherwise added to the Fund. Should the total claims outstanding at any time exceed the current balance of the Fund, the President shall pay such claims, to the extent authorized under this section, in full in the order in which they were finally determined.

(2) In any fiscal year, 85 percent of the money credited to the Fund under title II

of this Act shall be available only for the purposes specified in paragraphs (1), (2), and (4) of subsection (a) of this section.

(3) No money in the Fund shall be available for remedial action, other than actions specified in subsection (c) of this section, with respect to federally owned facilities.

(4) Paragraphs (1) and (4) of subsection (a) of this section shall in the aggregate be subject to such amounts as are provided in appropriation Acts.

(f) The President is authorized to promulgate regulations designating one or more Federal officials who may obligate money in the Fund in accordance with this section or portions thereof. The President is also authorized to delegate authority to obligate money in the Fund or to settle claims to officials of a State operating under a contract or cooperative agreement with the Federal Government pursuant to section 104(d) of this title.

(g) The President shall provide for the promulgation of rules and regulations with respect to the notice to be provided to potential injured parties by an owner and operator of any vessel, or facility from which a hazardous substance has been released. Such rules and regulations shall consider the scope and form of the notice which would be appropriate to carry out the purposes of this title. Upon promulgation of such rules and regulations, the owner and operator of any vessel or facility from which a hazardous substance has been released shall provide notice in accordance with such rules and regulations. With respect to releases from public vessels, the President shall provide such notification as is appropriate to potential injured parties. Until the promulgation of such rules and regulations, the owner and operator of any vessel or facility from which a hazardous substance has been released shall provide reasonable notice to potential injured parties by publication in local newspapers serving the affected area.

(h)(1) In accordance with regulations promulgated under section 301(c) of this Act, damages for injury to, destruction of, or loss of natural resources resulting from a release of a hazardous substance, for the purposes of this Act and section 311(f)(4) and (5) of the Federal Water Pollution Control Act, shall be assessed by Federal officials designated by the President under the national contingency plan published under section 105 of the Act, and such officials shall act for the President as trustee under this section and section 311(f)(5) of the Federal Water Pollution Control Act.

(2) Any determination or assessment of damages for injury to, destruction of, or loss of natural resources for the purposes of this Act and section 311(f)(4) and (5) of the Federal Water Pollution Control Act shall have the force and effect of a rebuttable presumption on behalf of any claimant (including a trustee under section 107 of this Act or a Federal agency) in any judicial or adjudicatory administrative proceeding under this Act or section 311 of the Federal Water Pollution Control Act.

(i) Except in a situation requiring action to avoid an irreversible loss of natural resources or to prevent or reduce any continuing danger to natural resources or similar need for emergency action, funds may not be used under this Act for the restoration, rehabilitation, or replacement or acquisition of the equivalent of any natural resources until a plan for the use of such funds for such purposes has been developed and adopted by affected Federal agencies and the Governor or Governors of any State having sustained damage to natural resources within its borders, belonging to, managed by or appertaining to such State, after adequate public notice and opportunity for hearing and consideration of all public comment.

(j) The President shall use the money in the Post-closure Liability Fund for any of the purposes specified in subsection (a) of this section with respect to a hazardous waste disposal facility for which liability has transferred to such fund under section 107(k) of this Act, and, in addition, for payment of any claim or appropriate request for costs of response, damages, or other compensation for injury or loss under section 107 of this Act or any other State

or Federal law, resulting from a release of a hazardous substance from such a facility.

(k) The Inspector General of each department or agency to which responsibility to obligate money in the Fund is delegated shall provide an audit review team to audit all payments, obligations, reimbursements, or other uses of the Fund, to assure that the Fund is being properly administered and that claims are being appropriately and expeditiously considered. Each such Inspector General shall submit to the Congress an interim report one year after the establishment of the Fund and a final report two years after the establishment of the Fund. Each such Inspector General shall thereafter provide such auditing of the Fund as is appropriate. Each Federal agency shall cooperate with the Inspector General in carrying out this subsection.

(1) To the extent that the provisions of this Act permit, a foreign claimant may assert a claim to the same extent that a United States claimant may assert a claim if—

(1) the release of a hazardous substance occurred (A) in the navigable waters or (B) in or on the territorial sea or adjacent shoreline of a foreign country of which the claimant is a resident;

(2) the claimant is not otherwise compensated for his loss;

(3) the hazardous substance was released from a facility or from a vessel located adjacent to or within the navigable waters or was discharged in connection with activities conducted under the Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331 et seq.) or the Deepwater Port Act of 1974, as amended (33 U.S.C. 1501 et seq.); and

(4) recovery is authorized by a treaty or an executive agreement between the United States and foreign country involved, or if the Secretary of State, in consultation with the Attorney General and other appropriate officials, certifies that such country provides a comparable remedy for United States claimants.

CLAIMS PROCEDURE

SEC. 112. (a) All claims which may be asserted against the Fund pursuant to section 111 of this title shall be presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 107 of this title. In any case where the claim has not been satisfied within sixty days of presentation in accordance with this subsection, the claimant may elect to commence an action in court against such owner, operator, guarantor, or other person or to present the claim to the Fund for payment.

(b)(1) The President shall prescribe appropriate forms and procedures for claims filed hereunder, which shall include a provision requiring the claimant to make a sworn verification of the claim to the best of his knowledge. Any person who knowingly gives or causes to be given any false information as a part of any such claim shall, upon conviction, be fined up to $5,000 or imprisoned for not more than one year, or both.

(2)(A) Upon receipt of any claim, the President shall as soon as practicable inform any known affected parties of the claim and shall attempt to promote and arrange a settlement between the claimant and any person who may be liable. If the claimant and alleged liable party or parties can agree upon a settlement, it shall be final and binding upon the parties thereto, who will be deemed to have waived all recourse against the Fund.

(B) Where a liable party is unknown or cannot be determined, the claimant and the President shall attempt to arrange settlement of any claim against the Fund. The President is authorized to award and make payment of such a settlement, subject to such proof and procedures as he may promulgate by regulation.

(C) Except as provided in subparagraph (D) of this paragraph, the President shall use the facilities and services of private insurance and claims adjusting organiza-

tions or State agencies in implementing this subsection and may contract to pay compensation for those facilities and services. Any contract made under the provisions of this paragraph may be made without regard to the provisions of section 3709 of the Revised Statutes, as amended (41 U.S.C. 5), upon a showing by the President that advertising is not reasonably practicable. When the services of a State agency are used hereunder, no payment may be made on a claim asserted on behalf of that State or any of its agencies or subdivisions unless the payment has been approved by the President.

(D) To the extent necessitated by extraordinary circumstances, where the services of such private organizations or State agencies are inadequate, the President may use Federal personnel to implement this subsection.

(3) If no settlement is reached within forty-five days of filing of a claim through negotiation pursuant to this section, the President may, if he is satisfied that the information developed during the processing of the claim warrants it, make and pay an award of the claim. If the claimant is dissatisfied with the award, he may appeal it in the manner provided for in subparagraph (G) of paragraph (4) of this subsection. If the President declines to make an award, he shall submit the claim for decision to a member of the Board of Arbitrators established pursuant to paragraph (4).

(4)(A) Within ninety days of the enactment of this Act, the President shall establish a Board of Arbitrators to implement this subsection. The Board shall consist of as many members as the President may determine will be necessary to implement this subsection expeditiously, and he may increase or decrease the size of the Board at any time in his discretion in order to enable it to respond to the demands of such implementation. Each member of the Board shall be selected through utilization of the procedures of the American Arbitration Association: *Provided, however,* That no regular employee of the President or any of the Federal departments, adminis-

trations, or agencies to whom he delegated responsibilities under this Act shall act as a member of the Board.

(B) Hearings conducted hereunder shall be public and shall be held in such place as may be agreed upon by the parties thereto, or, in the absence of such agreement, in such place as the President determines, in his discretion, will be most convenient for the parties thereto.

(C) Hearings before a member of the Board shall be informal, and the rules of evidence prevailing in judicial proceedings need not be required. Each member of the Board shall have the power to administer oaths and to subpena the attendance and testimony of witnesses and the production of books, records, and other evidence relative or pertinent to the issues presented to him for decision. Testimony may be taken by interrogatory or deposition. Each person appearing before a member of the Board shall have the right to counsel. Subpenas shall be issued and enforced in accordance with procedures in subsection (d) of section 555 of title 5, United States Code, and rules promulgated by the President. If a person fails or refuses to obey a subpena, the President may invoke the aid of the district court of the United States where the person is found, resides, or transacts business in requiring the attendance and testimony of the person and the production by him of books, papers, documents, or any tangible things.

(D) In any proceeding before a member of the Board, the claimant shall bear the burden of proving his claim. Should a member of the Board determine that further investigations, monitoring, surveys, testing, or other information gathering would be useful and necessary in deciding the claim, he may request the President in writing to undertake such activities pursuant to section 104(b) of this title. The President shall dispose of such a request in his sole discretion, taking into account various competing demands and the availability of the technical and financial capacity to conduct such studies, monitoring, and investigations. Should the President decide

to undertake the requested actions, all time requirements for the processing and deciding of claims hereunder shall be suspended until the President reports the results thereof to the member of the Board.

(E) All costs and expenses approved by the President attributable to the employment of any member of the Board shall be payable from the Fund, including fees and mileage expenses for witnesses summoned by such members on the same basis and to the same extent as if such witnesses were summoned before a district court of the United States.

(F) All decisions rendered by members of the Board shall be in writing, with notification to all appropriate parties, and shall be rendered within ninety days of submission of a claim to a member, unless all the parties to the claim agree in writing to an extension or unless the President extends the time limit pursuant to subparagraph (I) of this subsection.

(G) All decisions rendered by members of the Board shall be final, and any party to the proceeding may appeal such a decision within thirty days of notification of the award or decision. Any such appeal shall be made to the Federal district court for the district where the arbitral hearing took place. In any such appeal, the award or decision of the member of the Board shall be considered binding and conclusive, and shall not be overturned except for arbitrary or capricious abuse of the member's discretion: *Provided, however,* That no such award or decision shall be admissible as evidence of any issue of fact or law in any proceeding brought under any other provision of this Act or under any other provision of law. Nor shall any prearbitral settlement reached pursuant to subsection (b)(2)(A) of this section be admissible as evidence in any such proceeding.

(H) Within twenty days of the expiration of the appeal period for any arbitral award or decision, or within twenty days of the final judicial determination of any appeal taken pursuant to this subsection, the President shall pay any such award from the Fund. The President shall determine the method, terms, and time of payment.

(I) If at any time the President determines that, because of a large number of claims arising from any incident or set of incidents, it is in the best interests of the parties concerned, he may extend the time for prearbitral negotiation or for rendering an arbitral decision pursuant to this subsection by a period not to exceed sixty days. He may also group such claims for submission to a member of the Board of Arbitrators.

(c)(1) Payment of any claim by the Fund under this section shall be subject to the United States Government acquiring by subrogation the rights of the claimant to recover those costs of removal or damages for which it has compensated the claimant from the person responsible or liable for such release.

(2) Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of action for such damages and costs of removal that the claimant has under this Act or any other law.

(3) Upon request of the President, the Attorney General shall commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant pursuant to this title, and, without regard to any limitation of liability, all interest, administrative and adjudicative costs, and attorney's fees incurred by the Fund by reason of the claim. Such an action may be commenced against any owner, operator, or guarantor, or against any other person who is liable, pursuant to any law, to the compensated claimant or to the Fund, for the damages or costs for which compensation was paid.

(d) No claim may be presented, nor may an action be commenced for damages under this title, unless that claim is presented or action commenced within three years from the date of the discovery of the loss or the date of enactment of this Act, whichever is later: *Provided, however,* That the

time limitations contained herein shall not begin to run against a minor until he reaches eighteen years of age or a legal representative is duly appointed for him, nor against an incompetent person until his incompetency ends or a legal representative is duly appointed for him.

(e) Regardless of any State statutory or common law to the contrary, no person who asserts a claim against the Fund pursuant to this title shall be deemed or held to have waived any other claim not covered or assertable against the Fund under this title arising from the same incident, transaction, or set of circumstances, nor to have split a cause of action. Further, no person asserting a claim against the Fund pursuant to this title shall as a result of any determination of a question of fact or law made in connection with that claim be deemed or held to be collaterally estopped from raising such question in connection with any other claim not covered or assertable against the Fund under this title arising from the same incident, transaction, or set of circumstances.

LITIGATION, JURISDICTION AND VENUE

SEC. 113. (a) Review of any regulation promulgated under this Act may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia. Any such application shall be made within ninety days from the date of promulgation of such regulations. Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs.

(b) Except as provided in subsection (a) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this Act, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or

has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

(c) The provisions of subsections (a) and (b) of this section shall not apply to any controversy or other matter resulting from the assessment of collection of any tax, as provided by title II of this Act, or to the review of any regulation promulgated under the Internal Revenue Code of 1954.

(d) No provision of this Act shall be deemed or held to moot any litigation concerning any release of any hazardous substance, or any damages associated therewith, commenced prior to enactment of this Act.

RELATIONSHIP TO OTHER LAW

SEC. 114. (a) Nothing in this Act shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.

(b) Any person who receives compensation for removal costs or damages or claims pursuant to this Act shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law. Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this Act.

(c) Except as provided in this Act, no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under this title. Nothing in this section shall preclude any State from using general revenues for such a fund, or from imposing a tax or fee upon any person or upon any substance in order to finance the purchase or prepositioning of hazardous substance response equipment or other preparations for the response to a

release of hazardous substances which affects such State.

(d) Except as provided in this title, no owner or operator of a vessel or facility who establishes and maintains evidence of financial responsibility in accordance with this title shall be required under any State or local law, rule, or regulation to establish or maintain any other evidence of financial responsibility in connection with liability for the release of a hazardous substance from such vessel or facility. Evidence of compliance with the financial responsibility requirements of this title shall be accepted by a State in lieu of any other requirement of financial responsibility imposed by such State in connection with liability for the release of a hazardous substance from such vessel or facility.

AUTHORITY TO DELEGATE, ISSUE REGULATIONS

SEC. 115. The President is authorized to delegate and assign any duties or powers imposed upon or assigned to him and to promulgate any regulations necessary to carry out the provisions of this title.

## TITLE II—HAZARDOUS SUBSTANCE RESPONSE REVENUE ACT OF 1980

SEC. 201. SHORT TITLE; AMENDMENT OF 1954 CODE.

(a) SHORT TITLE.—This title may be cited as the "Hazardous Substance Response Revenue Act of 1980".

(b) AMENDMENT OF 1954 CODE.—Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1954.

### Subtitle A—Imposition of Taxes on Petroleum and Certain Chemicals

SEC. 211. IMPOSITION OF TAXES.

(a) GENERAL RULE.—Subtitle D (relating to miscellaneous excise taxes) is amended by inserting after chapter 37 the following new chapter:

## "CHAPTER 38—ENVIRONMENTAL TAXES

"SUBCHAPTER A. Tax on petroleum.

"SUBCHAPTER B. Tax on certain chemicals.

### "Subchapter A—Tax on Petroleum

"Sec. 4611. Imposition of tax.

"Sec. 4612. Definitions and special rules.

"SEC. 4611. IMPOSITION OF TAX.

"(a) **General Rule.**—There is hereby imposed a tax of 0.79 cent a barrel on—

"(1) crude oil received at a United States refinery, and

"(2) petroleum products entered into the United States for consumption, use, or warehousing.

"(b) TAX ON CERTAIN USES AND EXPORTATION.—

"(1) IN GENERAL.—If—

"(A) any domestic crude oil is used in or exported from the United States, and

"(B) before such use or exportation, no tax was imposed on such crude oil under subsection (a),

then a tax of 0.79 cent a barrel is hereby imposed on such crude oil.

"(2) EXCEPTION FOR USE ON PREMISES WHERE PRODUCED.—Paragraph (1) shall not apply to any use of crude oil for extracting oil or natural gas on the premises where such crude oil was produced.

"(c) PERSONS LIABLE FOR TAX.—

"(1) CRUDE OIL RECEIVED AT REFINERY. —The tax imposed by subsection (a)(1) shall be paid by the operator of the United States refinery.

"(2) IMPORTED PETROLEUM PRODUCT. —The tax imposed by subsection (a)(2) shall be paid by the person entering the product for consumption, use, or warehousing.

"(3) TAX ON CERTAIN USES OR EXPORTS. —The tax imposed by subsection (b) shall be paid by the person using or exporting the crude oil, as the case may be.

"(d) TERMINATION.—The taxes imposed by this section shall not apply after September 30, 1985, except that if on September 30, 1983, or September 30, 1984—

"(1) the unobligated balance in the Hazardous Substance Response Trust Fund as of such date exceeds $900,000,-000, and

"(2) the Secretary, after consultation with the Administrator of the Environmental Protection Agency, determines that such unobligated balance will exceed $500,000,000 on September 30 of the following year if no tax is imposed under section 4611 or 4661 during the calendar year following the date referred to above,

then no tax shall be imposed by this section during the first calendar year beginning after the date referred to in paragraph (1).

"SEC. 4612. DEFINITIONS AND SPECIAL RULES.

"(a) DEFINITIONS.—For purposes of this subchapter—

"(1) CRUDE OIL.—The term 'crude oil' includes crude oil condensates and natural gasoline.

"(2) DOMESTIC CRUDE OIL.—The term 'domestic crude oil' means any crude oil produced from a well located in the United States.

"(3) PETROLEUM PRODUCT.—The term 'petroleum product' includes crude oil.

"(4) UNITED STATES.—

"(A) IN GENERAL.—The term 'United States' means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, any possession of the United States, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

"(B) UNITED STATES INCLUDES CONTINENTAL SHELF AREAS.—The principles of section 638 shall apply for purposes of the term 'United States'.

"(C) UNITED STATES INCLUDES FOREIGN TRADE ZONES.—The term 'United States' includes any foreign trade zone of the United States.

"(5) UNITED STATES REFINERY.—The term 'United States refinery' means any facility in the United States at which crude oil is refined.

"(6) REFINERIES WHICH PRODUCE NATURAL GASOLINE.—In the case of any United States refinery which produces natural gasoline from natural gas, the gasoline so produced shall be treated as received at such refinery at the time so produced.

"(7) PREMISES.—The term 'premises' has the same meaning as when used for purposes of determining gross income from the property under section 613.

"(8) BARREL.—The term 'barrel' means 42 United States gallons.

"(9) FRACTIONAL PART OF BARREL.—In the case of a fraction of a barrel, the tax imposed by section 4611 shall be the same fraction of the amount of such tax imposed on a whole barrel.

"(b) ONLY 1 TAX IMPOSED WITH RESPECT TO ANY PRODUCT.—No tax shall be imposed by section 4611 with respect to any petroleum product if the person who would be liable for such tax establishes that a prior tax imposed by such section has been imposed with respect to such product.

"(c) DISPOSITION OF REVENUES FROM PUERTO RICO AND THE VIRGIN ISLANDS.—The provisions of subsections (a)(3) and (b)(3) of section 7652 shall not apply to any tax imposed by section 4611.

## "Subchapter B—Tax on Certain Chemicals

"Sec. 4661. Imposition of tax.

"Sec. 4662. Definitions and special rules.

"SEC. 4661. IMPOSITION OF TAX.

"(a) GENERAL RULE.—There is hereby imposed a tax on any taxable chemical sold by the manufacturer, producer, or importer thereof.

"(b) AMOUNT OF TAX.—The amount of the tax imposed by subsection (a) shall be determined in accordance with the following table:

| "In the case of: | The tax is the following amount per ton |
|---|---|
| Acetylene | $4.87 |
| Benzene | 4.87 |
| Butane | 4.87 |

| | |
|---|---|
| Butylene | $4.87 |
| Butadiene | 4.87 |
| Ethylene | 4.87 |
| Methane | 3.44 |
| Naphthalene | 4.87 |
| Propylene | 4.87 |
| Toluene | 4.87 |
| Xylene | 4.87 |
| Ammonia | 2.64 |
| Antimony | 4.45 |
| Antimony trioxide | 3.75 |
| Arsenic | 4.45 |
| Arsenic trioxide | 3.41 |
| Barium sulfide | 2.30 |
| Bromine | 4.45 |
| Cadmium | 4.45 |
| Chlorine | 2.70 |
| Chromium | 4.45 |
| Chromite | 1.52 |
| Potassium dichromate | 1.69 |
| Sodium dichromate | 1.87 |
| Cobalt | 4.45 |
| Cupric sulfate | 1.87 |
| Cupric oxide | 3.59 |
| Cuprous oxide | 3.97 |
| Hydrochloric acid | 0.29 |
| Hydrogen fluoride | 4.23 |
| Lead oxide | 4.14 |
| Mercury | 4.45 |
| Nickel | 4.45 |
| Phosphorus | 4.45 |
| Stannous chloride | 2.85 |
| Stannic chloride | 2.12 |
| Zinc chloride | 2.22 |
| Zinc sulfate | 1.90 |
| Potassium hydroxide | 0.22 |
| Sodium hydroxide | 0.28 |
| Sulfuric acid | 0.26 |
| Nitric acid | 0.24 |

"(c) TERMINATION.—No tax shall be imposed under this section during any period during which no tax is imposed under section 4611(a).

"SEC. 4662. DEFINITIONS AND SPECIAL RULES.

"(a) DEFINITIONS.—For purposes of this subchapter—

"(1) TAXABLE CHEMICAL.—Except as provided in subsection (b), the term 'taxable chemical' means any substance—

"(A) which is listed in the table under section 4661(b), and

"(B) which is manufactured or produced in the United States or entered into the United States for consumption, use, or warehousing.

"(2) UNITED STATES.—The term 'United States' has the meaning given such term by section 4612(a)(4).

"(3) IMPORTER.—The term 'importer' means the person entering the taxable chemical for consumption, use, or warehousing.

"(4) TON.—The term 'ton' means 2,000 pounds. In the case of any taxable chemical which is a gas, the term 'ton' means the amount of such gas in cubic feet which is the equivalent of 2,000 pounds on a molecular weight basis.

"(5) FRACTIONAL PART OF TON.—In the case of a fraction of a ton, the tax imposed by section 4661 shall be the same fraction of the amount of such tax imposed on a whole ton.

"(b) EXCEPTIONS; OTHER SPECIAL RULES. —For purposes of this subchapter—

"(1) METHANE OR BUTANE USED AS A FUEL.—Under regulations prescribed by the Secretary, methane or butane shall be treated as a taxable chemical only if it is used otherwise than as a fuel (and, for purposes of section 4661(a), the person so using it shall be treated as the manufacturer thereof).

"(2) SUBSTANCES USED IN THE PRODUCTION OF FERTILIZER.—

"(A) IN GENERAL.—In the case of nitric acid, sulfuric acid, ammonia, or methane used to produce ammonia which is a qualified substance, no tax shall be imposed under section 4661(a).

"(B) QUALIFIED SUBSTANCE.—For purposes of this section, the term 'qualified substance' means any substance—

"(i) used in a qualified use by the manufacturer, producer, or importer,

"(ii) sold for use by the purchaser in a qualified use, or

"(iii) sold for resale by the purchaser to a second purchaser for use by such second purchaser in a qualified use.

"(C) QUALIFIED USE.—For purposes of this subsection, the term 'qualified use' means any use in the manufacture or production of a fertilizer.

"(3) SULFURIC ACID PRODUCED AS A BY-PRODUCT OF AIR POLLUTION CONTROL.—In the case of sulfuric acid produced solely as a byproduct of and on the same site as air pollution control equipment, no tax shall be imposed under section 4661.

"(4) SUBSTANCES DERIVED FROM COAL.—For purposes of this subchapter, the term 'taxable chemical' shall not include any substance to the extent derived from coal.

"(c) USE BY MANUFACTURER, ETC., CONSIDERED SALE.—If any person manufactures, produces, or imports a taxable chemical and uses such chemical, then such person shall be liable for tax under section 4661 in the same manner as if such chemical were sold by such person.

"(d) REFUND OR CREDIT FOR CERTAIN USES.—

"(1) IN GENERAL.—Under regulations prescribed by the Secretary, if—

"(A) a tax under section 4661 was paid with respect to any taxable chemical, and.

"(B) such chemical was used by any person in the manufacture or production of any other substance the sale of which by such person would be taxable under such section,

then an amount equal to the tax so paid shall be allowed as a credit or refund (without interest) to such person in the same manner as if it were an overpayment of tax imposed by such section. In any case to which this paragraph applies, the amount of any such credit or refund shall not exceed the amount of tax imposed by such section on the other substance manufactured or produced.

"(2) USE AS FERTILIZER.—Under regulations prescribed by the Secretary, if—

"(A) a tax under section 4661 was paid with respect to nitric acid, sulfuric acid, ammonia, or methane used to make ammonia without regard to subsection (b)(2), and

"(B) any person uses such substance, or sells such substance for use, as a qualified substance,

then an amount equal to the excess of the tax so paid over the tax determined with regard to subsection (b)(2) shall be allowed as a credit or refund (without interest) to such person in the same manner as if it were an overpayment of tax imposed by this section.

"(e) DISPOSITION OF REVENUES FROM PUERTO RICO AND THE VIRGIN ISLANDS.—The provisions of subsections (a)(3) and (b)(3) of section 7652 shall not apply to any tax imposed by section 4661."

(b) CLERICAL AMENDMENT.—The table of chapters for subtitle D is amended by inserting after the item relating to chapter 37 the following new item:

"CHAPTER 38. Environmental taxes.".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on April 1, 1981.

## Subtitle B—Establishment of Hazardous Substance Response Trust Fund

SEC. 221. ESTABLISHMENT OF HAZARDOUS SUBSTANCE RESPONSE TRUST FUND.

(a) CREATION OF TRUST FUND.—There is established in the Treasury of the United States a trust fund to be known as the "Hazardous Substance Response Trust Fund" (hereinafter in this subtitle referred to as the "Response Trust Fund"), consisting of such amounts as may be appropriated or transferred to such Trust Fund as provided in this section.

(b) TRANSFERS TO RESPONSE TRUST FUND.—

(1) AMOUNTS EQUIVALENT TO CERTAIN TAXES, ETC.—There are hereby appropriated, out of any money in the Treasury not otherwise appropriated, to the Response Trust Fund amounts determined by the Secretary of the Treasury (hereinafter in this subtitle referred to as the "Secretary") to be equivalent to—

(A) the amounts received in the Treasury under section 4611 or 4661 of the Internal Revenue Code of 1954,

(B) the amounts recovered on behalf of the Response Trust Fund under this Act,

(C) all moneys recovered or collected under section 311(b)(6)(B) of the Clean Water Act,

(D) penalties assessed under title I of this Act, and

(E) punitive damages under section 107(c)(8) of this Act.

(2) AUTHORIZATION FOR APPROPRIATIONS.—There is authorized to be appropriated to the Emergency Response Trust Fund for fiscal year—

(A) 1981, $44,000,000,

(B) 1982, $44,000,000,

(C) 1983, $44,000,000,

(D) 1984, $44,000,000, and

(E) 1985, $44,000,000, plus an amount equal to so much of the aggregate amount authorized to be appropriated under subparagraphs (A), (B), (C), and (D) as has not been appropriated before October 1, 1984.

(3) TRANSFER OF FUNDS.—There shall be transferred to the Response Trust Fund—

(A) one-half of the unobligated balance remaining before the date of the enactment of this Act under the Fund in section 311 of the Clean Water Act, and

(B) the amounts appropriated under section 504(b) of the Clean Water Act during any fiscal year.

(c) EXPENDITURES FROM RESPONSE TRUST FUND.—

(1) IN GENERAL.—Amounts in the Response Trust Fund shall be available in connection with releases or threats of releases of hazardous substances into the environment only for purposes of making expenditures which are described in section 111 (other than subsection (j) thereof) of this Act, as in effect on the date of the enactment of this Act, including—

(A) response costs,

(B) claims asserted and compensable but unsatisfied under section 311 of the Clean Water Act,

(C) claims for injury to, or destruction or loss of, natural resources, and

(D) related costs described in section 111(c) of this Act.

(2) LIMITATIONS ON EXPENDITURES.—At least 85 percent of the amounts appropriated to the Response Trust Fund under subsection (b)(1)(A) and (2) shall be reserved—

(A) for the purposes specified in paragraphs (1), (2), and (4) of section 111(a) of this Act, and

(B) for the repayment of advances made under section 223(c), other than advances subject to the limitation of section 223(c)(2)(C).

[Editor's note: Public Law 97–272, the "Department of Housing and Urban Development—Independent Agencies Appropriations Act, 1983," provides the following concerning the Hazardous Substance Response Trust Fund:

## "PAYMENT TO THE HAZARDOUS SUBSTANCE RESPONSE TRUST FUND

For payment to the Hazardous Substance Response Trust Fund as authorized by Public Law 96–510, $40,000,000.

## HAZARDOUS SUBSTANCE RESPONSE TRUST FUND

For necessary expenses to carry out the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, including sections 111(c)(3), (c)(5), (c)(6), and (e)(4), $210,000,000, to be derived from the Hazardous Substance Response Trust Fund, to remain available until expended: Provided, That not to exceed $37,380,000 shall be available for administrative expenses. Funds appropriated under this account may be allocated to other Federal agencies in accordance with section 111(a) of Public Law 96–510: Provided further, That of the funds appropriated under this head, $8,000,000 shall be made available to the Department of Health and Human Ser-

vices, upon enactment, and up to an additional $2,000,000 may be made available by the Administrator to the Department for the performance of specific activities in accordance with section 111(c)(4) of Public Law 96–510, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980: Provided further, That management of all funds made available to the Department shall be consistent with the responsibilities of the Trustee of the Fund, as outlined in section 223(b) of the Act: Provided further, That the administrative expenses contained in the first proviso are increased by $4,708,000: Provided further, That for purposes of carrying out section 3012 of the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. 6933), as added by Public Law 96–482 $10,-000,000, from the funds provided under this head, to remain available until September 30, 1984."]

[*Editor's note:* Public Law 98–45, the "Department of Housing and Urban Development—Independent Agencies Appropriation Act, 1984," provides the following concerning the Hazardous Substance Response Trust Fund:

### "PAYMENT TO THE HAZARDOUS SUBSTANCE RESPONSE TRUST FUND

For payment to the Hazardous Substance Response Trust Fund as authorized by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9601 et seq.), $44,000,000.

### HAZARDOUS SUBSTANCE RESPONSE TRUST FUND

For necessary expenses to carry out the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, including sections 111(c)(3), (c)(5), (c)(6), and (e)(4) (42 U.S.C. 9611), $410,000,000, to be derived from the Hazardous Substance Response Trust Fund, to remain available until expended: *Provided,* That not to exceed $64,000,000 shall be available for administrative expenses. Funds appropriated under this account may be allocated to other Federal agencies in accordance with section 111(a) of Public Law 96:510: *Provided further,* That for performance of specific activities in accordance with section 104(i) of Public Law 96–510, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, $5,000,000 shall be made available to the Department of Health and Human Services on October 1, 1983, to be derived by transfer from the Hazardous Substance Response Trust Fund." ]

SEC. 222. LIABILITY OF UNITED STATES LIMITED TO AMOUNT IN TRUST FUND.

(a) GENERAL RULE.—Any claim filed against the Response Trust Fund may be paid only out of such Trust Fund. Nothing in this Act (or in any amendment made by this Act) shall authorize the payment by the United States Government of any additional amount with respect to any such claim out of any source other than the Response Trust Fund.

(b) ORDER IN WHICH UNPAID CLAIMS ARE TO BE PAID.—If at any time the Response Trust Fund is unable (by reason of subsection (a) or the limitation of section 221(c)(2)) to pay all of the claims payable out of such Trust Fund at such time, such claims shall, to the extent permitted under subsection (a), be paid in full in the order in which they were finally determined.

SEC. 223. ADMINISTRATIVE PROVISIONS.

(a) METHOD OF TRANSFER.—The amounts appropriated by section 221(b)(1) shall be transferred at least monthly from the general fund of the Treasury to the Response Trust Fund on the basis of estimates made by the Secretary of the amounts referred to in such section. Proper adjustments shall be made in the amount subsequently transferred to the extent prior estimates were in excess of or less than the amounts required to be transferred.

(b) MANAGEMENT OF TRUST FUND.—

(1) REPORT.—The Secretary shall be the trustee of the Response Trust Fund, and shall report to the Congress for each fiscal year ending on or after September

30, 1981, on the financial condition and the results of the operations of such Trust Fund during such fiscal year and on its expected condition and operations during the next 5 fiscal years. Such report shall be printed as a House document of the session of the Congress to which the report is made.

(2) INVESTMENT.—It shall be the duty of the Secretary to invest such portion of such Trust Fund as is not, in his judgment, required to meet current withdrawals. Such investments shall be in public debt securities with maturities suitable for the needs of such Trust Fund and bearing interest at rates determined by the Secretary, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities. The income on such investments shall be credited to and form a part of such Trust Fund.

(c) **Authority To Borrow.**—

(1) IN GENERAL.—There are authorized to be appropriated to the Response Trust Fund, as repayable advances, such sums as may be necessary to carry out the purposes of such Trust Fund.

(2) LIMITATIONS ON ADVANCES TO RESPONSE TRUST FUND.—

(A) AGGREGATE ADVANCES.—The maximum aggregate amount of repayable advances to the Response Trust Fund which is outstanding at any one time shall not exceed an amount which the Secretary estimates will be equal to the sum of the amounts which will be appropriated or transferred to such Trust Fund under paragraph (1)(A) of section 221(b) of this Act for the following 12 months, and

(B) ADVANCES FOR PAYMENT OF RESPONSE COSTS.—No amount may be advanced after March 31, 1983, to the Response Trust Fund for the purpose of paying response costs described in section 111(a)(1), (2), or (4), unless such costs are incurred incident to any spill the effects of which the Secretary determines to be catastrophic.

(C) ADVANCES FOR OTHER COSTS.—The maximum aggregate amount advanced to the Response Trust Fund which is outstanding at any one time for the purpose of paying costs other than costs described in section 111(a)(1), (2), or (4) shall not exceed one-third of the amount of the estimate made under subparagraph (A).

(D) FINAL REPAYMENT.—No advance shall be made to the Response Trust Fund after September 30, 1985, and all advances to such Fund shall be repaid on or before such date.

(3) REPAYMENT OF ADVANCES.—Advances made pursuant to this subsection shall be repaid, and interest on such advances shall be paid, to the general fund of the Treasury when the Secretary determines that moneys are available for such purposes in the Trust Fund to which the advance was made. Such interest shall be at rates computed in the same manner as provided in subsection (b) and shall be compounded annually.

## Subtitle C—Post-Closure Tax and Trust Fund

SEC. 231. IMPOSITION OF TAX.

(a) IN GENERAL.—Chapter 38, as added by section 211, is amended by adding at the end thereof the following new subchapter:

### "Subchapter C—Tax on Hazardous Wastes

"Sec. 4681. Imposition of tax.

"Sec. 4682. Definitions and special rules.

"SEC. 4681. IMPOSITION OF TAX.

"(a) GENERAL RULE.—There is hereby imposed a tax on the receipt of hazardous waste at a qualified hazardous waste disposal facility.

"(b) AMOUNT OF TAX.—The amount of the tax imposed by subsection (a) shall be equal to $2.13 per dry weight ton of hazardous waste.

"SEC. 4682. DEFINITIONS AND SPECIAL RULES.

"(a) DEFINITIONS.—For purposes of this subchapter—

"(1) HAZARDOUS WASTE.—The term 'hazardous waste' means any waste—

"(A) having the characteristics identified under section 3001 of the Solid Waste Disposal Act, as in effect on the date of the enactment of this Act (other than waste the regulation of which under such Act has been suspended by Act of Congress on that date), or

"(B) subject to the reporting or recordkeeping requirements of sections 3002 and 3004 of such Act, as so in effect.

"(2) QUALIFIED HAZARDOUS WASTE DISPOSAL FACILITY.—The term 'qualified hazardous waste disposal facility' means any facility which has received a permit or is accorded interim status under section 3005 of the Solid Waste Disposal Act.

"(b) TAX IMPOSED ON OWNER OR OPERATOR. —The tax imposed by section 4681 shall be imposed on the owner or operator of the qualified hazardous waste disposal facility.

"(c) TAX NOT TO APPLY TO CERTAIN WASTES.—The tax imposed by section 4681 shall not apply to any hazardous waste which will not remain at the qualified hazardous waste disposal facility after the facility is closed.

"(d) APPLICABILITY OF SECTION.—The tax imposed by section 4681 shall apply to the receipt of hazardous waste after September 30, 1983, except that if, as of September 30 of any subsequent calendar year, the unobligated balance of the Post-closure Liability Trust Fund exceeds $200,000,000, no tax shall be imposed under such section during the following calendar year.".

(b) CONFORMING AMENDMENT.—The table of subchapters for chapter 38 is amended by adding at the end thereof the following new item:

"Subchapter C—Tax on Hazardous Wastes.".

SEC. 232. POST-CLOSURE LIABILITY TRUST FUND.

(a) CREATION OF TRUST FUND.—There is established in the Treasury of the United States a trust fund to be known as the "Post-closure Liability Trust Fund", con-
sisting of such amounts as may be appropriated, credited, or transferred to such Trust Fund.

(b) EXPENDITURES FROM POST-CLOSURE LIABILITY TRUST FUND.—Amounts in the Post-closure Liability Trust Fund shall be available only for the purposes described in sections 107(k) and 111(j) of this Act (as in effect on the date of the enactment of this Act).

(c) ADMINISTRATIVE PROVISIONS.—The provisions of sections 222 and 223 of this Act shall apply with respect to the Trust Fund established under this section, except that the amount of any repayable advances outstanding at any one time shall not exceed $200,000,000.

## TITLE III—MISCELLANEOUS PROVISIONS

### REPORTS AND STUDIES

SEC. 301. (a)(1) The President shall submit to the Congress, within four years after enactment of this Act, a comprehensive report on experience with the implementation of this Act, including, but not limited to—

(A) the extent to which the Act and Fund are effective in enabling Government to respond to and mitigate the effects of releases of hazardous substances;

(B) a summary of past receipts and disbursements from the Fund;

(C) a projection of any future funding needs remaining after the expiration of authority to collect taxes, and of the threat to public health, welfare, and the environment posed by the projected releases which create any such needs;

(D) the record and experience of the Fund in recovering Fund disbursements from liable parties;

(E) the record of State participation in the system of response, liability, and compensation established by this Act;

(F) the impact of the taxes imposed by title II of this Act on the Nation's balance of trade with other countries;

(G) an assessment of the feasibility and desirability of a schedule of taxes which would take into account one or more of the following: the likelihood of a release of a hazardous substance, the degree of hazard and risk of harm to public health, welfare, and the environment resulting from any such release, incentives to proper handling, recycling, incineration, and neutralization of hazardous wastes, and disincentives to improper or illegal handling or disposal of hazardous materials, administrative and reporting burdens on Government and industry, and the extent to which the tax burden falls on the substances and parties which create the problems addressed by this Act. In preparing the report, the President shall consult with appropriate Federal, State, and local agencies, affected industries and claimants, and such other interested parties as he may find useful. Based upon the analyses and consultation required by this subsection, the President shall also include in the report any recommendations for legislative changes he may deem necessary for the better effectuation of the purposes of this Act, including but not limited to recommendations concerning authorization levels, taxes, State participation, liability and liability limits, and financial responsibility provisions for the Response Trust Fund and the Post-closure Liability Trust Fund;

(H) an exemption from or an increase in the substances or the amount of taxes imposed by section 4661 of the Internal Revenue Code of 1954 for copper, lead, and zinc oxide, and for feedstocks when used in the manufacture and production of fertilizers, based upon the expenditure experience of the Response Trust Fund;

(I) the economic impact of taxing coal-derived substances and recycled metals.

(2) The Administrator of the Environmental Protection Agency (in consultation with the Secretary of the Treasury) shall submit to the Congress (i) within four years after enactment of this Act, a report identifying additional wastes designated by rule as hazardous after the effective date of this Act and pursuant to section 3001 of the Solid Waste Disposal Act and recommendations on appropriate tax rates for such wastes for the Post-closure Liability Trust Fund. The report shall, in addition, recommend a tax rate, considering the quantity and potential danger to human health and the environment posed by the disposal of any wastes which the Administrator, pursuant to subsection 3001(b)(2)(B) and subsection 3001(b)(3)(A) of the Solid Waste Disposal Act of 1980, has determined should be subject to regulation under subtitle C of such Act, (ii) within three years after enactment of this Act, a report on the necessity for and the adequacy of the revenue raised, in relation to estimated future requirements, of the Post-closure Liability Trust Fund.

(b) The President shall conduct a study to determine (1) whether adequate private insurance protection is available on reasonable terms and conditions to the owners and operators of vessels and facilities subject to liability under section 107 of this Act, and (2) whether the market for such insurance is sufficiently competitive to assure purchasers of features such as a reasonable range of deductibles, coinsurance provisions, and exclusions. The President shall submit the results of his study, together with his recommendations, within two years of the date of enactment of this Act, and shall submit an interim report on his study within one year of the date of enactment of this Act.

(c)(1) The President, acting through Federal officials designated by the National Contingency Plan published under section 105 of this Act, shall study and, not later than two years after the enactment of this Act, shall promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release of oil or a hazardous substance for the purposes of this Act and section 311(f)(4) and (5) of the Federal Water Pollution Control Act.

(2) Such regulations shall specify (A) standard procedures for simplified assess-

ments requiring minimal field observation, including establishing measures of damages based on units of discharge or release or units of affected area, and (B) alternative protocols for conducting assessments in individual cases to determine the type and extent of short- and long-term injury, destruction, or loss. Such regulations shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover.

(3) Such regulations shall be reviewed and revised as appropriate every two years.

(d) The Administrator of the Environmental Protection Agency shall, in consultation with other Federal agencies and appropriate representatives of State and local governments and nongovernmental agencies, conduct a study and report to the Congress within two years of the date of enactment of this Act on the issues, alternatives, and policy considerations involved in the selection of locations for hazardous waste treatment, storage, and disposal facilities. This study shall include—

(A) an assessment of current and projected treatment, storage, and disposal capacity needs and shortfalls for hazardous waste by management category on a State-by-State basis;

(B) an evaluation of the appropriateness of a regional approach to siting and designing hazardous waste management facilities and the identification of hazardous waste management regions, interstate or intrastate, or both, with similar hazardous waste management needs;

(C) solicitation and analysis of proposals for the construction and operation of hazardous waste management facilities by nongovernmental entities, except that no proposal solicited under terms of this subsection shall be analyzed if it involves cost to the United States Government or fails to comply with the requirements of subtitle C of the Solid Waste Disposal Act and other applicable provisions of law;

(D) recommendations on the appropriate balance between public and private sector involvement in the siting, design, and operation of new hazardous waste management facilities;

(E) documentation of the major reasons for public opposition to new hazardous waste management facilities; and

(F) an evaluation of the various options for overcoming obstacles to siting new facilities, including needed legislation for implementing the most suitable option or options.

(e)(1) In order to determine the adequacy of existing common law and statutory remedies in providing legal redress for harm to man and the environment caused by the release of hazardous substances into the environment, there shall be submitted to the Congress a study within twelve months of enactment of this Act.

(2) This study shall be conducted with the assistance of the American Bar Association, the American Law Institute, the Association of American Trial Lawyers, and the National Association of State Attorneys General with the President of each entity selecting three members from each organization to conduct the study. The study chairman and one reporter shall be elected from among the twelve members of the study group.

(3) As part of their review of the adequacy of existing common law and statutory remedies, the study group shall evaluate the following:

(A) the nature, adequacy, and availability of existing remedies under present law in compensating for harm to man from the release of hazardous substances;

(B) the nature of barriers to recovery (particularly with respect to burdens of going forward and of proof and relevancy) and the role such barriers play in the legal system;

(C) the scope of the evidentiary burdens placed on the plaintiff in proving harm from the release of hazardous sub-

stances, particularly in light of the scientific uncertainty over causation with respect to—

(i) carcinogens, mutagens, and teratogens, and

(ii) the human health effects of exposure to low doses of hazardous substances over long periods of time;

(D) the nature and adequacy of existing remedies under present law in providing compensation for damages to natural resources from the release of hazardous substances;

(E) the scope of liability under existing law and the consequences, particularly with respect to obtaining insurance, of any changes in such liability;

(F) barriers to recovery posed by existing statutes of limitations.

(4) The report shall be submitted to the Congress with appropriate recommendations. Such recommendations shall explicitly address—

(A) the need for revisions in existing statutory or common law, and

(B) whether such revisions should take the form of Federal statutes or the development of a model code which is recommended for adoption by the States.

(5) The Fund shall pay administrative expenses incurred for the study. No expenses shall be available to pay compensation, except expenses on a per diem basis for the one reporter, but in no case shall the total expenses of the study exceed $300,000.

(f) The President, acting through the Administrator of the Environmental Protection Agency, the Secretary of Transportation, the Administrator of the Occupational Safety and Health Administration, and the Director of the National Institute for Occupational Safety and Health shall study and, not later than two years after the enactment of this Act, shall modify the national contingency plan to provide for the protection of the health and safety of employees involved in response actions.

EFFECTIVE DATES, SAVINGS PROVISION

SEC. 302. (a) Unless otherwise provided, all provisions of this Act shall be effective on the date of enactment of this Act.

(b) Any regulation issued pursuant to any provisions of section 311 of the Clean Water Act which is repealed or superseded by this Act and which is in effect on the date immediately preceding the effective date of this Act shall be deemed to be a regulation issued pursuant to the authority of this Act and shall remain in full force and effect unless or until superseded by new regulations issued thereunder.

(c) Any regulation—

(1) respecting financial responsibility,

(2) issued pursuant to any provision of law repealed or superseded by this Act, and

(3) in effect on the date immediately preceding the effective date of this Act shall be deemed to be a regulation issued pursuant to the authority of this Act and shall remain in full force and effect unless or until superseded by new regulations issued thereunder.

(d) Nothing in this Act shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants. The provisions of this Act shall not be considered, interpreted, or construed in any way as reflecting a determination, in part or whole, of policy regarding the inapplicability of strict liability, or strict liability doctrines, to activities relating to hazardous substances, pollutants, or contaminants or other such activities.

EXPIRATION, SUNSET PROVISION

SEC. 303. Unless reauthorized by the Congress, the authority to collect taxes conferred by this Act shall terminate on September 30, 1985, or when the sum of the amounts received in the Treasury under section 4611 and under 4661 of the Internal Revenue Code of 1954 total $1,380,000,000, whichever occurs first.

The Secretary of the Treasury shall estimate when this level of $1,380,000,000 will be reached and shall by regulation, provide procedures for the termination of the tax authorized by this Act and imposed under sections 4611 and 4661 of the Internal Revenue Code of 1954.

### CONFORMING AMENDMENTS

SEC. 304. (a) Subsection (b) of section 504 of the Federal Water Pollution Control Act is hereby repealed.

(b) One-half of the unobligated balance remaining before the date of the enactment of this Act under subsection (k) of section 311 of the Federal Water Pollution Control Act and all sums appropriated under section 504(b) of the Federal Water Pollution Control Act shall be transferred to the Fund established under title II of this Act.

(c) In any case in which any provision of section 311 of the Federal Water Pollution Control Act is determined to be in conflict with any provisions of this Act, the provisions of this Act shall apply.

### LEGISLATIVE VETO

SEC. 305. (a) Notwithstanding any other provision of law, simultaneously with promulgation or repromulgation of any rule or regulation under authority of title I of this Act, the head of the department, agency, or instrumentality promulgating such rule or regulation shall transmit a copy thereof to the Secretary of the Senate and the Clerk of the House of Representatives. Except as provided in subsection (b) of this section, the rule or regulation shall not become effective, if—

(1) within ninety calendar days of continuous session of Congress after the date of promulgation, both Houses of Congress adopt a concurrent resolution, the matter after the resolving clause of which is as follows: "That Congress disapproves the rule or regulation promulgated by the _____ dealing with the matter of _____, which rule or regulation was transmitted to Congress on _____.", the blank spaces therein being appropriately filled; or

(2) within sixty calendar days of continuous session of Congress after the date of promulgation, one House of Congress adopts such a concurrent resolution and transmits such resolution to the other House, and such resolution is not disapproved by such other House within thirty calendar days of continuous session of Congress after such transmittal.

(b) If, at the end of sixty calendar days of continuous session of Congress after the date of promulgation of a rule or regulation, no committee of either House of Congress has reported or been discharged from further consideration of a concurrent resolution disapproving the rule or regulation and neither House has adopted such a resolution, the rule or regulation may go into effect immediately. If, within such sixty calendar days, such a committee has reported or been discharged from further consideration of such a resolution, or either House has adopted such a resolution, the rule or regulation may go into effect not sooner than ninety calendar days of continuous session of Congress after such rule is prescribed unless disapproved as provided in subsection (a) of this section.

(c) For purposes of subsections (a) and (b) of this section—

(1) continuity of session is broken only by an adjournment of Congress sine die; and

(2) the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of thirty, sixty, and ninety calendar days of continuous session of Congress.

(d) Congressional inaction on, or rejection of, a resolution of disapproval shall not be deemed an expression of approval of such rule or regulation.

### TRANSPORTATION

SEC. 306. (a) Each hazardous substance which is listed or designated as provided in section 101(14) of this Act shall, within ninety days after the date of enactment of this Act or at the time of such listing or

designation, whichever is later, be listed as a hazardous material under the Hazardous Materials Transportation Act.

(b) A common or contract carrier shall be liable under other law in lieu of section 107 of this Act for damages or remedial action resulting from the release of a hazardous substance during the course of transportation which commenced prior to the effective date of the listing of such substance as a hazardous material under the Hazardous Materials Transportation Act, or for substances listed pursuant to subsection (a) of this section, prior to the effective date of such listing: *Provided, however,* That this subsection shall not apply where such a carrier can demonstrate that he did not have actual knowledge of the identity or nature of the substance released.

(c) Section 11901 of title 49, United States Code, is amended by—

(1) redesignating subsection (h) as subsection (i);

(2) by inserting "and subsection (h)" after "subsection (g)" in subsection (i)(2) as so redesignated by paragraph (1) of this subsection; and

(3) by inserting the following new subsection (h):

"(h) A person subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title, or an officer, agent, or employee of that person, and who is required to comply with section 10921 of this title but does not so comply with respect to the transportation of hazardous wastes as defined by the Environmental Protection Agency pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Congress) shall, in any action brought by the Commission, be liable to the United States for a civil penalty not to exceed $20,000 for each violation.".

ASSISTANT ADMINISTRATOR FOR SOLID WASTE

SEC. 307. (a) Section 2001 of the Solid Waste Disposal Act is amended by striking out "a Deputy Assistant" and inserting in lieu thereof "an Assistant".

(b) The Assistant Administrator of the Environmental Protection Agency appointed to head the Office of Solid Waste shall be in addition to the five Assistant Administrators of the Environmental Protection Agency provided for in section 1(d) of Reorganization Plan Numbered 3 of 1970 and the additional Assistant Administrator provided by the Toxic Substances Control Act, shall be appointed by the President by and with the advice and consent of the Senate.

[307(b) amended by PL 98–80]

(c) The amendment made by subsection (a) shall become effective ninety days after the date of the enactment of this Act.

SEPARABILITY

SEC. 308. If any provision of this Act, or the application of any provision of this Act to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances and the remainder of this Act shall not be affected thereby.

## RESOURCE CONSERVATION AND RECOVERY ACT OF 1976

**(Enacted by PL 94–580, October 21, 1976; 90 Stat. 95, 42 U.S.C. 3251 et seq; Recodified as 42 U.S.C. 6901 et seq; Amended by PL 95–609, November 8, 1978; PL 96–463, October 15, 1980; PL 96–482, October 21, 1980; PL 96–510, December 11, 1980; PL 97–272, September 30, 1982; PL 97–375, December 21, 1982; PL 98–45, July 12, 1983)**

[*Editor's note:* The Resource Conservation and Recovery Act of 1976, PL 94–580, completely replaced the previous language of the Solid Waste Disposal Act.

Public Law 96–463 (S2412) enacted the "Used Oil Recycling Act of 1980." Section 3, 4(a) and (b), and 5 through 7 of the Act amended the Resource Conservation and Recovery Act and their provisions have been incorporated into the main text of this Act. Except for the enacting language,

[the remaining sections further clarify container labeling requirements and prescribe additional responsibilities of the EPA administrator. Those sections are published at the end of this Act.]

## AN ACT

To provide technical and financial assistance for the development of management plans and facilities for the recovery of energy and other resources from discarded materials and for the safe disposal of discarded materials, and to regulate the management of hazardous waste.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### Short Title

Section 1. This Act may be cited as the "Resource Conservation and Recovery Act of 1976."

### Amendment of Solid Waste Disposal Act

Sec. 2. The Solid Waste Disposal Act (42 U.S.C. 3251 and following) is amended to read as follows:

## "TITLE II—SOLID WASTE DISPOSAL

### "Subtitle A—General Provisions

### "Short Title and Table of Contents

"Sec. 1001. This title (hereinafter in this title referred to as 'this Act'), together with the following table of contents, may be cited as the 'Solid Waste Disposal Act':

### "Subtitle A—General Provisions

"Sec. 1001. Short title and table of contents.
"Sec. 1002. Congressional findings.
"Sec. 1003. Objectives.
"Sec. 1004. Definitions.
"Sec. 1005. Governmental cooperation.
"Sec. 1006. Application of Act and integration with other Acts.
"Sec. 1007. Financial disclosure.
"Sec. 1008. Solid waste management information and guidelines.

### "Subtitle B—Office of Solid Waste; Authorities of the Administrator

"Sec. 2001. Office of Solid Waste and interagency coordinating committee.
"Sec. 2002. Authorities of Administrator.
"Sec. 2003. Resource recovery and conservation panels.
"Sec. 2004. Grants for discarded tire disposal.
"Sec. 2005. Labeling of certain oil.
"Sec. 2006. Annual report.
"Sec. 2007. General authorization.

### "Subtitle C—Hazardous Waste Management

"Sec. 3001. Identification and listing of hazardous waste.
"Sec. 3002. Standards applicable to generators of hazardous waste.
"Sec. 3003. Standards applicable to transporters of hazardous waste.
"Sec. 3004. Standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities.
"Sec. 3005. Permits for treatment, storage, or disposal of hazardous waste.
"Sec. 3006. Authorized State hazardous waste programs.
"Sec. 3007. Inspections.
"Sec. 3008. Federal enforcement.
"Sec. 3009. Retention of State authority.
"Sec. 3010. Effective date.
"Sec. 3011. Authorization of assistance to States.
"Sec. 3012. Restrictions on recycled oil.
"Sec. 3012. Hazardous waste site inventory.
"Sec. 3013. Monitoring, analysis, and testing.

### "Subtitle D—State or Regional Solid Waste Plans

"Sec. 4001. Objectives of subtitle.
"Sec. 4002. Federal guidelines for plans.
"Sec. 4003. Minimum requirements for approval of plans.
"Sec. 4004. Criteria for sanitary landfills; sanitary landfills required for all disposal.
"Sec. 4005. Upgrading of open dumps.

**1098**

"Sec. 4006. Procedure for development and implementation of State plan.

"Sec. 4007. Approval of State plan; Federal assistance.

"Sec. 4008. Federal assistance.

"Sec. 4009. Rural communities assistance.

**"Subtitle E—Duties of the Secretary of Commerce in Resource and Recovery**

"Sec. 5001. Functions.

"Sec. 5002. Development of specifications for secondary materials.

"Sec. 5003. Development of markets for recovered materials.

"Sec. 5004. Technology promotion.

"Sec. 5005. Nondiscrimination requirement.

"Sec. 5006. Authorization of appropriations.

**"Subtitle F—Federal Responsibilities**

"Sec. 6001. Application of Federal, State, and local law to Federal facilities.

"Sec. 6002. Federal procurement.

"Sec. 6003. Cooperation with Environmental Protection Agency.

"Sec. 6004. Applicability of solid waste disposal guidelines to executive agencies.

**"Subtitle G—Miscellaneous Provisions**

"Sec. 7001. Employee protection.

"Sec. 7002. Citizen suits.

"Sec. 7003. Imminent hazard.

"Sec. 7004. Petition for regulations; public participation.

"Sec. 7005. Separability.

"Sec. 7006. Judicial review.

"Sec. 7007. Grants or contracts for training projects.

"Sec. 7008. Payments.

"Sec. 7009. Labor standards.

**"Subtitle H—Research, Development, Demonstration, and Information**

"Sec. 8001. Research, demonstrations, training, and other activities.

"Sec. 8002. Special studies; plans for research, development, and demonstrations.

"Sec. 8003. Coordination, collection, and dissemination of information.

"Sec. 8004. Full-scale demonstration facilities.

"Sec. 8005. Special study and demonstration projects on recovery of useful energy and materials.

"Sec. 8006. Grants for resource recovery systems and improved solid waste disposal facilities.

"Sec. 8007. Authorization of appropriations.

**"Congressional Findings**

"Sec. 1002. (a) Solid Waste.—The Congress finds with respect to solid waste—

"(1) that the continuing technological progress and improvement in methods of manufacture, packaging, and marketing of consumer products has resulted in an ever-mounting increase, and in a change in the characteristics, of the mass material discarded by the purchaser of such products;

"(2) that the economic and population growth of our Nation, and the improvements in the standard of living enjoyed by our population, have required increased industrial production to meet our needs, and have made necessary the demolition of old buildings, the construction of new buildings, and the provision of highways and other avenues of transportation, which, together with related industrial, commercial, and agricultural operations, have resulted in a rising tide of scrap, discarded, and waste materials;

(3) that the continuing concentration of our population in expanding metropolitan and other urban areas has presented these communities with serious financial, management, intergovernmental, and technical problems in the disposal of solid wastes resulting from the industrial, commercial, domestic, and other activities carried on in such areas;

"(4) that while the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become a matter national in scope and in concern and

necessitate Federal action through financial and technical assistance and leadership in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices.

"(b) Environment and Health.—The Congress finds with respect to the environment and health, that—

"(1) although land is too valuable a national resource to be needlessly polluted by discarded materials, most solid waste is disposed of on land in open dumps and sanitary landfills;

"(2) disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment;

"(3) as a result of the Clean Air Act, the Water Pollution Control Act, and other Federal and State laws respecting public health and the environment, greater amounts of solid waste (in the form of sludge and other pollution treatment residues) have been created. Similarly, inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health;

"(4) open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land;

"(5) hazardous wastes presents, in addition to the problems associated with non-hazardous solid waste, special dangers to health and requires a greater degree of regulation than does non-hazardous solid waste; and

"(6) alternatives to existing methods of land disposal must be developed since many of the cities in the United States will be running out of suitable solid waste disposal sites within five years unless immediate action is taken;

"(c) Materials.—The Congress finds with respect to materials, that:

"(1) millions of tons of recoverable material which could be used are needlessly buried each year;

"(2) methods are available to separate usable materials from solid waste; and

"(3) the recovery and conservation of such materials can reduce the dependence of the United States on foreign resources and reduce the deficit in its balance of payments.

"(d) Energy.—The Congress finds with respect to energy, that—

"(1) solid waste represents a potential source of solid fuel, oil, or gas that can be converted into energy;

"(2) the need exists to develop alternative energy sources for public and private consumption in order to reduce our dependence on such sources as petroleum products, natural gas, nuclear and hydroelectric generation; and

"(3) technology exists to produce usable energy from solid waste.

### "Objectives

"Sec. 1003. The objectives of this Act are to promote the protection of health and the environment and to conserve valuable material and energy resources by—

"(1) providing technical and financial assistance to State and local governments and interstate agencies for the development of solid waste management plans (including resource recovery and resource conservation systems) which will promote improved solid waste management techniques (including more effective organizational arrangements), new and improved methods of collection, separation, and recovery of solid waste, and the environmentally safe disposal of nonrecoverable residues;

"(2) providing training grants in occupations involving the design, operation, and maintenance of solid waste disposal systems;

"(3) prohibiting future open dumping on the land and requiring the conversion of

existing open dumps to facilities which do not pose a danger to the environment or to health;

"(4) regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment;

"(5) providing for the promulgation of guidelines for solid waste collection, transport, separation, recovery, and disposal practices and systems;

"(6) promoting a national research and development program for improved solid waste management and resource conservation techniques, more effective organizational arrangements, and new and improved methods of collection, separation, and recovery, and recycling of solid wastes and environmentally safe disposal of nonrecoverable residues;

"(7) promoting the demonstration, construction, and application of solid waste management, resource recovery, and resource conservation systems which preserve and enhance the quality of air, water, and land resources; and

"(8) establishing a cooperative effort among the Federal, State, and local governments and private enterprise in order to recover valuable materials and energy from solid waste.

## "Definitions

"Sec. 1004. As used in this Act:

"(1) The term 'Administrator' means the Administrator of the Environmental Protection Agency.

"(2) The term 'construction,' with respect to any project of construction under this Act, means (A) the erection or building of new structures and acquisition of lands or interests therein, or the acquisition, replacement, expansion, remodeling, alteration, modernization, or extension of existing structures, and (B) the acquisition and installation of initial equipment of, or required in connection with, new or newly acquired structures or the expanded, remodeled, altered, modernized or extended part of existing structures (including trucks and other motor vehicles, and trac-

tors, cranes, and other machinery) necessary for the proper utilization and operation of the facility after completion of the project; and includes preliminary planning to determine the economic and engineering feasibility and the public health and safety aspects of the project, the engineering, architectural, legal, fiscal, and economic investigations and studies, and any surveys, designs, plans, working drawings, specifications, and other action necessary for the carrying out of the project, and (C) the inspection and supervision of the process of carrying out the project to completion.

"2(A) The term 'demonstration' means the initial exhibition of a new technology process or practice or a significantly new combination or use of technologies, processes or practices, subsequent to the development stage, for the purpose of proving technological feasibility and cost effectiveness.

"(3) The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

"(4) The term 'Federal agency' means any department, agency, or other instrumentality of the Federal Government, any independent agency or establishment of the Federal Government including any Government corporation, and the Government Printing Office.

"(5) The term 'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

"(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapaciting reversible, illness; or

"(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored,

transported, or disposed of, or otherwise managed.

"(6) The term 'hazardous waste generation' means the act or process of producing hazardous waste.

"(7) The term 'hazardous waste management' means the systematic control of the collection, source separation, storage, transportation, processing, treatment, recovery, and disposal of hazardous wastes.

"(8) For purposes of Federal financial assistance (other than rural communities assistance), the term 'implementation' does not include the acquisition, leasing, construction, or modification of facilities or equipment or the acquisition, leasing, or improvement of land.

"(9) The term 'intermunicipal agency' means an agency established by two or more municipalities with responsibility for planning or administration of solid waste.

"(10) The term 'interstate agency' means an agency of two or more municipalities in different States, or an agency established by two or more States, with authority to provide for the management of solid wastes and serving two or more municipalities located in different States.

"(11) The term 'long-term contract' means, when used in relation to solid waste supply, a contract of sufficient duration to assure the viability of a resource recovery facility (to the extent that such viability depends upon solid waste supply).

"(12) The term 'manifest' means the form used for identifying the quantity, composition, and the origin, routing, and destination of hazardous waste during its transportation from the point of generation to the point of disposal, treatment, or storage.

"(13) The term 'municipality' (A) means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law, with responsibility for the planning or administration of solid waste management, or an Indian tribe or authorized tribal organization or Alaska Native village or organization, and (B) includes any rural community or unincorporated town or village or any other public entity for which an application for assistance is made by a State or political subdivision thereof.

"(14) The term 'open dump' means any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 4004 and which is not a facility for disposal of hazardous waste.

[1004(14) revised by PL 96–482]

"(15) The term 'person' means an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body.

"(16) The term 'procurement item' means any device, good, substance, material, product, or other item whether real or personal property which is the subject of any purchase, barter, or other exchange made to procure such item.

"(17) The term 'procuring agency' means any Federal agency, or any State agency or agency of a political subdivision of a State which is using appropriated Federal funds for such procurement, or any person contracting with any such agency with respect to work performed under such contract.

"(18) The term 'recoverable' refers to the capability and likelihood of being recovered from solid waste for a commercial or industrial use.

"(19) The term 'recovered material' means waste material and byproducts which have been recovered or diverted from solid waste, but such terms does not include those materials and byproducts generated from, and commonly reused within, an original manufacturing process.

[1004(19) revised by PL 96–482]

"(20) The term 'recovered resources' means material or energy recovered from solid waste.

"(21) The term 'resource conservation' means reduction of the amounts of solid waste that are generated, reduction of

overall resource consumption, and utilization of recovered resources.

"(22) The term 'resource recovery' means the recovery of material or energy from solid waste.

"(23) The term 'resource recovery system' means a solid waste management system which provides for collection, separation, recycling, and recovery of solid wastes, including disposal of nonrecoverable waste residues.

"(24) The term 'resource recovery facility' means any facility at which solid waste is processed for the purpose of extracting, converting to energy, or otherwise separating and preparing solid waste for reuse.

"(25) The term 'regional authority' means the authority established or designated under section 4006.

"(26) The term 'sanitary landfill' means a facility for the disposal of solid waste which meets the criteria published under section 4004.

"(26A) The term 'sludge' means any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects.

"(27) The term 'solid waste' means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended (86 Stat. 880), or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923).

"(28) The term 'solid waste management' means the systematic administration of activities which provide for the collection, source separation, storage, transportation, transfer, processing, treatment, and disposal of solid waste.

"(29) The term 'solid waste management facility' includes (A) any resource recovery system or component thereof, (B) any system, program, or facility for resource conservation, and (C) any facility for the collection, source separation, storage, transportation, transfer, processing, treatment or disposal of solid wastes including hazardous wastes, whether such facility is associated with facilities generating such wastes or otherwise.

"(30) The terms 'solid waste planning,' 'solid waste management,' and 'comprehensive planning' include planning or management respecting resource recovery and resource conservation.

"(31) The term 'State' means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

"(32) The term 'State authority' means the agency established or designated under section 4007.

"(33) The term 'storage,' when used in connection with hazardous waste, means the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste.

"(34) The term 'treatment', when used in connection with hazardous waste, means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form

or chemical composition of hazardous waste so as to render it nonhazardous.

"(35) The term 'virgin material' means a raw material, including previously unused copper, aluminum, lead, zinc, iron, or other metal or metal ore, any undeveloped resource that is, or with new technology will become, a source of raw materials.

"(36) The term 'used oil' means any oil which has been—

"(A) refined from crude oil,

"(B) used, and

"(C) as a result of such use, contaminated by physical or chemical impurities.

"(37) The term 'recycled oil' means any used oil which is reused, following its original use, for any purpose (including the purpose for which the oil was originally used). Such term includes oil which is re-refined, reclaimed, burned, or reprocessed.

"(38) The term 'lubricating oil' means the fraction of crude oil which is sold for purposes of reducing friction in any industrial or mechanical device. Such term includes re-refined oil.

"(39) The term 're-refined oil' means used oil from which the physical and chemical contaminants acquired through previous use have been removed through a refining process.

[1004(36) through (39) added by PL 96-463]

## "Governmental Cooperation

"Sec. 1005. (a) Interstate Cooperation.—The provisions of this Act to be carried out by States may be carried out by interstate agencies and provisions applicable to States may apply to interstate regions where such agencies and regions have been established by the respective States and approved by the Administrator. In any such case, action required to be taken by the Governor of a State, respecting regional designation shall be required to be taken by the Governor of each of the respective States with respect to so much of the interstate region as is within the jurisdiction of that State.

"(b) Consent of Congress to Compacts.—The Consent of the Congress is hereby given to two or more States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the United States, for—

"(1) cooperative effort and mutual assistance for the management of solid waste or hazardous waste (or both) and the enforcement of their respective laws relating thereto, and

"(2) the establishment of such agencies, joint or otherwise, as they may deem desirable for making effective such agreements or compacts.

No such agreement or compact shall be binding or obligatory upon any State a party thereto unless it is agreed upon by all parties to the agreement and until it has been approved by the Administrator and the Congress.

## "Application of Act and Integration with Other Acts

"Sec. 1006. (a) Application of Act.—Nothing in this Act shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act (33 U.S.C. 1151 and following), the Safe Drinking Water Act (42 U.S.C. 300f and following), the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. 1401 and following), or the Atomic Energy Act of 1954 (42 U.S.C. 2011 and following) except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.

"(b) Integration With Other Acts.—The Administrator shall integrate all provisions of this Act for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act (42 U.S.C. 1857 and following), the Federal Water Pollution Control Act (33 U.S.C. 1151 and following), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. 135 and following), the Safe Drinking Water Act (42 U.S.C. 300f

and following), the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. 1401 and following) and such other Acts of Congress as grant regulatory authority to the Administrator. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this Act and in the other acts referred to in this subsection.

"(c) Integration With the Surface Mining Control and Reclamation Act of 1977.—(1) No later than 90 days after the date of enactment of the Solid Waste Disposal Act Amendments of 1980, the Administrator shall review any regulations applicable to the treatment, storage, or disposal of any coal mining wastes or overburden promulgated by the Secretary of the Interior under the Surface Mining and Reclamation Act of 1977. If the Administrator determines that any requirement of final regulations promulgated under any section of subtitle C relating to mining wastes or overburden is not adequately addressed in such regulations promulgated by the Secretary, the Administrator shall promptly transmit such determination, together with suggested revisions and supporting documentation, to the Secretary.

"(2) The Secretary of the Interior shall have exclusive responsibility for carrying out any requirement of subtitle C of this Act with respect to coal mining wastes or overburden for which a surface coal mining and reclamation permit is issued or approved under the Surface Mining Control and Reclamation Act of 1977. The Secretary shall, with the concurrence of the Administrator, promulgate such regulations as may be necessary to carry out the purposes of this subsection and shall integrate such regulations with regulations promulgated under the Surface Mining Control and Reclamation Act of 1977.

[1006(c) added by PL 96–482]

### "Financial Disclosure

"Sec. 1007. (a) Statement.—Each officer or employee of the Administrator who—

"(1) performs any function or duty under this Act; and

"(2) has any known financial interest in any person who applies for or receives financial assistance under this Act

shall beginning on February 1, 1977, annually file with the Administrator a written statement concerning all such interests held by such officer or employee during the preceding calendar year. Such statement shall be available to the public.

"(b) Action by Administrator.—The Administrator shall—

"(1) act within ninety days after the date of enactment of this Act—

"(A) to define the term 'known financial interest' for purposes of subsection (a) of this section; and

"(B) to establish the methods by which the requirement to file written statements specified in subsection (a) of this section will be monitored and enforced, including appropriate provision for the filing by such officers and employees of such statements and the review by the Administrator of such statements; and

"(2) report to the Congress on June 1, 1978, and of each succeeding calendar year with respect to such disclosures and the actions taken in regard thereto during the preceding calendar year.

"(c) Exemption.—In the rules prescribed under subsection (b) of this section, the Administrator may identify specific positions within the Environmental Protection Agency which are of a nonpolicymaking nature and provide that officers or employees occupying such positions shall be exempt from the requirements of this section.

"(d) Penalty.—Any officer or employee who is subject to, and knowingly violates, this section shall be fined not more than $2,500 or imprisoned not more than one year, or both.

### "Solid Waste Management Information and Guidelines

"Sec. 1008. (a) Guidelines.—Within one year of enactment of this section, and from time to time thereafter, the Administrator

shall, in cooperation with appropriate Federal, State, municipal, and inter-municipal agencies, and in consultation with other interested persons, and after public hearings, develop and publish suggested guidelines for solid waste management. Such suggested guidelines shall—

"(1) provide a technical and economic description of the level of performance that can be attained by various available solid waste management practices (including operating practices) which provide for the protection of public health and the environment;

"(2) not later than two years after the enactment of this section, describe levels of performance, including appropriate methods and degrees of control, that provide at a minimum for (A) protection of public health and welfare; (B) protection of the quality of ground waters and surface waters from leachates; (C) protection of the quality of surface waters from runoff through compliance with effluent limitations under the Federal Water Pollution Control Act, as amended; (D) protection of ambient air quality through compliance with new source performance standards or requirements of air quality implementation plans under the Clean Air Act, as amended; (E) disease and vector control; (F) safety; and (G) esthetics; and

"(3) provide minimum criteria to be used by the States to define those solid waste management practices which constitute the open dumping of solid waste or hazardous waste and are to be prohibited under subtitle D of this Act.

Where appropriate, such suggested guidelines also shall include minimum information for use in deciding the adequate location, design, and construction of facilities associated with solid waste management practices, including the consideration of regional, geographic, demographic, and climatic factors.

"(b) Notice.—The Administrator shall notify the Committee on Public Works of the Senate and the Committee on Interstate and Foreign Commerce of the House of Representatives a reasonable time before publishing any suggested guidelines or proposed regulations under this act of the content of such proposed suggested guidelines or proposed regulations under this Act.

## "Subtitle B—Office of Solid Waste; Authorities of the Administrator

## "Office of Solid Waste and Interagency Coordinating Committee

"Sec. 2001.(a) Office of Solid Waste.— The Administrator shall establish within the Environmental Protection Agency an Office of Solid Waste (hereinafter referred to as the 'Office') to be headed by an Assistant Administrator of the Environmental Protection Agency. The duties and responsibilities (other than duties and responsibilities relating to research and development) of the Administrator under this Act (as modified by applicable reorganization plans) shall be carried out through the Office.

[2001(a) designated by PL 96–482; amended by PL 96–510, effective March 10, 1981]

[See also Sec. 307(b) of PL 96–510, p. 71:0701]

"(b) Interagency Coordinating Committee.—(1) There is hereby established an Interagency Coordinating Committee on Federal Resource Conservation and Recovery Activities which shall have the responsibility for coordinating all activities dealing with resource conservation and recovery from solid waste carried out by the Environmental Protection Agency, the Department of Energy, the Department of Commerce, and all other Federal agencies which conduct such activities pursuant to this or any other Act. For purposes of this subsection, the term 'resource conservation and recovery activities' shall include, but not be limited to, all research, development and demonstration projects on resource conservation or energy, or material, recovery from solid waste, and all technical or financial assistance for State or local planning for, or implementation of, projects related to resource conservation or energy or material, recovery from solid waste. The Committee shall be chaired by the Adminis-

trator of the Environmental Protection Agency or such person as the Administrator may designate. Members of the Committee shall include representatives of the Department of Energy, the Department of Commerce, the Department of the Treasury, and each other Federal agency which the Administrator determines to have programs or responsibilities affecting resource conservation or recovery.

"(2) The Interagency Coordinating Committee shall include oversight of the implementation of

"(A) the May 1979 Memorandum of Understanding on Energy Recovery from Municipal Solid Waste between the Environmental Protection Agency and the Department of Energy;

"(B) the May 30, 1978, Interagency Agreement between the Department of Commerce and the Environmental Protection Agency on the Implementation of the Resource Conservation and Recovery Act; and

"(C) any subsequent agreements between these agencies or other Federal agencies which address Federal resource recovery or conservation activities.

"(3) The Interagency Coordinating Committee shall submit to the Congress by March 1, 1981, and on March 1 each year thereafter, a five-year action plan for Federal resource conservation or recovery activities which shall identify means and propose programs to encourage resource conservation or material and energy recovery and increase private and municipal investment in resource conservation or recovery systems, especially those which provide for material conservation or recovery as well as energy conservation or recovery. Such plan shall describe, at a minimum, a coordinated and nonduplicatory plan for resource recovery and conservation activities for the Environmental Protection Agency, the Department of Energy, the Department of Commerce, and all other Federal agencies which conduct such activities.

### "Authorities of Administrator

"Sec. 2002. (a) Authorities.—In carrying out this Act, the Administrator is authorized to—

"(1) prescribe, in consultation with Federal, State, and regional authorities, such regulations as are necessary to carry out his functions under this Act;

"(2) consult with or exchange information with other Federal agencies undertaking research, development, demonstration projects, studies, or investigations relating to solid waste;

"(3) provide technical and financial assistance to States or regional agencies in the development and implementation of solid waste plans and hazardous waste management programs;

"(4) consult with representatives of science, industry, agriculture, labor, environmental protection and consumer organizations, and other groups, as he deems advisable;

"(5) utilize the information, facilities, personnel and other resources of Federal agencies, including the National Bureau of Standards and the National Bureau of the Census, on a reimbursable basis, to perform research and analyses and conduct studies and investigations related to resource recovery and conservation and to otherwise carry out the Administrator's functions under this Act; and

"(6) to delegate to the Secretary of Transportation the performance of any inspection or enforcement function under this Act relating to the transportation of hazardous waste where such delegation would avoid unnecessary duplication of activity and would carry out the objectives of this Act and of the Hazardous Materials Transportation Act.

[2002(a)(6) added by PL 96–482]

"(b) Revision of Regulations.—Each regulation promulgated under this Act shall be reviewed and, where necessary, revised not less frequently than every three years.

## "Resource Recovery and Conservation Panels

"Sec. 2003. The Administrator shall provide teams of personnel, including Federal, State, and local employees or contractors (hereinafter referred to as 'Resource Conservation and Recovery Panels') to provide Federal agencies, States and local governments upon request with technical assistance on solid waste management, resource recovery, and resource conservation. Such teams shall include technical, marketing, financial, and institutional specialists, and the services of such teams shall be provided without charge to States or local governments.

[*Editor's note:* Public Law 97–272, an appropriations bill for the Department of Housing and Urban Development and independent agencies, provides the following concerning funds for EPA compliance activities:

## ABATEMENT, CONTROL AND COMPLIANCE

"For abatement, control and compliance activities, $369,075,000, to remain available until September 30, 1984: Provided, That none of these funds may be expended for purposes of Resource Conservation and Recovery Panels established under section 2003 of the Resource Conservation and Recovery Act, as amended (42 U.S.C. 6913) or for support to State, regional, local and interstate agencies in accordance with subtitle D of the Solid Waste Disposal Act, as amended, other than section 4008(a)(2) or 4009:" ....]

[*Editor's note:* Public Law 98–45, the "Department of Housing and Urban Development—Independent Agencies Appropriation Act, 1984," provides the following funds for EPA compliance activities:

## ABATEMENT, CONTROL, AND COMPLIANCE

"For abatement, control, and compliance activities, $393,900,000, to remain available until September 30, 1985: Provided, That none of these funds may be expended for purposes of Resource Conservation and Recovery Panels established under section 2003 of the Resource Conservation and Recovery Act, as amended (42 U.S.C. 6913), or for support to State, regional, local and interstate agencies in accordance with subtitle D of the Solid Waste Disposal Act, as amended, other than section 4008(a)(2) or 4009."]

## "Grants for Discarded Tire Disposal

"Sec. 2004. (a) Grants.—The Administrator shall make available grants equal to 5 percent of the purchase price of tire shredders (including portable shredders attached to tire collection trucks) to those eligible applicants best meeting criteria promulgated under this section. An eligible applicant may be any private purchaser, public body, or public-private joint venture. Criteria for receiving grants shall be promulgated under this section and shall include the policy to offer any private purchaser the first option to receive a grant, the policy to develop widespread geographic distribution of tire shredding facilities, the need for such facilities within a geographic area, and the projected risk and viability of any such venture. In the case of an application under this section from a public body, the Administrator shall first make a determination that there are no private purchasers interested in making an application before approving a grant to a public body.

"(b) Authorization.—There is authorized to be appropriated $750,000 for each of the fiscal years 1978 and 1979 to carry out this section.

## "Labeling of Certain Oil

"Sec. 2005. For purposes of any provision of law which requires the labeling of commodities, lubricating oil shall be treated as lawfully labeled only if it bears the following statement, prominently displayed:

" 'DON'T POLLUTE—CONSERVE RESOURCES; RETURN USED OIL TO COLLECTION CENTERS'.

[2005 added by PL 96-463]

[*Editor's note:* See also Sec. 4(c) of PL 96-463 published at the end of this Act.]

## "Annual Report

"Sec. 2006. The Administrator shall transmit to the Congress and the President, not later than ninety days after the end of each fiscal year, a comprehensive and detailed report on all activities of the Office during the preceding fiscal year. Each such report shall include—

"(1) a statement of specific and detail objectives for the activities and programs conducted and assisted under this Act;

"(2) statements of the Administrator's conclusions as to the effectiveness of such activities and programs in meeting the stated objectives and the purposes of this Act, measured through the end of such fiscal year;

"(3) a summary of outstanding solid waste problems confronting the Administrator, in order of priority;

"(4) recommendations with respect to such legislation which the Administrator deems necessary or desirable to assist in solving problems respecting solid waste;

"(5) all other information required to be submitted to the Congress pursuant to any other provision of this Act; and

"(6) the Administrator's plans for activities and programs respecting solid waste during the next fiscal year.

[2005 redesignated as 2006 by PL 96-463]

## "General Authorization

"Sec. 2007. (a) General Administration.—There are authorized to be appropriated to the Administrator for the purpose of carrying out the provisions of this Act, $35,000,000 for the fiscal year ending September 30, 1977, $38,000,000 for the fiscal year ending September 30, 1978, $42,000,-000 for the fiscal year ending September 30, 1979, $70,000,000 for the fiscal year ending September 30, 1980, $80,000,000 for the fiscal year ending September 30, 1981, and $80,000,000 for the fiscal year ending September 30, 1982.

"(b) Resource Recovery and Conservation Panels.—Not less than 20 percent of the amount appropriated under subsection (a), or $5,000,000 per fiscal year, whichever is less, shall be used only for purposes of Resource Recovery and Conservation Panels established under section 2003 (including travel expenses incurred by such panels in carrying out their functions under this Act).

"(c) Hazardous Waste.—Not less than 30 percent of the amount appropriated under subsection (a) shall be used only for purposes of carrying out subtitle C of this Act (relating to hazardous waste) other than section 3011.

"(d) State and Local Support.—Not less than 25 per centum of the total amount appropriated under this title, up to the amount authorized in section 4008(a)(1), shall be used only for purposes of support to State, regional, local, and interstate agencies in accordance with subtitle D of this Act other than section 4008(a)(2) or 4009.

[*Editor's note:* PL 96-463 redesignated Section 2006 as 2007. However, PL 96-482 cites the former designation (2006) in amending this Section.]

## "Subtitle C—Hazardous Waste Management

## "Identification and Listing of Hazardous Waste

"Sec. 3001. (a) Criteria for Identification or Listing—Not later than eighteen months after the date of the enactment of this Act, the Administrator shall, after notice and opportunity for public hearing, and after consultation with appropriate Federal and State agencies, develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the provisions of this subtitle, taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics. Such cri-

teria shall be revised from time to time as may be appropriate.

"(b)(1) Identification and Listing.—Not later than eighteen months after the date of enactment of this section, and after notice and opportunity for public hearing, the Administrator shall promulgate regulations identifying the characteristics of hazardous waste, and listing particular hazardous wastes (within the meaning of section 1004(5)), which shall be subject to the provisions of this subtitle. Such regulations shall be based on the criteria promulgated under subsection (a) and shall be revised from time to time thereafter as may be appropriate.

[3001(b)(1) designated by PL 96–482]

"(2)(A) Notwithstanding the provisions of paragraph (1) of this subsection, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy shall be subject only to existing State or Federal regulatory programs in lieu of subtitle C until at least 24 months after the date of enactment of the Solid Waste Disposal Act Amendments of 1980 and after promulgation of the regulations in accordance with subparagraphs (B) and (C) of this paragraph. It is the sense of the Congress that such State or Federal programs should include, for waste disposal sites which are to be closed, provisions requiring at least the following:

"(i) The identification through surveying, platting, or other measures, together with recordation of such information on the public record, so as to assure that the location where such wastes are disposed of can be located in the future; except however, that no such surveying, platting, or other measure identifying the location of a disposal site for drilling fluids and associated wastes shall be required if the distance from the disposal site to the surveyed or platted location to the associated well is less than two hundred lineal feet; and

"(ii) A chemical and physical analysis of a produced water and a composition of a drilling fluid suspected to contain a hazardous material, with such information to be acquired prior to closure and to be placed on the public record.

"(B) Not later than six months after completion and submission of the study required by section 8002(m) of this Act, the Administrator shall, after public hearings and opportunity for comment, determine either to promulgate regulations under this subtitle for drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy or that such regulations are unwarranted. The Administrator shall publish his decision in the Federal Register accompanied by an explanation and justification of the reasons for it. In making the decision under this paragraph, the Administrator shall utilize the information developed or accumulated pursuant to the study required under section 8002(m).

"(C) The Administrator shall transmit his decision, along with any regulations, if necessary, to both Houses of Congress. Such regulations shall take effect only when authorized by Act of Congress.

[3001(b)(2) added by PL 96–482]

"(3)(A) Notwithstanding the provisions of paragraph (1) of this subsection, each waste listed below shall, except as provided in subparagraph (B) of this paragraph, be subject only to regulation under other applicable provisions of Federal or State law in lieu of this subtitle until at least six months after the date of submission of the applicable study required to be conducted under subsection (f), (n), (o), or (p) of section 8002 of this Act and after promulgation of regulations in accordance with subparagraph (C) of this paragraph:

"(i) Fly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels.

"(ii) Solid waste from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from the mining of uranium ore.

"(iii) Cement kiln dust waste.

"(B)(i) Owners and operators of disposal sites for wastes listed in subparagraph (A) may be required by the Administrator, through regulations prescribed under authority of section 2002 of this Act—

"(I) as to disposal sites for such wastes which are to be closed, to identify the locations of such sites through surveying, platting, or other measures, together with recordation of such information on the public record, to assure that the locations where such wastes are disposed of are known and can be located in the future, and

"(II) to provide chemical and physical analysis and composition of such wastes, based on available information, to be placed on the public record.

"(ii)(I) In conducting any study under subsection (f), (n), (o), or (p), of section 8002 of this Act, any officer, employee, or authorized representative of the Environmental Protection Agency, duly designated by the Administrator, is authorized, at reasonable times and as reasonably necessary for the purposes of such study, to enter any establishment where any waste subject to such study is generated, stored, treated, disposed of, or transported from; to inspect, take samples, and conduct monitoring and testing; and to have access to and copy records relating to such waste. Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee, or authorized representative obtains any samples prior to leaving the premises, he shall give to the owner, operator, or agent in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume or weight to the portion retained. If any analysis is made of such samples, or monitoring and testing performed, a copy of the results shall be furnished promptly to the owner, operator, or agent in charge.

"(II) Any records, reports, or information obtained from any person under subclause (I) shall be available to the public, except that upon a showing satisfactory to the Administrator by any person that records, reports, or information, or particular part thereof, to which the Administrator has access under this subparagraph if made public, would divulge information entitled to protection under section 1905 of title 18 of the United States Code, the Administrator shall consider such information or particular portion thereof confidential in accordance with the purposes of that section, except that such record, report, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this Act. Any person not subject to the provisions of section 1905 of title 18 of the United States Code who knowingly and willfully divulges or discloses any information entitled to protection under this subparagraph shall, upon conviction, be subject to a fine of not more than $5,000 or to imprisonment not to exceed one year, or both.

"(iii) The Administrator may prescribe regulations, under the authority of this Act, to prevent radiation exposure which presents an unreasonable risk to human health from the use in construction or land reclamation (with or without revegetation) of (I) solid waste from the extraction, beneficiation, and processing of phosphate rock or (II) overburden from the mining of uranium ore.

"(iv) Whenever on the basis of any information the Administrator determines that any person is in violation of any requirement of this subparagraph, the Administrator shall give notice to the violator of his failure to comply with such requirement. If such violation extends beyond the thirtieth day after the Administrator's notification, the Administrator may issue an order requiring compliance within a specified time period or the Administrator may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction.

"(C) Not later than six months after the date of submission of the applicable study required to be conducted under subsection (f), (n), (o), or (p), of section 8002 of this

Act, the Administrator shall, after public hearings and opportunity for comment, either determine to promulgate regulations under this subtitle for each waste listed in subparagraph (A) of this paragraph or determine that such regulations are unwarranted. The Administrator shall publish his determination, which shall be based on information developed or accumulated pursuant to such study, public hearings, and comment, in the Federal Register accompanied by an explanation and justification of the reasons for it.

[3001(b)(3) added by PL 96–482]

"(c) Petition by State Governor.—At any time after the date eighteen months after the enactment of this title, the Governor of any State may petition the Administrator to identify or list a material as a hazardous waste. The Administrator shall act upon such petition within ninety days following his receipt thereof and shall notify the Governor of such action. If the Administrator denies such petition because of financial considerations, in providing such notice to the Governor he shall include a statement concerning such considerations.

**"Standards Applicable to Generators of Hazardous Waste**

"Sec. 3002. Not later than eighteen months after the date of the enactment of this section, and after notice and opportunity for public hearings and after consultation with appropriate Federal and State agencies, the Administrator shall promulgate regulations establishing such standards, applicable to generators of hazardous waste identified or listed under this subtitle, as may be necessary to protect human health and the environment. Such standards shall establish requirements respecting—

"(1) recordkeeping practices that accurately identify the quantities of such hazardous waste generated, the constituents thereof which are significant in quantity or in potential harm to human health or the environment, and the disposition of such wastes;

"(2) labeling practices for any containers used for the storage, transport, or disposal of such hazardous waste such as will identify accurately such waste;

"(3) use of appropriate containers for such hazardous waste;

"(4) furnishing of information on the general chemical composition of such hazardous waste to persons transporting, treating, storing, or disposing of such wastes;

"(5) use of a manifest system and any other reasonable means necessary to assure that all such hazardous waste generated is designated for treatment, storage, or disposal in, and arrives at treatment, storage, or disposal facilities (other than facilities on the premises where the waste is generated) for which a permit has been issued as provided in this subtitle, or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052); and

"(6) submission of reports to the Administrator (or the State agency in any case in which such agency carries out an authorized permit program pursuant to this subtitle) at such times as the Administrator (or the State agency if appropriate) deems necessary, setting out—

"(A) the quantities of hazardous waste identified or listed under the subtitle that he has generated during a particular time period; and

"(B) the disposition of all hazardous waste reported under subparagraph (A).

**"Standards Applicable to Transporters of Hazardous Waste**

"Sec. 3003. (a) Standards.—Not later than eighteen months after the date of enactment of this section, and after opportunity for public hearings the Administrator, after consultation with the Secretary of Transportation and the States, shall promulgate regulations establishing such standards, applicable to transporters of hazardous waste identified or listed under this subtitle, as may be necessary to protect human health and the environment. Such standards shall include but need not be limited to requirements respecting—

"(1) recordkeeping concerning such hazardous waste transported, and their source and delivery points;

"(2) transportation of such waste only if properly labeled;

"(3) compliance with the manifest system referred to in section 3002(5); and

"(4) transportation of all such hazardous waste only to the hazardous waste treatment, storage, or disposal facilities which the shipper designates on the manifest form to be a facility holding a permit issued under this subtitle, or pursuant to title I of the Marine Protection, Research, and Sanctuaries act (86 Stat. 1052).

"(b) Coordination With Regulations of Secretary of Transportation.—In case of any hazardous waste identified or listed under this subtitle which is subject to the Hazardous Materials Transportation Act (88 Stat. 2156; 49 U.S.C. 1801 and following), the regulations promulgated by the Administrator under this section shall be consistent with the requirements of such Act and the regulations thereunder. The Administrator is authorized to make recommendations to the Secretary of Transportation respecting the regulations of such hazardous waste under the Hazardous Materials Transportation Act and for addition of materials to be covered by such Act.

**"Standards Applicable to Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities**

Sec. 3004. Not later than eighteen months after the date of enactment of this section, and after opportunity for public hearings and after consultation with appropriate Federal and State agencies, the Administrator shall promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous waste identified or listed under this subtitle, as may be necessary to protect human health and the environment. In establishing such standards the Administrator shall, where appropriate, distinguish in such standards between requirements appropriate for new facilities and for facilities in existence on the date of promulgation of such regulations. Such standards shall include, but need not be limited to, requirements respecting—

[3004 amended by PL 96-482]

"(1) maintaining records of all hazardous wastes identified or listed under this title which is treated, stored, or disposed of, as the case may be, and the manner in which such wastes were treated, stored, or disposed of;

"(2) satisfactory reporting, monitoring, and inspection and compliance with the manifest system referred to in section 3002(5);

"(3) treatment, storage, or disposal of all such waste received by the facility pursuant to such operating methods, techniques, and practices as may be satisfactory to the Administrator;

"(4) the location, design, and construction of such hazardous waste treatment, disposal, or storage facilities;

"(5) contingency plans for effective action to minimize unanticipated damage from any treatment, storage, or disposal of any such hazardous waste;

"(6) the maintenance of operation of such facilities and requiring such additional qualifications as to ownership, continuity of operation, training for personnel, and financial responsibility as may be necessary or desirable; and

"(7) compliance with the requirements of section 3005 respecting permits for treatment, storage, or disposal.

No private entity shall be precluded by reason of criteria established under paragraph (6) from the ownership or operation of facilities providing hazardous waste treatment, storage, or disposal services where such entity can provide assurances of financial responsibility and continuity of operation consistent with the degree and duration of risks associated with the treatment, storage, or disposal of specified hazardous waste.

"Permits for Treatment, Storage, or
Disposal of Hazardous Waste

"Sec. 3005. (a) Permit Requirements.—
Not later than eighteen months after the
date of the enactment of this section, the
Administrator shall promulgate regulations
requiring each person owning or operating
a facility for the treatment, storage, or
disposal of hazardous waste identified or
listed under this subtitle to have a permit
issued pursuant to this section. Such regulations shall take effect on the date provided in section 3010 and upon and after such
date the treatment, storage, or disposal of
any such hazardous waste is prohibited except in accordance with such a permit.

"(b) Requirements of Permit Application.
—Each application for a permit under this
section shall contain such information as
may be required under regulations promulgated by the Administrator, including information respecting—

"(1) estimates with respect to the composition, quantities, and concentrations of any
hazardous waste identified or listed under
this subtitle, or combinations of any such
hazardous waste and any other solid waste,
proposed to be disposed of, treated, transported, or stored, and the time, frequency,
or rate of which such waste is proposed to
be disposed of, treated, transported, or
stored; and

"(2) the site at which such hazardous
waste or the products of treatment of such
hazardous waste will be disposed of, treated, transported to, or stored.

"(c) Permit Issuance.—Upon a determination by the Administrator (or a State, if
applicable), of compliance by a facility for
which a permit is applied for under this
section with the requirements of this section and section 3004, the Administrator (or
the State) shall issue a permit for such
facilities. In the event permit applicants
propose modification of their facilities, or in
the event the Administrator (or the State)
determines that modifications are necessary to conform to the requirements under
this section and section 3004, the permit
shall specify the time allowed to complete
the modifications.

"(d) Permit Revocation.—Upon a determination by the Administrator (or by a
State, in the case of a State having an
authorized hazardous waste program under
section 3006) of noncompliance by a facility
having a permit under this title with the
requirements of this section or section
3004, the Administrator (or State, in the
case of a State having an authorized hazardous waste program under section 3006)
shall revoke such permit.

"(e) Interim Status.—Any person who—

"(1) owns or operates a facility required
to have a permit under this section which
facility is in existence on November 19,
1980,

[3005(e)(1) amended by PL 96–482]

"(2) has complied with the requirements
of section 3010(a), and

"(3) has made an application for a permit
under this section shall be treated as having been issued such permit until such time
as final administrative disposition of such
application is made, unless the Administrator or other plaintiff proves that final administrative disposition of such application
has not been made because of the failure of
the applicant to furnish information reasonably required or requested in order to process the application.

"(f) Coal Mining Wastes and Reclamation Permits.—Notwithstanding subsection
(a) through (e) of this section, any surface
coal mining and reclamation permit covering any coal mining wastes or overburden
which has been issued or approved under
the Surface Mining Control and Reclamation Act of 1977 shall be deemed to be a
permit issued pursuant to this section with
respect to the treatment, storage, or disposal of such wastes or overburden. Regulations promulgated by the Administrator
under this subtitle shall not be applicable to
treatment, storage, or disposal of coal mining wastes and overburden which are covered by such a permit.

[3005(f) added by PL 96–482]

"Authorized State Hazardous
Waste Programs

"Sec. 3006. (a) Federal Guidelines.—
Not later than eighteen months after the

date of enactment of this Act, the Administrator, after consultation with State authorities, shall promulgate guidelines to assist States in the development of State hazardous waste programs.

"(b) Authorization of State Program.—Any State which seeks to administer and enforce a hazardous waste program pursuant to this subtitle may develop and, after notice and opportunity for public hearing, submit to the Administrator an application, in such form as he shall require, for authorization of such program. Within ninety days following submission of an application under this subsection, the Administrator shall issue a notice as to whether or not he expects such program to be authorized, and within ninety days following such notice (and after opportunity for public hearing) he shall publish his findings as to whether or not the conditions listed in items (1), (2), and (3) below have been met. Such State is authorized to carry out such program in lieu of the Federal program under this subtitle in such State and to issue and enforce permits for the storage, treatment, or disposal of hazardous waste unless, within ninety days following submission of the application the Administrator notifies such State that such program may not be authorized and, within ninety days following such notice and after opportunity for public hearing, he finds that (1) such State program is not equivalent to the Federal program under this subtitle, (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subtitle.

"(c) Interim Authorization.—Any State which has in existence a hazardous waste program pursuant to State law before the date ninety days after the date of promulgation of regulations under sections 3002, 3003, 3004, and 3005, may submit to the Administrator evidence of such existing program and may request a temporary authorization to carry out such program under this subtitle. The Administrator shall, if the evidence submitted shows the existing State program to be substantially

equivalent to the Federal program under this subtitle, grant an interim authorization to the State to carry out such program in lieu of the Federal program pursuant to this subtitle for a twenty-four month period beginning on the date six months after the date of promulgation of regulations under sections 3002 through 3005.

"(d) Effect of State Permit.—Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subtitle.

"(e) Withdrawal of Authorization.—Whenever the Administrator determines after public hearing that a State is not administering and enforcing a program authorized under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw authorization of such program and establish a Federal program pursuant to this subtitle. The Administrator shall not withdraw authorization of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

## "Inspections

"Sec. 3007. (a) Access Entry.—For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this title, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator, or upon request of any duly designated officer, employee or representative of a State having an authorized hazardous waste program, furnish information relating to such wastes and permit such person at all reasonable times to have access to, and to copy all records relating to such wastes. For the purposes of developing or assisting

in the development of any regulation or enforcing the provisions of this title, such officers, employees or representatives are authorized—

"(1) to enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from;

"(2) to inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes.

Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee or representative obtains any samples, prior to leaving the premises, he shall give to the owner, operator, or agent in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume or weight to the portion retained. If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or agent in charge.

[3007(a) amended by PL 96–482]

"(b) Availability to Public.—(1) Any records, reports, or information obtained from any person under this section shall be available to the public, except that upon a showing satisfactory to the Administrator (or the State, as the case may be) by any person that records, reports, or information, or particular part thereof, to which the Administrator (or the State, as the case may be) or any officer, employee or representative thereof has access under this section if made public, would divulge information entitled to protection under section 1905 of title 18 of the United States Code, such information or particular portion thereof shall be considered confidential in accordance with the purposes of that section, except that such record, report, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this Act, or when relevant in any proceeding under this Act.

"(2) Any person not subject to the provisions of section 1905 of title 18 of the United States Code who knowingly and willfully divulges or discloses any information entitled to protection under this subsection shall, upon conviction, be subject to a fine of not more than $5,000 or to imprisonment not to exceed one year, or both.

"(3) In submitting data under this Act, a person required to provide such data may—

"(A) designate the data which such person believes is entitled to protection under this subsection, and

"(B) submit such designated data separately from other data submitted under this Act.

A designation under this paragraph shall be made in writing and in such manner as the Administrator may prescribe.

"(4) Notwithstanding any limitation contained in this section or any other provision of law, all information reported to, or otherwise obtained by, the Administrator (or any representative of the Administrator) under this Act shall be made available, upon written request of any duly authorized committee of the Congress, to such committee (including records, reports, or information obtained by representatives of the Environmental Protection Agency).

**"Federal Enforcement**

"Sec. 3008. (a) Compliance Orders.—(1) Except as provided in paragraph (2), whenever on the basis of any information the Administrator determines that any person is in violation of any requirement of this subtitle, the Administrator may issue an order requiring compliance immediately or within a specified time period or the Administrator may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction.

[3008(a)(1) amended by PL 96–482]

"(2) In the case of a violation of any requirement of this subtitle where such violation occurs in a State which is authorized to carry out a hazardous waste pro-

gram under section 3006, the Administrator shall give notice to the State in which such violation has occurred prior to issuing an order or commencing a civil action under this section.

[3008(a)(2) amended by PL 96–482]

"(3) If such violator fails to take corrective action within the time specified in the order, he shall be liable for a civil penalty of not more than $25,000 for each day of continued noncompliance and the Administrator may suspend or revoke any permit issued to the violator (whether issued by the Administrator or the State).

"(b) Public Hearing.—Any order shall become final unless, no later than thirty days after the order is served, the person or persons named therein request a public hearing. Upon such request the Administrator shall promptly conduct a public hearing. In connection with any proceeding under this section the Administrator may issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and may promulgate rules for discovery procedures.

[3008(b) amended by PL 96–482]

"(c) Requirements of Compliance Orders.—Any order issued under this section may include a suspension or revocation of a permit issued under this subtitle, and shall state with reasonable specificity the nature of the violation and specify a time for compliance and assess a penalty, if any, which the Administrator determines is reasonable taking into account the seriousness of the violation and any good faith efforts to comply with the applicable requirements.

[3008(c) amended by PL 96–482]

"(d) Criminal Penalties.—Any person who—

"(1) knowingly transports any hazardous waste identified or listed under this subtitle to a facility which does not have a permit under section 3005 (or 3006 in case of a State program), or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052),

"(2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subtitle either—

"(A) without having obtained a permit under section 3005 (or 3006 in the case of a State program) or pursuant to title I of the Marine Protection, Research, and Sanctuaries Act (86 Stat. 1052); or

"(B) in knowing violation of any material condition or requirement of such permit;

"(3) knowingly makes any false material statement or representation in any application, label, manifest, record, report, permit or other document filed, maintained, or used for purposes of compliance with this subtitle; or

"(4) knowingly generates, stores, treats, transports, disposes of, or otherwise handles any hazardous waste (whether such activity took place before or takes place after the date of the enactment of this paragraph) and who knowingly destroys, alters, or conceals any record required to be maintained under regulations promulgated by the Administrator under this subtitle shall, upon conviction, be subject to a fine of not more than $25,000 ($50,000 in the case of a violation of paragraph (1) or (2)) for each day of violation, or to imprisonment not to exceed one year (two years in the case of a violation of paragraph (1) or (2)), or both. If the conviction is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment for not more than two years, or by both.

[3008(d) revised and (e) through (g) added by PL 96–482]

"(e) Knowing Endangerment.—Any person who knowingly transports, treats, stores, or disposes of any hazardous waste identified or listed under this subtitle—

"(1)(A) in violation of paragraphs (1) or (2) of subsection (d) of this section, or

"(B) having applied for a permit under section 3005 or 3006, and knowingly either—

"(i) has failed to include in his application material information required under regulations promulgated by the Administrator, or

"(ii) fails to comply with the applicable interim status regulations and standards promulgated pursuant to this subtitle, who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, and

"(2)(A) if his conduct in the circumstances manifests an unjustified and inexcusable disregard for human life, or

"(B) if his conduct in the circumstances manifests an extreme indifference for human life.

shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment for not more than 2 years, or both, except that any person who violates subsection (e)(2)(B) shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment for not more than 5 years, or both. A defendant that is an organization shall, upon conviction of violating this subsection, be subject to a fine of not more than $1,000,000.

"(f) Special Rules.—For the purposes of subsection (e)—

"(1) A person's state of mind is knowing with respect to—

"(A) his conduct, if he is aware of the nature of his conduct;

"(B) an existing circumstance, if he is aware or believes that the circumstance exists; or

"(C) a result of his conduct, if he is aware or believes that his conduct is substantially certain to cause danger of death or serious bodily injury.

"(2) In determining whether a defendant who is a natural person knew that his conduct placed another person in imminent danger of death or serious bodily injury—

"(A) the person is responsible only for actual awareness or actual belief that he possessed; and

"(B) knowledge possessed by a person other than the defendant but not by the defendant himself may not be attributed to the defendant;

"*Provided,* That in proving the defendant's possession of actual knowledge, circumstantial evidence may be used, including evidence that the defendant took affirmative steps to shield himself from relevant information.

"(3) It is an affirmative defense to a prosecution that the conduct charged was consented to by the person endangered and that the danger and conduct charged were reasonably foreseeable hazards of—

"(A) an occupation, a business, or a profession; or

"(B) medical treatment or medical or scientific experimentation conducted by professionally approved methods and such other person had been made aware of the risks involved prior to giving consent.

The defendant may establish an affirmative defense under this subsection by a preponderance of the evidence.

"(4) All general defenses, affirmative defenses, and bars to prosecution that may apply with respect to other Federal criminal offenses may apply under subsection (e) and shall be determined by the courts of the United States according to the principles of common law as they may be interpreted in the light of reason and experience. Concepts of justification and excuse applicable under this section may be developed in the light of reason and experience.

"(5) The term 'organization' means a legal entity, other than a government, established or organized for any purpose, and such term includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, trust, society, union, or any other association of persons.

"(6) The term 'serious bodily injury' means—

"(A) bodily injury which involves a substantial risk of death;

"(B) unconsciousness;

"(C) extreme physical pain;

"(D) protracted and obvious disfigurement; or

"(E) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

"(g) Civil Penalty.—Any person who violates any requirement of this subtitle shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation.

### "Retention of State Authority

"Sec. 3009. Upon the effective date of regulations under this subtitle no State or political subdivision may impose any requirements less stringent than those authorized under this subtitle respecting the same matter as governed by such regulations, except that if application of a regulation with respect to any matter under this subtitle is postponed or enjoined by the action of any court, no State or political subdivision shall be prohibited from acting with respect to the same aspect of such matter until such time as such regulation takes effect. Nothing in this title shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations.

[3009 amended by PL 96–482]

### "Effective Date

"Sec. 3010. (a) Preliminary Notification.—Not later than ninety days after promulgation of regulations under section 3001 identifying by its characteristics or listing any substance as hazardous waste subject to this subtitle, any person generating or transporting such substance or owning or operating a facility for treatment, storage, or disposal of such substance shall file with the Administrator (or with States having authorized hazardous waste permit programs under section 3006) a notification stating the location and general description of such activity and the identified or listed hazardous wastes handled by such person. In revising any regulation under section

3001 identifying additional characteristics of hazardous waste or listing any additional substance as hazardous waste subject to this subtitle, the Administrator may require any person referred to in the preceding sentence to file with the Administrator (or with States having authorized hazardous waste permit programs under section 3006) the notification described in the preceding sentence. Not more than one such notification shall be required to be filed with respect to the same substance. No identified or listed hazardous waste subject to this subtitle may be transported, treated, stored, or disposed of unless notification has been given as required under this subsection.

[3010(a) amended by PL 96–482]

"(b) Effective Date of Regulation.—The regulations under this subtitle respecting requirements applicable to the generation, transportation, treatment, storage, or disposal of hazardous waste (including requirements respecting permits for such treatment, storage, or disposal) shall take effect on the date six months after the date of promulgation thereof (or six months after the date of revision in the case of any regulation which is revised after the date required for promulgation thereof).

### "Authorization of Assistance to States

Sec. 3001. (a) Authorization.—There is authorized to be appropriated $25,000,000 for each of the fiscal years 1978 and 1979, $20,000,000 for fiscal year 1980, $35,000,000 for fiscal year 1981, and $40,000,000 for fiscal year 1982 to be used to make grants to the States for purposes of assisting the States in the development and implementation of authorized State hazardous waste programs.

[3011(a) amended by PL 96–482]

"(b) Allocation.—Amounts authorized to be appropriated under subsection (a) shall be allocated among the States on the basis of regulations promulgated by the Administrator, after consultation with the States, which take into account, the extent to which hazardous waste is generated, transported, treated, stored, and disposed of

within such State, the extent of exposure of human beings and the environment within such State to such waste, and such other factors as the Administrator deems appropriate.

"(c) Activities Included.—State hazardous waste programs for which grants may be made under subsection (a) may include (but shall not be limited to) planning for hazardous waste treatment, storage and disposal facilities, and the development and execution of programs to protect health and the environment from inactive facilities which may contain hazardous waste.

[3011(c) added by PL 96–482]

[*Editor's note:* Public Laws 96–463 and 96–482 both amended Subtitle C of this Act and add a new Section 3012. The text of each version follows:]

### "Restrictions on Recycled Oil

"Sec. 3012. Not later than one year after the date of the enactment of this section, the Administrator shall promulgate regulations establishing such performance standards and other requirements as may be necessary to protect the public health and the environment from hazards associated with recycled oil. In developing such regulations, the Administrator shall conduct an analysis of the economic impact of the regulations on the oil recycling industry. The Administrator shall ensure that such regulations do not discourage the recovery or recycling of used oil.

[3012 added by PL 96–463]

### "Hazardous Waste Site Inventory

"Sec. 3012. (a) State Inventory Programs.—Each State shall, as expeditiously as practicable, undertake a continuing program to compile, publish, and submit to the Administrator an inventory describing the location of each site within such State at which hazardous waste has at any time been stored or disposed of. Such inventory shall contain—

"(1) a description of the location of the sites at which any such storage or disposal has taken place before the date on which permits are required under section 3005 for such storage or disposal;

"(2) such information relating to the amount, nature, and toxicity of the hazardous waste at each such site as may be practicable to obtain and as may be necessary to determine the extent of any health hazard which may be associated with such site;

"(3) the name and address, or corporate headquarters of, the owner of each such site, determined as of the date of preparation of the inventory;

"(4) an identification of the types or techniques of waste treatment or disposal which have been used at each such site; and

"(5) information concerning the current status of the site, including information respecting whether or not hazardous waste is currently being treated or disposed of at such site (and if not, the date on which such activity ceased) and information respecting the nature of any other activity currently carried out at such site.

For purposes of assisting the States in compiling information under this section, the Administrator shall make available to each State undertaking a program under this section such information as is available to him concerning the items specified in paragraphs (1) through (5) with respect to the sites within such State, including such information as the Administrator is able to obtain from other agencies or departments of the United States and from surveys and studies carried out by any committee or subcommittee of the Congress. Any State may exercise the authority of section 3007 for purposes of this section in the same manner and to the same extent as provided in such section in the case of States having an authorized hazardous waste program, and any State may by order require any person to submit such information as may be necessary to compile the data referred to in paragraphs (1) through (5).

"(b) Environmental Protection Agency Program.—If the Administrator determines that any State program under subsection (a) is not adequately providing information respecting the sites in such State referred

to in subsection (a), the Administrator shall notify the State. If within ninety days following such notification, the State program has not been revised or amended in such manner as will adequately provide such information, the Administrator shall carry out the inventory program in such State. In any such case—

"(1) the Administrator shall have the authorities provided with respect to State programs under subsection (a);

"(2) the funds allocated under subsection (c) for grants to States under this section may be used by the Administrator for carrying out such program in such State; and

"(3) no further expenditure may be made for grants to such State under this section until such time as the Administrator determines that such State is carrying out, or will carry out, an inventory program which meets the requirements of this section.

"(c) Grants.—(1) Upon receipt of an application submitted by any State to carry out a program under this section, the Administrator may make grants to the States for purposes of carrying out such a program. Grants under this section shall be allocated among the several States by the Administrator based upon such regulations as he prescribes to carry out the purposes of this section. The Administrator may make grants to any State which has conducted an inventory program which effectively carried out the purposes of this section before the date of the enactment of the Solid Waste Disposal Act Amendments of 1980 to reimburse such State for all, or any portion of, the costs incurred by such State in conducting such program.

"(2) There are authorized to be appropriated to carry out this section $20,000,000.

"(d) No Impediment to Immediate Remedial Action.—Nothing in this section shall be construed to provide that the Administrator or any State should, pending completion of the inventory required under this section, postpone undertaking any enforcement or remedial action with respect to any site at which hazardous waste has been treated, stored, or disposed of.

[3012 added by PL 96-482]

**"Monitoring, Analysis, and Testing**

"Sec. 3013. (a) Authority of Administrators.—If the Administrator determines, upon receipt of any information, that—

"(1) the presence of any hazardous waste at a facility or site at which hazardous waste is, or has been, stored, treated, or disposed of, or

"(2) the release of any such waste from such facility or site may present a substantial hazard to human health or the environment, he may issue an order requiring the owner or operator of such facility or site to conduct such monitoring, testing, analysis, and reporting with respect to such facility or site as the Administrator deems reasonable to ascertain the nature and extent of such hazard.

"(b) Previous Owners and Operators.— In the case of any facility or site not in operation at the time a determination is made under subsection (a) with respect to the facility or site, if the Administrator finds that the owner of such facility or site could not reasonably be expected to have actual knowledge of the presence of hazardous waste at such facility or site and of its potential for release, he may issue an order requiring the most recent previous owner or operator of such facility or site who could reasonably be expected to have such actual knowledge to carry out the actions referred to in subsection (a).

"(c) Proposal.—An order under subsection (a) or (b) shall require the person to whom such order is issued to submit to the Administrator within 30 days from the issuance of such order a proposal for carrying out the required monitoring, testing, analysis, and reporting. The Administrator may, after providing such person with an opportunity to confer with the Administrator respecting such proposal, require such person to carry out such monitoring, testing, analysis, and reporting in accordance with such proposal, and such modifications in such proposal as the Administrator

deems reasonable to ascertain the nature and extent of the hazard.

"(d) Monitoring, Etc., Carried Out by Administrator.—(1) If the Administrator determines that no owner or operator referred to in subsection (a) or (b) is able to conduct monitoring, testing, analysis, or reporting satisfactory to the Administrator, if the Administrator deems any such action carried out by an owner or operator to be unsatisfactory, or if the Administrator cannot initially determine that there is an owner or operator referred to in subsection (a) or (b) who is able to conduct such monitoring, testing, analysis, or reporting, he may—

"(A) conduct monitoring, testing, or analysis (or any combination thereof) which he deems reasonable to ascertain the nature and extent of the hazard associated with the site concerned, or

"(B) authorize a State or local authority or other person to carry out any such action, and require, by order, the owner or operator referred to in subsection (a) or (b) to reimburse the Administrator or other authority or person for the costs of such activity.

"(2) No order may be issued under this subsection requiring reimbursement of the costs of any action carried out by the Administrator which confirms the results of an order issued under subsection (a) or (b).

"(3) For purposes of carrying out this subsection, the Administrator or any authority or other person authorized under paragraph (1), may exercise the authorities set forth in section 3007.

"(e) Enforcement.—The Administrator may commence a civil action against any person who fails or refuses to comply with any order issued under this section. Such action shall be brought in the United States district court in which the defendant is located, resides, or is doing business. Such court shall have jurisdiction to require compliance with such order and to assess a civil penalty of not to exceed $5,000 for each day during which such failure or refusal occurs.

[3013 added by PL 96–482]

## "Subtitle D—State or Regional Solid Waste Plans

### "Objectives of Subtitle

"Sec. 4001. The objectives of this subtitle are to assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound and which maximize the utilization of valuable resources including energy and materials which are recoverable from solid waste and to encourage resource conservation. Such objectives are to be accomplished through Federal technical and financial assistance to States or regional authorities for comprehensive planning pursuant to Federal guidelines designed to foster cooperation among Federal, State, and local governments and private industry.

[4001 amended by PL 96–482]

### "Federal Guidelines for Plans

"Sec. 4002. (a) Guidelines for Identification of Regions.—For purposes of encouraging and facilitating the development of regional planning for solid waste management, the Administrator, within one hundred and eighty days after the date of enactment of this section and after consultation with appropriate Federal, State, and local authorities, shall by regulation publish guidelines for the identification of those areas which have common solid waste management problems and are appropriate units for planning regional solid waste management services. Such guidelines shall consider—

"(1) the size and location of areas which should be included,

"(2) the volume of solid waste which should be included, and

"(3) the available means of coordinating regional planning with other related regional planning and for coordination of such regional planning into the State plan.

"(b) Guidelines for State Plans.—Not later than eighteen months after the date of enactment of this section and after notice and hearing, the Administrator shall, after consultation with appropriate Federal,

State, and local authorities, promulgate regulations containing guidelines to assist in the development and implementation of State solid waste management plans (hereinafter in this title referred to as 'State plans'). The guidelines shall contain methods for achieving the objectives specified in section 4001. Such guidelines shall be reviewed from time to time, but not less frequently than every three years, and revised as may be appropriate.

"(c) Considerations for State Plan Guidelines.—The guidelines promulgated under subsection (b) shall consider—

"(1) the varying regional, geologic, hydrologic, climatic, and other circumstances under which different solid waste practices are required in order to insure the reasonable protection of the quality of the ground and surface waters from leachate contamination, the reasonable protection of the quality of the surface waters from surface runoff contamination, and the reasonable protection of ambient are quality;

"(2) characteristics and conditions of collection, storage, processing, and disposal operating methods, techniques and practices, and location of facilities where such operating methods, techniques, and practices are conducted, taking into account the nature of the material to be disposed;

"(3) methods for closing or upgrading open dumps for purposes of eliminating potential health hazards;

"(4) population density, distribution, and projected growth;

"(5) geographic, geologic, climatic, and hydrologic characteristics;

"(6) the type and location of transportation;

"(7) the profile of industries;

"(8) the constituents and generation rates of waste;

"(9) the political, economic, organizational, financial, and management problems affecting comprehensive solid waste management;

"(10) types of resource recovery facilities and resource conservation systems which are appropriate; and

"(11) available new and additional markets for recovered material and energy and energy resources recovered from solid waste as well as methods for conserving such materials and energy.

[4002(c)(11) amended by PL 96–482]

**"Requirements for Approval of Plans**

[Amended by PL 96–463]

"Sec. 4003. (a) Minimum Requirements.—In order to be approved under section 4007, each State plan must comply with the following minimum requirements—

[*Editor's note:* PL 96–463 and PL 96–482 both designated 4003(a) and added identical amendments.]

"(1) The plan shall identify (in accordance with section 4006(b))(A) the responsibilities of State, local, and regional authorities in the implementation of the State plan, (B) the distribution of Federal funds to the authorities responsible for development and implementation of the State plan, and (C) the means for coordinating regional planning and implementation under the State plan.

"(2) The plan shall, in accordance with section 4004(b) and 4005(a), prohibit the establishment of new open dumps within the State, and contain requirements that all solid waste (including solid waste originating in other States, but not including hazardous waste) shall be (A) utilized for resource recovery or (B) disposed of in sanitary landfills (within the meaning of section 4004(a)) or otherwise disposed of in an environmentally sound manner.

[4003(a)(2) amended by PL 96–482]

"(3) The plan shall provide for the closing or upgrading of all existing open dumps within the State pursuant to the requirements of section 4005.

"(4) The plan shall provide for the establishment of such State regulatory powers as may be necessary to implement the plan.

"(5) The plan shall provide that no state or local government within the State shall be prohibited under State or local law from negotiating and entering into long-term contracts for the supply of solid waste to resource recovery facilities, from entering into long-term contracts for the operation of such facilities, or from securing long-term markets for material and energy recovered from such facilities or for conserving materials or energy by reducing the volume of waste.

[4003(5) amended by PL 96–482]

"(6) The plan shall provide for such resource conservation or recovery and for the disposal of solid waste in sanitary landfills or any combination of practices so as may be necessary to use or dispose of such waste in a manner that is environmentally sound.

[*Editor's note:* P.L. 96–463 and PL 96–482 both added a subsection (b) to Section 4003 of this Act. The text of each follows:]

"(b) Discretionary Plan Provisions Relating to Recycled Oil.—Any State plan submitted under this subtitle may include, at the option of the State, provisions to carry out each of the following:

"(1) Encouragement, to the maximum extent feasible and consistent with the protection of the public health and the environment, of the use of recycled oil in all appropriate areas of State and local government.

"(2) Encouragement of persons contracting with the State to use recycled oil to the maximum extent feasible, consistent with protection of the public health and the environment.

"(3) Informing the public of the uses of recycled oil.

"(4) Establishment and implementation of a program (including any necessary licensing of persons and including the use, where appropriate, of manifests) to assure that used oil is collected, transported, treated, stored, reused, and disposed of, in a manner which does not present a hazard to the public health or the environment.

Any plan submitted under this title before the date of the enactment of the Used Oil Recycling Act of 1980 may be amended, at the option of the State, at any time after such date to include any provision referred to in this subsection.

[4003(b) added by PL 96–463]

"(b) Energy and Materials Conservation and Recovery Feasibility Planning and Assistance.—(1) A State which has a plan approved under this subtitle or which has submitted a plan for such approval shall be eligible for assistance under section 4008(a)(3) if the Administrator determines that under such plan the State will—

"(A) analyze and determine the economic and technical feasibility of facilities and programs to conserve resources which contribute to the waste stream or to recover energy and materials from municipal waste;

"(B) analyze the legal, institutional, and economic impediments to the development of systems and facilities for conservation of energy or materials which contribute to the waste stream or for the recovery of energy and materials from municipal waste and make recommendations to appropriate governmental authorities for overcoming such impediments;

"(C) assist municipalities within the State in developing plans, programs, and projects to conserve resources or recover energy and materials from municipal waste; and

"(D) coordinate the resource conservation and recovery planning under subparagraph (C).

"(2) The analysis referred to in paragraph (1)(A) shall include—

"(A) the evaluation of, and establishment of priorities among, market opportunities for industrial and commercial users of all types (including public utilities and industrial parks) to utilize energy and materials recovered from municipal waste;

"(B) comparisons of the relative costs of energy recovered from municipal waste in relation to the costs of energy derived from fossil fuels and other sources;

"(C) studies of the transportation and storage problems and other problems associated with the development of energy and materials recovery technology, including curbside source separation;

"(D) the evaluation and establishment of priorities among ways of conserving energy or materials which contribute to the waste stream;

"(E) comparison of the relative total costs between conserving resources and disposing of or recovering such waste; and

"(F) studies of impediments to resource conservation or recovery, including business practices, transportation requirements, or storage difficulties.

Such studies and analyses shall also include studies of other sources of solid waste from which energy and materials may be recovered or minimized.

[4003(b) added by PL 96–482]

## "Criteria for Sanitary Landfills; Sanitary Landfills Required for All Disposal

"Sec. 4004. (a) Criteria for Sanitary Landfills.—Not later than one year after the date of enactment of this section, after consultation with the States, and after notice and public hearings, the Administrator shall promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps within the meaning of this Act. At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility. Such regulations may provide for the classification of the types of sanitary landfills.

"(b) Disposal Required to be in Sanitary Landfills, Etc.—For purposes of complying with section 4003(2) each State plan shall prohibit the establishment of open dumps and contain a requirement that disposal of all solid waste within the State shall be in compliance with such section 4003(2).

"(c) Effective Date.—The prohibition contained in subsection (b) shall take effect on the date six months after the date of promulgation of regulations under subsection (a) or on the date of approval of the State plan, whichever is later.

## "Upgrading of Open Dumps

"Sec. 4005. (a) Closing or Upgrading of Existing Open Dumps.—Upon promulgation of criteria under section 1008(a)(3), any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. For purposes of complying with section 4003(2) and 4003(3), each State plan shall contain a requirement that all existing disposal facilities or sites for solid waste in such State which are open dumps listed in the inventory under subsection (b) shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards. Each such plan shall establish, for any entity which demonstrates that it has considered other public or private alternatives for solid waste management to comply with the prohibition on open dumping and is unable to utilize such alternatives to so comply, a timetable or schedule for compliance for such practice or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time (not to exceed 5 years from the date of publication of criteria under section 1008(a)(3)).

[4005(c) redesignated as (a) and amended by PL 96–482]

"(b) Inventory.—To assist the States in complying with section 4003(3), not later than one year after promulgation of regulations under section 4004, the Administrator, with the cooperation of the Bureau of the Census shall publish an inventory of all

disposal facilities or sites in the United States which are open dumps within the meaning of this Act.

[4005(b) amended by PL 96–482]

**"Procedure for Development and Implementation of State Plan**

Sec. 4006. (a) Identification of Regions. —Within one hundred and eighty days after publication of guidelines under section 4002(a) (relating to identification of regions), the Governor of each State, after consultation with local elected officials, shall promulgate regulations based on such guidelines identifying the boundaries of each area within the State which, as a result of urban concentrations, geographic conditions, markets, and other factors, is appropriate for carrying out regional solid waste management. Such regulations may be modified from time to time (identifying additional or different regions) pursuant to such guidelines.

"(b) Identification of State and Local Agencies and Responsibilities.—(1) Within one hundred and eighty days after the Governor promulgates regulations under subsection (a), for purposes of facilitating the development and implementation of a State plan which will meet the minimum requirements of section 4003, the State, together with appropriate elected officials of general purpose units of local government, shall jointly (A) identify an agency to develop the State plan and identify one or more agencies to implement such plan, and (B) identify which solid waste management activities will, under such State plan, be planned for and carried out by the State and which such management activities will, under such State plan, be planned for and carried out by a regional or local authority or a combination of regional or local and State authorities. If a multi-functional regional agency authorized by State law to conduct solid waste planning and management (the members of which are appointed by the Governor) is in existence on the date of enactment of this Act, the Governor shall identify such authority for purposes of carrying out within such region clause (A) of this paragraph. Where feasible, des-

ignation of the agency for the affected area designated under section 208 of the Federal Water Pollution Control Act (86 Stat. 839) shall be considered. A State agency identified under this paragraph shall be established or designated by the Governor of such State. Local or regional agencies identified under this paragraph shall be composed of individuals at least a majority of whom are elected local officials.

[4006(b)(1) amended by PL 96–482]

"(2) If planning and implementation agencies are not identified and designated or established as required under paragraph (1) for any affected area, the governor shall, before the date two hundred and seventy days after promulgation of regulations under subsection (a), establish or designate a State agency to develop and implement the State plan for such area.

"(c) Interstate Regions.—(1) In the case of any region which, pursuant to the guidelines published by the Administrator under section 4002(a) (relating to identification of regions), would be located in two or more States, the Governors of the respective States, after consultation with local elected officials, shall consult, cooperate, and enter into agreements identifying the boundaries of such region pursuant to subsection (a).

"(2) Within one hundred and eighty days after an interstate region is identified by agreement under paragraph (1), appropriate elected officials of general purpose units of local government within such region shall jointly establish or designate an agency to develop a plan for such region. If no such agency is established or designated within such period by such officials, the Governors of the respective States may, by agreement, establish or designate for such purpose a single representative organization including elected officials of general purpose units of local government within such region.

"(3) Implementation of interstate regional solid waste management plans shall be conducted by units of local government for any portion of a region within their jurisdiction, or by multijurisdictional agencies

or authorities designated in accordance with State law, including those designated by agreement by such units of local government for such purpose. If no such unit, agency, or authority is so designated, the respective Governors shall designate or establish a single interstate agency to implement such plan.

"(4) For purposes of this subtitle, so much of an interstate regional plan as is carried out within a particular State shall be deemed part of the State plan for such State.

### "Approval of State Plan; Federal Assistance

"Sec. 4007. (a) Plan Approval.—The Administrator shall, within six months after a State plan has been submitted for approval, approve or disapprove the plan. The Administrator shall approve a plan if he determines that—

"(1) it meets the requirements of paragraphs (1), (2), (3), and (5) of section 4003; and

"(2) it contains provision for revision of such plan, after notice and public hearing, whenever the Administrator, by regulation, determines—

"(A) that revised regulations respecting minimum requirements have been promulgated under paragraphs (1), (2), (3), and (5) of section 4003 with which the State plan is not in compliance;

"(B) that information has become available which demonstrates the inadequacy of the plan to effectuate the purposes of this subtitle; or

"(C) that such revision is otherwise necessary. The Administrator shall review approved plans from time to time and if he determines that revision or corrections are necessary to bring such plan into compliance with the minimum requirements promulgated under section 4003 (including new or revised requirements), he shall, after notice and opportunity for public hearing, withdraw his approval of such plan. Such withdrawal of approval shall cease to be effective upon the Administrator's de-

termination that such complies with such minimum requirements.

"(b) Eligibility of States for Federal Financial Assistance.—(1) The Administrator shall approve a State application for financial assistance under this subtitle, and make grants to such State, if such State and local and regional authorities within such State have complied with the requirements of section 4006 within the period required under such section and if such State has a State plan which has been approved by the Administrator under this subtitle.

"(2) The Administrator shall approve a State application for financial assistance under this subtitle, and make grants to such State, for fiscal years 1978 and 1979 if the Administrator determines that the State plan continues to be eligible for approval under subsection (a) and is being implemented by the State.

"(3) Upon withdrawal of approval of a State plan under subsection (a), the Administrator shall withhold Federal financial and technical assistance under this subtitle (other than such technical assistance as may be necessary to assist in obtaining the reinstatement of approval) until such time as such approval is reinstated.

"(c) Existing Activities.—Nothing in this subtitle shall be construed to prevent or affect any activities respecting solid waste planning or management which are carried out by State, regional, or local authorities unless such activities are inconsistent with a State plan approved by the Administrator under this subtitle.

### "Federal Assistance

"Sec. 4008. (a) Authorization of Federal Financial Assistance.—(1) There are authorized to be appropriated $30,000,000 for fiscal year 1978, $40,000,000 for fiscal year 1979, $20,000,000 for fiscal year 1980, $15,-000,000 for fiscal year 1981, and $20,000,-000 for fiscal year 1982 for purposes of financial assistance to States and local, regional, and interstate authorities for the development and implementation of plans approved by the Administrator under this subtitle (other than the provisions of such

plans referred to in section 4003(b), relating to feasibility planning for municipal waste energy and materials conservation and recovery).

[4008(a)(1) amended by PL 96–482]

"(2)(A) The Administrator is authorized to provide financial assistance to States, counties, municipalities, and intermunicipal agencies and State and local public solid waste management authorities for implementation of programs to provide solid waste management, resource recovery, and resource conservation services and hazardous waste management. Such assistance shall include assistance for facility planning and feasibility studies; expert consultation; surveys and analyses of market needs; marketing of recovered resources; technology assessments; legal expenses; construction feasibility studies; source separation projects; and fiscal or economic investigations or studies; but such assistance shall not include any other element of construction, or any acquisition of land or interest in land, or any subsidy for the price of recovered resources. Agencies assisted under this subsection shall consider existing solid waste management and hazardous waste management services and facilities as well as facilities proposed for construction.

"(B) An applicant for financial assistance under this paragraph must agree to comply with respect to the project or program assisted with the applicable requirements of section 4005 and Subtitle C of this Act and apply applicable solid waste management practices, methods, and levels of control consistent with any guidelines published pursuant to section 1008 of this Act. Assistance under this paragraph shall be available only for programs certified by the State to be consistent with any applicable State or areawide solid waste management plan or program. Applicants for technical and financial assistance under this section shall not preclude or foreclose consideration of programs for the recovery of recyclable materials through source separation or other resource recovery techniques.

[4008(a)(2)(B) amended by PL 96–482]

"(C) There are authorized to be appropriated $15,000,000 for each of the fiscal years 1978 and 1979 for purposes of this section. There are authorized to be appropriated $10,000,000 for fiscal year 1980, $10,000,000 for fiscal year 1981, and $10,000,000 for fiscal year 1982 for purposes of this paragraph.

[4008(a)(2)(C) amended by PL 96–482]

"(3)(A) There is authorized to be appropriated for the fiscal year beginning October 1, 1981, and for each fiscal year thereafter before October 1, 1986, $4,000,000 for purposes of making grants to States to carry out section 4003(b). No amount may be appropriated for such purposes for the fiscal year beginning on October 1, 1986, or for any fiscal year thereafter.

"(B) Assistance provided by the Administrator under this paragraph shall be used only for the purposes specified in section 4003(b). Such assistance may not be used for purposes of land acquisition, final facility design, equipment purchase, construction, startup or operation activities.

"(C) Where appropriate, any State receiving assistance under this paragraph may make all or any part of such assistance available to municipalities within the State to carry out the activities specified in section 4003(b)(1)(A) and (B).

[4008(a)(3) added by PL 96–482]

"(b) State Allotment.—The sums appropriated in any fiscal year under subsection (a)(1) shall be allotted by the Administrator among all States, in the ration that the population in each State bears to the population in all of the States, except that no State shall receive less than one-half of 1 per centum of the sums so allotted in any fiscal year. No State shall receive any grant under this section during any fiscal year when its expenditures of non-Federal funds for other than nonrecurrent expenditures for solid waste management control programs will be less than its expenditures were for such programs during fiscal year 1975, except that such funds may be reduced by an amount equal to their propor-

tionate share of any general reduction of State spending ordered by the Governor or legislature of such State. No State shall receive any grant for solid waste management programs unless the Administrator is satisfied that such grant will be so used as to supplement and, to the extent practicable, increase the level of State, local, regional, or other non-Federal funds that would in the absence of such grant be made available for the maintenance of such programs.

"(c) Distribution of Federal Financial Assistance Within the State.—The Federal assistance allotted to the States under subsection (b) shall be allocated by the State receiving such funds to State, local, regional, and interstate authorities carrying out planning and implementation of the State plan. Such allocation shall be based upon the responsibilities of the respective parties as determined pursuant to section 4006(b).

"(d) Technical Assistance.—(1) The Administrator may provide technical assistance to State and local governments for purposes of developing and implementing State plans. Technical assistance respecting resource recovery and conservation may be provided through resource recovery and conservation panels, established in the Environmental Protection Agency under subtitle B, to assist the State and local governments with respect to particular resource recovery and conservation projects under consideration and to evaluate their effect on the State plan.

[4008(d)(1) designated by PL 96–463 and PL 96–482]

[*Editor's note:* PL 96–463 and 96–482 added different versions of 4008(d)(2) to this Act. The text of each follows:]

"(2) In carrying out this subsection, the Administrator may, upon request, provide technical assistance to States to assist in the removal or modification of legal, institutional, economic, and other impediments to the recycling of used oil. Such impediments may include laws, regulations, and policies, including State procurement policies, which are not favorable to the recycling of used oil.

[4008(d)(2) added by PL 96–463]

"(2) In carrying out this subsection, the Administrator is authorized to provide technical assistance to States, municipalities, regional authorities, and intermunicipal agencies upon request, to assist in the removal or modification of legal, institutional, and economic impediments which have the effect of impeding the development of systems and facilities to recover energy and materials from municipal waste or to conserve energy or materials which contribute to the waste stream. Such impediments may include—

"(A) laws, regulations, and policies, including State and local procurement policies, which are not favorable to resource conservation and recovery policies, systems, and facilities;

"(B) impediments to the financing of facilities to conserve or recover energy and materials from municipal waste through the exercise of State and local authority to issue revenue bonds and the use of State and local credit assistance; and

"(C) impediments to institutional arrangements necessary to undertake projects for the conservation or recovery of energy and materials from municipal waste, including the creation of special districts, authorities, or corporations where necessary having the power to secure the supply of waste of a project, to conserve resources, to implement the project, and to undertake related activities.

[4008(d)(2) added by PL 96–482]

"(e) Special Communities.—(1) The Administrator, in cooperation with State and local officials, shall identify local governments within the United States (A) having a solid waste disposal facility (i) which is owned by the unit of local government, (ii) for which an order has been issued by the State to cease receiving solid waste for treatment, storage, or disposal, and (iii) which is subject to a State-approved end-use recreation plan, and (B) which are located over an aquifer which is the source of drinking water for any person or public water system which has serious environ-

mental problems resulting from the disposal of such solid waste, including methane migration.

"(2) There is authorized to be appropriated to the Administrator $2,500,000 for the fiscal year 1980 and $1,500,000 for each of the fiscal years 1981 and 1982 to make grants to be used for the containment and stabilization of solid waste located at the disposal sites referred to in paragraph (1). Not more than one community in any State shall be eligible for grants under this paragraph and not more than one project in any State shall be eligible for such grants. No unit of local government shall be eligible for grants under this paragraph with respect to any site which exceeds 65 acres in size. [4008(e)(1) and (2) amended and (3) deleted by PL 96-482]

[*Editor's note:* PL 96-463 and PL 96-482 both added a subsection (f) to Section 4008. The text of each follows:]

"(f) Assistance to States for Discretionary Program for Recycled Oil.—(1) The Administrator may make grants to States, which have a State plan approved under section 4007, or which have submitted a State plan for approval under such section, if such plan includes the discretionary provisions described in section 4003(b). Grants under this subsection shall be for purposes of assisting the State in carrying out such discretionary provisions. No grant under this subsection may be used for construction or for the acquisition of land or equipment.

"(2) Grants under this subsection shall be allotted among the States in the same manner as provided in the first sentence of subsection (b).

"(3) No grant may be made under this subsection unless an application therefor is submitted to, and approved by, the Administrator. The application shall be in such form, be submitted in such manner, and contain such information as the Administrator may require.

"(4) For purposes of making grants under this subsection, there are authorized to be appropriated $5,000,000 for fiscal year 1982 and $5,000,000 for fiscal year 1983.
[4008(f) added by PL 96-463]

"(f) Assistance to Municipalities for Energy and Materials Conservation and Recovery Planning Activities.—(1) The Administrator is authorized to make grants to municipalities, regional authorities, and intermunicipal agencies to carry out activities described in subparagraphs (A) and (B) of section 4003(b)(1). Such grants may be made only pursuant to an application submitted to the Administrator by the municipality which application has been approved by the State and determined by the State to be consistent with any State plan approved or submitted under this subtitle or any other appropriate planning carried out by the State.

"(2) There is authorized to be appropriated for the fiscal year beginning October 1, 1981, and for each fiscal year thereafter before October 1, 1986, $8,000,000 for purposes of making grants to municipalities under this subsection. No amount may be appropriated for such purposes for the fiscal year beginning on October 1, 1986, or for any fiscal year thereafter.

"(3) Assistance provided by the Administrator under this subsection shall be used only for the purposes specified in paragraph (1). Such assistance may not be used for purposes of land acquisition, final facility design, equipment purchase, construction, startup or operation activities.
[4008(f) added by PL 96-482]

**"Rural Communities Assistance**

"Sec. 4009. (a) In General.—The Administrator shall make grants to States to provide assistance to municipalities with a population of five thousand or less, or counties with a population of ten thousand or less or less than twenty persons per square mile and not within a metropolitan area, for solid waste management facilities (including equipment) necessary to meet the requirements of section 4005 of this Act or restrictions on open burning or other requirements arising under the Clean Air Act or the Federal Water Pollution

Control Act. Such assistance shall only be available—

"(1) to any municipality or county which could not feasibly be included in a solid waste management system or facility serving an urbanized, multijurisdictional area because of its distance from such systems;

"(2) where existing or planned solid waste management services or facilities are unavailable or insufficient to comply with the requirements of section 4005 of this Act; and

"(3) for systems which are certified by the State to be consistent with any plans or programs established under any State or areawide planning process.

"(b) Allotment.—The Administrator shall allot the sums appropriated to carry out this section in any fiscal year among the States in accordance with regulations promulgated by him on the basis of the average of the ratio which the population of rural areas of each State bears to the total population of rural areas of all the States, the ratio which the population of counties in each State having less than twenty persons per square mile bears to the total population of such counties in all the States, and the ratio which the population of such low-density counties in each State having 33 per centum or more of all families with incomes not in excess of 125 per centum of the poverty level bears to the total population of such counties in all the States.

"(c) Limit.—The amount of any grant under this section shall not exceed 75 per centum of the costs of the project. No assistance under this section shall be available for the acquisition of land or interests in land.

"(d) Appropriations.—There are authorized to be appropriated $25,000,000 for each of the fiscal years 1978 and 1979 to carry out this section. There are authorized to be appropriated $10,000,000 for the fiscal year 1980 and $15,000,000 for each of the fiscal years 1981 and 1982 to carry out this section.

[4009(d) amended by PL 96–482]

## "Subtitle E—Duties of the Secretary of Commerce in Resource and Recovery

### "Functions

"Sec. 5001. The Secretary of Commerce shall encourage greater commercialization of proven resource recovery technology by providing—

"(1) accurate specifications for recovered materials;

"(2) stimulation of development of markets for recovered materials;

"(3) promotion of proven technology; and

"(4) a forum for the exchange of technical and economic data relating to resource recovery facilities.

### "Development of Specifications for Secondary Materials

"Sec. 5002. The Secretary of Commerce, acting through the National Bureau of Standards, and in conjunction with national standards-setting organizations in resource recovery, shall, after public hearings, and not later than two years after September 1, 1979, publish guidelines for the development of specifications for the classification of materials recovered from waste which were destined for disposal. The specifications shall pertain to the physical and chemical properties and characteristics of such materials with regard to their use in replacing virgin materials in various industrial, commercial, and governmental uses. In establishing such guidelines the Secretary shall also, to the extent feasible, provide such information as may be necessary to assist Federal agencies with procurement of items containing recovered materials. The Secretary shall continue to cooperate with national standards-setting organizations, as may be necessary, to encourage the publication, promulgation and updating of standards for recovered materials and for the use of recovered materials in various industrial, commercial, and governmental uses.

[5002 amended by PL 96–482]

## "Development of Markets for Recovered Materials

"Sec. 5003. The Secretary of Commerce shall within two years after September 1, 1979, take such actions as may be necessary to—

"(1) identify the geographical location of existing or potential markets for recovered materials;

"(2) identify the economic and technical barriers to the use of recovered materials; and

"(3) encourage the development of new uses for recovered materials.

[5003 amended by PL 96–482]

## "Technology Promotion

"Sec. 5004. The Secretary of Commerce is authorized to evaluate the commercial feasibility of resource recovery facilities and to publish the results of such evaluation, and to develop a data base for purposes of assisting persons in choosing such a system.

## "Nondiscrimination Requirement

"Sec. 5005. In establishing any policies which may affect the development of new markets for recovered materials and in making any determination concerning whether or not to impose monitoring or other controls on any marketing or transfer of recovered materials, the Secretary of Commerce may consider whether to establish the same or similar policies or impose the same or similar monitoring or other controls on virgin materials.

[5005 added by PL 96–482]

## "Authorization of Appropriations

"Sec. 5006. There are authorized to be appropriated to the Secretary of Commerce $5,000,000 for each of fiscal years 1980, 1981 and 1982 to carry out the purposes of this subtitle.

[5006 added by PL 96–482]

## "Subtitle F—Federal Responsibilities

## "Application of Federal, State, and Local Law to Federal Facilities

"Sec. 6001. Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any solid waste management facility or disposal site, or (2) engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and complying with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief. The President may exempt any solid waste management facility of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so. No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting each such exemption.

## "Federal Procurement

"Sec. 6002. (a) Application of Section. —Except as provided in subsection (b), a

procuring agency shall comply with the requirements set forth in this section and any regulations issued under this section, with respect to any purchase or acquisition of a procurement item where the purchase price of the item exceeds $10,000 or where the quantity of such items or of functionally equivalent items purchased or acquired in the course of the preceding fiscal year was $10,000 or more.

"(b) Procurement Subject to Other Law. —Any procurement, by any procuring agency, which is subject to regulations of the Administrator under section 6004 (as promulgated before the date of enactment of this section under comparable provisions of prior law) shall not be subject to the requirements of this section to the extent that such requirements are inconsistent with such regulations.

"(c) Requirements.—(1) After the date specified in applicable guidelines prepared pursuant to subsection (e) of this section, each procuring agency which procures any items designated in such guidelines shall procure such items composed of the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, considering such guidelines. The decision not to procure such items shall be based on a determination that such procurement items—

[6002(c)(1) amended by PL 96–482]

"(A) are not reasonably available within a reasonable period of time;

"(B) fail to meet the performance standards set forth in the applicable specifications or fail to meet the reasonable performance standards of the procuring agencies; or

"(C) are only available at an unreasonable price. Any determination under subparagraph (B) shall be made on the basis of the guidelines of the Bureau of Standards in any case in which such material is covered by such guidelines.

"(2) Agencies that generate heat, mechanical, or electrical energy from fossil fuel in systems that have the technical capability of using energy or fuels derived from solid waste as a primary or supplementary fuel shall use such capability to the maximum extent practicable.

"(3) After the date specified in any applicable guidelines prepared pursuant to subsection (e) of this section contracting, officers shall require that vendors:

"(A) certify that the percentage of recovered materials to be used in the performance of the contract will be at least the amount required by applicable specifications or other contractual requirements and

"(B) estimate the percentage of the total material utilized for the performance of the contract which is recovered materials.

[6003(c)(3) amended by PL 96–482]

"(d) Specifications.—All Federal agencies that have the responsibility for drafting or reviewing specifications for procurement items procured by Federal agencies shall—

"(1) as expeditiously as possible but in any event no later than five years after the date of enactment of this Act, eliminate from such specifications—

"(A) any exclusion of recovered materials and

"(B) any requirement that items be manufactured from virgin materials; and

"(2) within one year after the date of publication of applicable guidelines under subsection (e), or as otherwise specified in such guidelines, assure that such specifications require the use of recovered materials to the maximum extent possible without jeopardizing the intended end use of the item.

[6003(d) revised by PL 96–482]

"(e) Guidelines.—The Administrator, after consultation with the Administrator of General Services, the Secretary of Commerce (acting through the Bureau of Standards), and the Public Printer, shall prepare, and from time to time revise, guidelines for the use of procuring agencies in complying with the requirements of this section. Such guidelines shall—

"(1) designate those items which are or can be produced with recovered materials

and whose procurement by procuring agencies will carry out the objectives of this section; and

"(2) set forth recommended practices with respect to the procurement of recovered materials and items containing such materials and with respect to certification by vendors of the percentage of recovered materials used,

and shall provide information as to the availability, relative price, and performance of such materials and items and where appropriate shall recommend the level of recovered material to be contained in the procured product. The Administrator shall prepare final guidelines for at least three product categories, including paper, by May 1, 1981, and for two additional product categories, including construction materials, by September 30, 1982. In making the designation under paragraph (1), the Administrator shall consider, but is not limited in his considerations, to—

"(A) the availability of such items;

"(B) the impact of the procurement of such items by procuring agencies on the volume of solid waste which must be treated, stored or disposed of;

"(C) the economic and technological feasibility of producing and using such items; and

"(D) other uses for such recovered materials.

[6002(e) revised by PL 96–482]

"(f) Procurement of Services.—A procuring agency shall, to the maximum extent practicable, manage or arrange for the procurement of solid waste management services in a manner which maximizes energy and resource recovery.

"(g) Executive Office.—The Office of Procurement Policy in the Executive Office of the President, in cooperation with the Administrator, shall implement the policy expressed in this section. It shall be the responsibility of the Office of Procurement Policy to coordinate this policy with other policies for Federal procurement, in such a way as to maximize the use of recovered resources.

[6002(g) amended by PL 97–375]

## "Cooperation With the Environmental Protection Agency

"Sec. 6003. (a) General Rule.—All Federal agencies shall assist the Administrator in carrying out his functions under this Act and shall promptly make available all requested information concerning past or present Agency waste management practices and past or present Agency owned, leased, or operated solid or hazardous waste facilities. This information shall be provided in such format as may be determined by the Administrator.

"(b) Information Relating to Energy and Materials Conservation and Recovery.— The Administrator shall collect, maintain, and disseminate information concerning the market potential of energy and materials recovered from solid waste, including materials obtained through source separation, and information concerning the savings potential of conserving resources contributing to the waste stream. The Administrator shall identify the regions in which the increased substitution of such energy for energy derived from fossil fuels and other sources is most likely to be feasible, and provide information on the technical and economic aspects of developing integrated resource conservation or recovery systems which provide for the recovery of source-separated materials to be recycled or the conservation of resources. The Administrator shall utilize the authorities of subsection (a) in carrying out this subsection.

[6003 revised by PL 96–482]

## "Applicability of Solid Waste Disposal Guidelines to Executive Agencies

"Sec. 6004. (a) Compliance.—(1) If—

"(A) an Executive agency (as defined in section 105 of title 5, United States Code or any unit of the legislative branch of the Federal Government has jurisdiction over any real property or facility the operation or administration of which involves such agency in solid waste management activities, or

[6004(a)(1)(A) amended by PL 96–482]

"(B) such an agency enters into a contract with any person for the operation by such person of any Federal property or facility, and the performance of such contract involves such person in solid waste management activities,

then such agency shall insure compliance with the guidelines recommended under section 1008 and the purposes of this Act in operation or administration of such property or facility, or the performance of such contract, as the case may be.

"(2) Each Executive agency or any unit of the legislative branch of the Federal Government which conducts any activity—

[6004(a)(2) amended by PL 96–482]

"(A) which generates solid waste, and

"(B) which, if conducted by a person other than such agency, would require a permit or license from such agency in order to dispose of such solid waste,

"(B) which, if conducted by a person other than such agency, would require a permit or license from such agency in order to dispose of such solid wate, shall insure compliance with such guidelines and the purposes of this Act in conducting such activity.

"(3) Each Executive agency which permits the use of Federal property for purposes of disposal of solid waste shall insure compliance with such guidelines and the purposes of this Act in the disposal of such waste.

"(4) The President or the Committee on House Administration of the House of Representatives and the Committee on Rules and Administration of the Senate with regard to any unit of the legislative branch of the Federal Government shall prescribe regulations to carry out this subsection.

[6004(a)(4) amended by PL 96–482]

"(b) Licenses and Permits.—Each Executive agency which issues any license or permit for disposal of solid waste shall, prior to the issuance of such license or permit, consult with the Administrator to insure compliance with guidelines recom-

mended under section 1008 and the purposes of this Act.

## "Subtitle G—Miscellaneous Provisions

### "Employee Protection

"Sec. 7001. (a) General.—No person shall fire, or in any other way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of the fact that such employee or representative has filed, instituted, or caused to be filed or instituted any proceeding under this Act or under any applicable implementation plan, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this Act or of any applicable implementation plan.

"(b) Remedy.—Any employee or a representative of employees who believes that he has been fired or otherwise discriminated against by any person in violation of subsection (a) of this section may, within thirty days after such alleged violation occurs, apply to the Secretary of Labor for a review of such firing or alleged discrimination. A copy of the application shall be sent to such person who shall be the respondent. Upon receipt of such application, the Secretary of Labor shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing at the request of any party to such review to enable the parties to present information relating to such alleged violation. The parties shall be given written notice of the time and place of the hearing at least five days prior to the hearing. Any such hearing shall be of record and shall be subject to section 554 of title 5 of the United States Code. Upon receiving the report of such investigation, the Secretary of Labor shall make findings of fact. If he finds that such violation did occur, he shall issue a decision, incorporating an order therein and his findings, requiring the party committing such violation to take such affirmative action to abate the violation as the Secretary of Labor deems appropriate, including, but not limited to, the rehiring or reinstate-

ment of the employee or representative of employees to his former position with compensation. If he finds that there was no such violation, he shall issue an order denying the application. Such order issued by the Secretary of Labor under this subparagraph shall be subject to judicial review in the same manner as orders and decisions of the Administrator or subject to judicial review under this Act.

"(c) Costs.—Whenever an order is issued under this section to abate such violation, at the request of the applicant, a sum equal to the aggregate amount of all costs and expenses (including the attorney's fees) as determined by the Secretary of Labor, to have been reasonably incurred by the applicant for, or in connection with, the institution and prosecution of such proceedings, shall be assessed against the person committing such violation.

"(d) Exception.—This section shall have no application to any employee who, acting without direction from his employer (or his agent) deliberately violates any requirement of this Act.

"(e) Employment Shifts and Loss.—The Administrator shall conduct continuing evaluations of potential loss or shifts of employment which may result from the administration or enforcement of the provisions of this Act and applicable implementation plans, including, where appropriate, investigating threatened plant closures or reductions in employment allegedly resulting from such administration or enforcement. Any employee who is discharged, or laid off, threatened with discharge or layoff, or otherwise discriminated against by any person because of the alleged results of such administration or enforcement, or any representative of such employee, may request the Administrator to conduct a full investigation of the matter. The Administrator shall thereupon investigate the matter and, at the request of any party, shall hold public hearings on not less than five days' notice, and shall at such hearings require the parties, including the employer involved, to present information relating to the actual or potential effect of such ad-

ministration or enforcement on employment and on any alleged discharge, layoff, or other discrimination and the detailed reasons or justification therefor. Any such hearing shall be of record and shall be subject to section 554 of title 5 of the United States Code. Upon receiving the report of such investigation, the Administrator shall make findings of fact as to the effect of such administration or enforcement on employment and on the alleged discharge, layoff, or discrimination and shall make such recommendations as he deems appropriate. Such report, findings, and recommendations shall be available to the public. Nothing in this subsection shall be construed to require or authorize the Administrator or any State to modify or withdraw any standard, limitation, or any other requirement of this Act or any applicable implementation plan.

"(f) Occupational Safety and Health.—In order to assist the Secretary of Labor and the Director of the National Institute for Occupational Safety and Health in carrying out their duties under the Occupational Safety and Health Act of 1970, the Administrator shall—

"(1) provide the following information, as such information becomes available, to the Secretary and the Director:

"(A) the identity of any hazardous waste generation, treatment, storage, disposal facility or site where cleanup is planned or underway;

"(B) information identifying the hazards to which persons working at a hazardous waste generation, treatment, storage, disposal facility or site or otherwise handling hazardous waste may be exposed, the nature and extent of the exposure, and methods to protect workers from such hazards; and

"(C) incidents of worker injury or harm at a hazardous waste generation, treatment, storage or disposal facility or site; and

"(2) notify the Secretary and the Director of the Administrator's receipt of notifications under section 3010 or reports

under sections 3002, 3003, and 3004 of this title and make such notifications and reports available to the Secretary and the Director.

[7001(f) added by PL 96–482]

### "Citizen Suits

"Sec. 7002. (a) In General.—Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

"(1) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this Act; or

"(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator.

Any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred. Any action brought under paragraph (a)(2) of this subsection may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such regulation or order, or to order the Administrator to perform such act or duty as the case may be.

"(b) Actions Prohibited.—No action may be commenced under paragraph (a)(1) of this section—

"(1) prior to sixty days after the plaintiff has given notice of the violation (A) to the Administrator; (B) to the State in which the alleged violation occurs; and (C) to any alleged violator of such permit, standard, regulation, condition, requirement, or order; or

"(2) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, or order: *Provided, however,* That in any such action in a court of the United States, any person may intervene as a matter of right.

"(c) Notice.—No action may be commenced under paragraph (a)(2) of this section prior to sixty days after the plaintiff has given notice to the Administrator that he will commence such action, except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subtitle C of this Act. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation. Any action respecting a violation under this Act may be brought under this section only in the judicial district in which such alleged violation occurs.

"(d) Intervention.—In any action under this section the Administrator, if not a party, may intervene as a matter of right.

"(e) Costs.—The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such an award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

"(f) Other Rights Preserved.—Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency).

### "Imminent Hazard

"Sec. 7003. (a) Authority of Administrator.—Notwithstanding any other provision of this Act, upon receipt of evidence

that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person contributing to such handling, storage, treatment, transportation or disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary. The Administrator shall provide notice to the affected State of any such suit. The Administrator may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.

"(b) Violations.—Any person who willfully violates, or fails or refuses to comply with, any order of the Administrator under subsection (a) may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $5,000 for each day in which such violation occurs or such failure to comply continues.

[7003(a) designated and amended and (b) added by PL 96–482]

### "Petition for Regulations; Public Participation

"Sec. 7004. (a) Petition.—Any person may petition the Administrator for the promulgation, amendment, or repeal of any regulation under this Act. Within a reasonable time following receipt of such petition, the Administrator shall take action with respect to such petition and shall publish notice of such action in the Federal Register together with the reasons therefor.

"(b)(1) Public Participation.—Public participation in the development, revision, implementation, and enforcement of any regulation, guideline, information, or program under this Act shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish minimum guidelines for public participation in such processes.

[7004(b)(1) designated by PL 96–482]

"(2) Before the issuing of a permit to any person with any respect to any facility for the treatment, storage, or disposal of hazardous wastes under section 3005, the Administrator shall—

"(A) cause to be published in major local newspapers of general circulation and broadcast over local radio stations notice of the agency's intention to issue such permit, and

"(B) transmit in writing notice of the agency's intention to issue such permit to each unit of local government having jurisdiction over the area in which such facility if proposed to be located and to each State agency having any authority under State law with respect to the construction or operation of such facility. If within 45 days the Administrator receives written notice of opposition to the agency's intention to issue such permit and a request for a hearing, or if the Administrator determines on his own initiative, he shall hold an informal public hearing (including an opportunity for presentation of written and oral views) on whether he should issue a permit for the proposed facility. Whenever possible the Administrator shall schedule such hearing at a location convenient to the nearest population center to such proposed facility and give notice in the aforementioned manner of the date, time, and subject matter of such hearing. No State program which provides for the issuance of permits referred to in this paragraph may be authorized by the Administrator under section 3006 unless such program provides for the notice and hearing required by the paragraph.

[7004(b)(2) added by PL 96–482]

### "Separability

"Sec. 7005. If any provision of this Act, or the application of any provision of this Act to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the

remainder of this Act, shall not be affected thereby.

### "Judicial Review

"Sec. 7006. (a) Review of Final Regulations and Certain Petitions—Any judicial review of final regulations promulgated pursuant to this Act and the Administrator's denial of any petition for the promulgation, amendment, or repeal of any regulation under this Act shall be in accordance with sections 701 through 706 of title 5 of the United States Code, except that—

"(1) a petition for review of action of the Administrator in promulgating any regulation, or requirement under this Act or denying any petition for the promulgation, amendment or repeal of any regulation under this Act may be filed only in the United States Court of Appeals for the District of Columbia, and such petition shall be filed within ninety days from the date of such promulgation or denial or after such date if such petition for review is based solely on grounds arising after such ninetieth day; action of the Administrator with respect to which review could have been obtained under this subsection shall not be subject to judicial review in civil or criminal proceedings for enforcement; and

[7006(a) designated and (a)(1) amended by PL 96–482]

"(2) in any judicial proceeding brought under this section in which review is sought of a determination under this Act required to be made on the record after notice and opportunity for hearing, if a party seeking review under this Act applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that the information is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, and to be adduced upon the hearing in such manner and upon such terms and conditions as the court may deem proper; the Administrator may modify his findings as to the facts, or make new findings, by reason of the addi-

tional evidence so taken, and he shall file with the court such modified or new findings and his recommendation, if any for the modification or setting aside of his original order, with the return of such additional evidence.

[7006(a)(2) amended by PL 96–482]

"(b) Review of Certain Actions Under Sections 3005 and 3006.—Review of the Administrator's action (1) in issuing, denying, modifying or revoking any permit under section 3005, or (2) in granting, denying, or withdrawing authorization or interim authorization under section 3006, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such issuance, denial, modification, revocation, grant, or withdrawal, or after such date only if such application is based solely on grounds which arose after such ninetieth day. Such review shall be in accordance with sections 701 through 706 of title 5 of the United States Code.

[7006(b) added by PL 96–482]

### "Grants or Contracts for Training Projects

"Sec. 7007. (a) General Authority.—The Administrator is authorized to make grants to, and contracts with any eligible organization. For purposes of this section the term "eligible organization" means a State or interstate agency, a municipality, educational institution, and any other organization which is capable of effectively carrying out a project which may be funded by grant under subsection (b) of this section.

"(b) Purposes.—(1) Subject to the provisions of paragraph (2), grants or contracts may be made to pay all or a part of the costs, as may be determined by the Administrator, of any project operated or to be operated by an eligible organization, which is designed—

"(A) to develop, expand, or carry out a program (which may combine training, education, and employment) for training persons for occupations involving the management, supervision, design, operation, or maintenance of solid waste management and resource recovery equipment and facilities; or

"(B) to train instructors and supervisory personnel to train or supervise persons in occupations involving the design, operation, and maintenance of solid waste management and resource recovery equipment and facilities.

"(2) A grant or contract authorized by paragraph (1) of this subsection may be made only upon application to the Administrator at such time or times and containing such information as he may prescribe, except that no such application shall be approved unless it provides for the same procedures and reports (and access to such reports and to other records) as required by section 207(b)(4) and (5) (as in effect before the date of the enactment of Resource Conservation and Recovery Act of 1976) with respect to applications made under such section (as in effect before the date of the enactment of Resource Conservation and Recovery Act of 1976).

"(c) Study.—The Administrator shall make a complete investigation and study to determine—

"(1) the need for additional trained State and local personnel to carry out plans assisted under this Act and other solid waste and resource recovery programs;

"(2) means of using existing training programs to train such personnel; and

"(3) the extent and nature of obstacles to employment and occupational advancement in the solid waste management and resource recovery field which may limit either available manpower or the advancement of personnel in such field.

He shall report the results of such investigation and study, including his recommendations to the President and the Congress.

"**Payments**

"Sec. 7008. (a) General Rule.—Payments of grants under this Act may be made (after necessary adjustment on account of previously made underpayments or overpayments) in advance or by way of reimbursement, and in such installments and on such conditions as the Administrator may determine.

"(b) Prohibition.—No grant may be made under this Act to any private profit-making organization.

"**Labor Standards**

"Sec. 7009. No grant for a project of construction under this Act shall be made unless the Administrator finds that the application contains or is supported by reasonable assurance that all laborers and mechanics employed by contractors or subcontractors on projects of the type covered by the Davis-Bacon Act, as amended (40 U.S.C. 276a–276a–5), will be paid wages at rates not less than those prevailing on similar work in the locality as determined by the Secretary of Labor in accordance with that Act; and the Secretary of Labor shall have with respect to the labor standards specified in this section the authority and functions set forth in Reorganization Plan Numbered 14 of 1950 (15 F.R. 3176; 5 U.S.C. 133z–5) and section 2 of the Act of June 13, 1934, as amended (40 U.S.C. 276c).

[7009 amended by PL 96–482]

"**Subtitle H—Research, Development, Demonstration, and Information**

"**Research, Demonstration, Training, and Other Activities**

"Sec. 8001. (a) General Authority.—The Administrator, alone or after consultation with the Administrator of the Federal Energy Administration, the Administrator of the Energy Research and Development Administration, or the Chairman of the Federal Power Commission, shall conduct, and encourage, cooperate with, and render financial and other assistance to appropriate public (whether Federal, State, interstate, or local) authorities, agencies, and institutions, private agencies and institutions, and individuals in the conduct of, and

promote the coordination of, research, investigations, experiments, training, demonstrations, surveys, public education programs, and studies relating to—

"(1) any adverse health and welfare effects of the release into the environment of material present in solid waste, and methods to eliminate such effects;

"(2) the operation and financing of solid waste management programs;

"(3) the planning, implementation, and operation of resource recovery and resource conservation systems and hazardous waste management systems, including the marketing of recovered resources;

"(4) the production of usable forms of recovered resources, including fuel, from solid waste;

"(5) the reduction of the amount of such waste and unsalvageable waste materials;

"(6) the development and application of new and improved methods of collecting and disposing of solid waste and processing and recovering materials and energy from solid wastes;

"(7) the identification of solid waste components and potential materials and energy recoverable from such waste components;

"(8) small scale and low technology solid waste management systems, including but limited to, resource recovery source separation systems;

"(9) methods to improve the performance characteristics of resources recovered from solid waste and the relationship of such performance characteristics to available and potentially available markets for such resources;

"(10) improvements in land disposal practices for solid waste (including sludge) which may reduce the adverse environmental effects of such disposal and other aspects of solid waste disposal on land, including means for reducing the harmful environmental effects of earlier and existing landfills, means for restoring areas damaged by such earlier or existing landfills, means for rendering landfills safe for purposes of construction and other uses, and techniques of recovering materials and energy from landfills;

"(11) methods for the sound disposal of, or recovery of resources, including energy, from, sludge (including sludge from pollution control and treatment facilities, coal slurry pipelines, and other sources);

"(12) methods of hazardous waste management, including methods of rendering such waste environmentally safe; and

"(13) any adverse effects on air quality (particularly with regard to the emission of heavy metals) which result from solid waste which is burned (either alone or in conjunction with other substances) for purposes of treatment, disposal or energy recovery.

"(b) Management Program.—(1)(A) In carrying out his functions pursuant to this Act and any other Federal legislation respecting solid waste or discarded material research, development, and demonstrations, the Administrator shall establish a management program or system to insure the coordination of all such activities and to facilitate and accelerate the process of development of sound new technology (or other discoveries) from the research phase, through development, and into the demonstration phase.

"(B) The Administrator shall (i) assist, on the basis of any research projects which are developed with assistance under this Act or without Federal assistance, the construction of pilot plant facilities for the purpose of investigating or testing the technological feasibility of any promising new fuel, energy, or resource recovery or resource conservation method or technology; and (ii) demonstrate each such method and technology that appears justified by an evaluation at such pilot plant stage or at a pilot plant stage developed without Federal assistance. Each such demonstration shall incorporate new or innovative technical advances or shall apply such advances to different circumstances and conditions, for the purpose of evaluating design concepts or to test the performance, efficiency, and economic feasibility of a particular method or technology under actual operating condi-

tions. Each such demonstration shall be so planned and designed that, if successful, it can be expanded or utilized directly as a full-scale operational fuel, energy, or resource recovery or resource conservation facility.

"(2) Any energy-related research, development, or demonstration project for the conversion including bioconversion, of solid waste carried out by the Environmental Protection Agency or by the Energy Research and Development Administration pursuant to this or any other Act shall be administered in accordance with the May 7, 1976, Interagency Agreement between the Environmental Protection Agency and the Energy Research and Development Administration on the Development of Energy from Solid Wastes and specifically, that in accordance with this agreement, (A) for those energy-related projects of mutual interest, planning will be conducted jointly by the Environmental Protection Agency and the Energy Research and Development Administration, following which project responsibility will be assigned to one agency; (B) energy-related portions of projects for recovery of synthetic fuels or other forms of energy from solid waste shall be the responsibility of the Energy Research and Development Administration; (C) the Environmental Protection Agency shall retain responsibility for the environmental, economic, and institutional aspects of solid waste projects and for assurance that such projects are consistent with any applicable suggested guidelines published pursuant to section 1008, and any applicable State or regional solid waste management plan; and (D) any activities undertaken under provisions of sections 8002 and 8003 as related to energy; as related to energy or synthetic fuels recovery from waste; or as related to energy conservation shall be accomplished through coordination and consultation with the Energy Research and Development Administration.

"(c) Authorities.—(1) In carrying out subsection (a) of this section respecting solid waste research, studies, development, and demonstration, except as otherwise specifically provided in section 8004(d), the Administrator may make grants to or enter into contracts (including contracts for construction) with, public agencies and authorities or private persons.

"(2) Contracts for research, development, or demonstrations or for both (including contracts for construction) shall be made in accordance with and subject to the limitations provided with respect to research contracts of the military departments in title 10, United States Code, section 2353, except that the determination, approval, and certification required thereby shall be made by the Administrator.

"(3) Any invention made or conceived in the course of, or under, any contract under this Act shall be subject to section 9 of the Federal Nonnuclear Energy Research and Development Act of 1974 to the same extent and in the same manner as inventions made or conceived in the course of contracts under such Act, except that in applying such section, the Environmental Protection Agency shall be substituted for the Energy Research and Development Administration and the words 'solid waste' shall be substituted for the word 'energy' where appropriate.

"(4) For carrying out the purpose of this Act the Administrator may detail personnel of the Environmental Protection Agency to agencies eligible for assistance under this section.

**"Special Studies; Plans for Research, Development, and Demonstrations**

"Sec. 8002. (a) Glass and Plastic.—The Administrator shall undertake a study and publish a report on resource recovery from glass and plastic waste, including a scientific, technological, and economic investigation of potential solutions to implement such recovery.

"(b) Composition of Waste Stream.—The Administrator shall undertake a systematic study of the composition of the solid waste stream and of anticipated future changes in the composition of such stream and shall publish a report containing the results of such study and quantitatively evaluating the potential utility of such components.

"(c) Priorities Study.—For purposes of determining priorities for research on recovery of materials and energy from solid waste and developing materials and energy recovery research, development, and demonstration strategies, the Administrator shall review, and make a study of, the various existing and promising techniques of energy recovery from solid waste (including, but not limited to, waterwall furnace incinerators, dry shredded fuel systems, pyrolysis, densified refuse-derived fuel systems, anerobic digestion, and fuel and feedstock preparation systems). In carrying out such study the Administrator shall investigate with respect to each such technique—

"(1) the degree of public need for the potential results of such research development, or demonstration,

"(2) the potential for research, development, and demonstration without Federal action, including the degree of restraint on such potential posed by the risks involved, and

"(3) the magnitude of effort and period of time necessary to develop the technology to the point where Federal assistance can be ended.

"(d) Small-Scale and Low Technology Study.—The Administrator shall undertake a comprehensive study and analysis of, and publish a report on, systems of small-scale and low technology solid waste management, including household resource recovery and resource recovery systems which have special application to multiple dwelling units and high density housing and office complexes. Such study and analysis shall include an investigation of the degree to which such systems could contribute to energy conservation.

"(e) Front-End Source Separation.—The Administrator shall undertake research and studies concerning the compatibility of front-end source separation systems with high technology resource recovery systems and shall publish a report containing the results of such research and studies.

"(f) Mining Waste.—The Administrator, in consultation with the Secretary of the Interior, shall conduct a detailed and comprehensive study on the adverse effects of solid wastes from active and abandoned surface and underground mines on the environment, including, but not limited to, the effects of such wastes on humans, water, air, health, welfare, and natural resources, and on the adequacy of means and measures currently employed by the mining industry, Government agencies, and others to dispose of and utilize such solid wastes and to prevent or substantially mitigate such adverse effects. Such study shall include an analysis of—

"(1) the sources and volume of discarded material generated per year from mining;

"(2) present disposal practices;

"(3) potential dangers to human health and the environment from surface runoff of leachate and air pollution by dust;

"(4) alternatives to current disposal methods;

"(5) the cost of those alternatives in terms of the impact on mine product costs; and

"(6) potential for use of discarded material as a secondary source of the mine product.

Not later than thirty-six months after the date of the enactment of the Solid Waste Disposal Act Amendments of 1980 the Administrator shall publish a report of such study and shall include appropriate findings and recommendations for Federal and non-Federal actions concerning such effects. Such report shall be submitted to the Committee on Environment and Public Works of the United States Senate and the Committee on Interstate and Foreign Commerce of the United States House of Representatives.

"(g) Sludge.—The Administrator shall undertake a comprehensive study and publish a report on sludge. Such study shall include an analysis of—

"(1) what types of solid waste (including but not limited to sewage and pollution treatment residues and other residues from

industrial operations such as extraction of oil from shale, liquefaction and gasification of coal and coal slurry pipeline operations) shall be classified as sludge;

"(2) the effects of air and water pollution legislation on the creation of large volumes of sludge;

"(3) the amounts of sludge originating in each State and in each industry producing sludge;

"(4) methods of disposal of such sludge, including the cost, efficiency and effectiveness of such methods;

"(5) alternative methods for the use of sludge, including agricultural applications of sludge and energy recovery from sludge; and

"(6) methods to reclaim areas which have been used for the disposal of sludge or which have been damaged by sludge.

"(h) Tires.—The Administrator shall undertake a study and publish a report respecting discarded motor vehicle tires which shall include an analysis of the problems involved in the collection, recovery of resources including energy, and use of such tires.

"(i) Resource Recovery Facilities.—The Administrator shall conduct research and report on the economics of, and impediments, to the effective functioning of resource recovery facilities.

"(j) Resource Conservation Committee.— (1) The Administrator shall serve as Chairman of a Committee composed of himself, the Secretary of Commerce, the Secretary of Labor, the Chairman of the Council on Environmental Quality, the Secretary of Treasury, the Secretary of the Interior, the Secretary of Energy, the Chairman of the Council of Economic Advisors, and a representative of the Office of Management and Budget, which shall conduct a full and complete investigation and study of all aspects of the economic, social and environmental consequences of resource conservation with respect to—

"(A) the appropriateness of recommended incentives and disincentives to foster resource conservation;

"(B) the effect of existing public policies (including subsidies and economic incentives and disincentives, percentage depletion allowances, capital gains treatment and other tax incentives and disincentives) upon resource conservation, and the likely effect of the modification or elimination of such incentives and disincentives upon resource conservation;

"(C) the appropriateness and feasibility of restricting the manufacture or use of categories of consumer products as a resource conservation strategy;

"(D) the appropriateness and feasibility of employing as a resource conservation strategy the imposition of solid waste management charges on consumer products, which charges would reflect the costs of solid waste management services, litter pickup, the value of recoverable components of such product, final disposal, and any social value associated with the nonrecycling or uncontrolled disposal of such product; and

"(E) the need for further research, development, and demonstration in the area of resource conservation.

"(2) The study required in paragraph (1)(D) may include pilot scale projects, and shall consider and evaluate alternative strategies with respect to—

"(A) the product categories on which such charges would be imposed;

"(B) the appropriate state in the production of such consumer product at which to levy such charge;

"(C) appropriate criteria for establishing such charges for each consumer product category;

"(D) methods for the adjustment of such charges to reflect actions such as recycling which would reduce the overall quantities of solid waste requiring disposal; and

"(E) procedures for amending, modifying, or revising such charges to reflect changing conditions.

"(3) The design for the study required in paragraph (1)(D) of this subsection shall include timetables for the completion of the

study. A preliminary report putting forth the study design shall be sent to the President and the Congress within six months following enactment of this section and followup reports shall be sent six months thereafter. Each recommendation resulting from the study shall include at least two alternatives to the proposed recommendation.

"(4) The results of such investigation and study, including recommendations, shall be reported to the President and the Congress not later than two years after enactment of this subsection.

"(5) There are authorized to be appropriated not to exceed $2,000,000 to carry out this subsection.

"(k) Airport Landfills.—The Administrator shall undertake a comprehensive study and analysis of and publish a report on systems to alleviate the hazards to aviation from birds congregating and feeding on landfills in the vicinity of airports.

"(*l*) Completion of Research and Studies. —The Administrator shall complete the research and studies, and submit the reports, required under subsections (b), (c), (d), (e), (f), (g), and (k) not later than October 1, 1978. The Administrator shall complete the research and studies, and submit the reports, required under subsections (a), (h), and (i) not later than October 1, 1979. Upon completion, each study specified in subsections (a) through (k) of this section, the Administrator shall prepare a plan for research, development, and demonstration respecting the findings of the study and shall submit any legislative recommendations resulting from such study to appropriate committees of Congress.

[8002(m)–(p) added by PL 96–482]

"(m) Drilling Fluids, Produced Waters, and Other Wastes Associated With the Exploration, Development, or Production of Crude Oil or Natural Gas or Geothermal Energy.—(1) The Administrator shall conduct a detailed and comprehensive study and submit a report on the adverse effects, if any, of drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy on human health and the environment, including, but not limited to the effects of such wastes on humans, water, air, health, welfare, and natural resources and on the adequacy of means and measures currently employed by the oil and gas and geothermal drilling and production industry, Government agencies, and others to dispose of and utilize such wastes and to prevent or substantially mitigate such adverse effects. Such study shall include an analysis of—

"(A) the sources and volume of discarded material generated per year from such wastes;

"(B) present disposal practices;

"(C) potential danger to human health and the environment from the surface runoff or leachate;

"(D) documented cases which prove or have caused danger to human health and the environment from surface runoff or leachate;

"(E) alternatives to current disposal methods;

"(F) the cost of such alternatives; and

"(G) the impact of those alternatives on the exploration for, and development and production of, crude oil and natural gas or geothermal energy.

In furtherance of this study, the Administrator shall, as he deems appropriate, review studies and other actions of other Federal agencies concerning such wastes with a view toward avoiding duplication of effort and the need to expedite such study. The Administrator shall publish a report of such study and shall include appropriate findings and recommendations for Federal and non-Federal actions concerning such effects.

"(2) The Administrator shall complete the research and study and submit the report required under paragraph (1) not later than twenty-four months from the date of enactment of the Solid Waste Disposal Act Amendments of 1980. Upon completion of the study, the Administrator shall prepare a summary of the findings of the study, a

plan for research, development, and demonstration respecting the findings of the study, and shall submit the findings and the study, along with any recommendations resulting from such study, to the Committee on Environment and Public Works of the United States Senate and the Committee on Interstate and Foreign Commerce of the United States House of Representatives.

"(3) There are authorized to be appropriated not to exceed $1,000,000 to carry out the provisions of this subsection.

"(n) Materials Generated From the Combustion of Coal and Other Fossil Fuels.— The Administrator shall conduct a detailed and comprehensive study and submit a report on the adverse effects on human health and the environment, if any, of the disposal and utilization of fly ash waste, bottom ash waste, slag waste, flue gas emission control waste, and other byproduct materials generated primarily from the combustion of coal or other fossil fuels. Such study shall include an analysis of—

"(1) the source and volumes of such material generated per year;

"(2) present disposal and utilization practices;

"(3) potential danger, if any, to human health and the environment from the disposal and reuse of such materials;

"(4) documented cases in which danger to human health or the environment from surface runoff or leachate has been proved;

"(5) alternatives to current disposal methods;

"(6) the costs of such alternatives;

"(7) the impact of those alternatives on the use of coal and other natural resources; and

"(8) the current and potential utilization of such materials.

In furtherance of this study, the Administrator shall, as he deems appropriate, review studies and other actions of other Federal and State agencies concerning such material and invite participation by other concerned parties, including industry and other Federal and State agencies, with a view toward avoiding duplication of effort. The Administrator shall publish a report on such study, which shall include appropriate findings, not later than twenty-four months after the enactment of the Solid Waste Disposal Act Amendments of 1980. Such study and findings shall be submitted to the Committee on Environment and Public Works of the United States Senate and the Committee on Interstate and Foreign Commerce of the United States House of Representatives.

"(o) Cement Kiln Dust Waste.—The Administrator shall conduct a detailed and comprehensive study of the adverse effects on human health and the environment, if any, of the disposal of cement kiln dust waste. Such study shall include an analysis of—

"(1) the source and volumes of such materials generated per year;

"(2) present disposal practices;

"(3) potential danger, if any, to human health and the environment from the disposal of such materials;

"(4) documented cases in which danger to human health or the environment has been proved;

"(5) alternatives to current disposal methods;

"(6) the costs of such alternatives;

"(7) the impact of those alternatives on the use of natural resources; and

"(8) the current and potential utilization of such materials.

In furtherance of this study the Administrator shall, as he deems appropriate, review studies and other actions of other Federal and State agencies concerning such waste or materials and invite participation by other concerned parties, including industry and other Federal and State agencies, with a view toward avoiding duplication of effort. The Administrator shall publish a report of such study, which shall include appropriate findings, not later than thirty-six months after the date of enactment of the Solid Waste Disposal Act Amendments

of 1980. Such report shall be submitted to the Committee on Environment and Public Works of the United States Senate and the Committee on Interstate and Foreign Commerce of the United States House of Representatives.

"(p) Materials Generated From the Extraction, Beneficiation, and Processing of Ores and Minerals, Including Phosphate Rock and Overburden From Uranium Mining.—The Administrator shall conduct a detailed and comprehensive study on the adverse effects on human health and the environment, if any, of the disposal and utilization of solid waste from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from uranium mining. Such study shall be conducted in conjunction with the study of mining wastes required by subsection (f) of this section and shall include an analysis of—

"(1) the source of volumes of such materials generated per year;

"(2) present disposal and utilization practices;

"(3) potential danger, if any, to human health and the environment from the disposal and reuse of such materials;

"(4) documented cases in which danger to human health or the environment has been proved;

"(5) alternatives to current disposal methods;

"(6) the costs of such alternatives;

"(7) the impact of those alternatives on the use of phosphate rock and uranium ore, and other natural resources; and

"(8) the current and potential utilization of such materials.

In furtherance of this study, the Administrator shall, as he deems appropriate, review studies and other actions of other Federal and State agencies concerning such waste or materials and invite participation by other concerned parties, including industry and other Federal and State agencies, with a view toward avoiding duplication of effort. The Administrator shall publish a report of such study, which shall include appropriate findings, in conjunction with the publication of the report of the study of mining wastes required to be conducted under subsection (f) of this section. Such report and findings shall be submitted to the Committee on Environment and Public Works of the United States Senate and the Committee on Interstate and Foreign Commerce of the United States House of Representatives.

"(q) Authorization of Appropriations.—There are authorized to be appropriated not to exceed $8,000,000 for the fiscal years 1978 and 1979 to carry out this section other than subsection (j).

## "Coordination, Collection, and Dissemination of Information

"Sec. 8003. (a) Information.—The Administrator shall develop, collect, evaluate, and coordinate information on—

"(1) methods and costs of the collection of solid waste;

"(2) solid waste management practices, including data on the different management methods and the cost, operation, and maintenance of such methods;

"(3) the amounts and percentages of resources (including energy) that can be recovered from solid waste by use of various solid waste management practices and various technologies;

"(4) methods available to reduce the amount of solid waste that is generated;

"(5) existing and developing technologies for the recovery of energy or materials from solid waste and the costs, reliability, and risks associated with such technologies;

"(6) hazardous solid waste, including incidents of damage resulting from the disposal of hazardous solid wastes; inherently and potentially hazardous solid wastes; methods of neutralizing or properly disposing of hazardous solid wastes; facilities that properly dispose of hazardous wastes;

"(7) methods of financing resource recovery facilities or, sanitary landfills, or hazardous solid waste treatment facilities, whichever is appropriate for the entity de-

veloping such facility or landfill (taking into account the amount of solid waste reasonably expected to be available to such entity);

"(8) the availability of markets for the purchase of resources, either materials or energy, recovered from solid waste; and

"(9) research and development projects respecting solid waste management.

"(b) Library.—(1) The Administrator shall establish and maintain a central reference library for (A) the materials collected pursuant to subsection (a) of this section and (B) the actual performance and cost effectiveness records and other data and information with respect to—

"(i) the various methods of energy and resource recovery from solid waste,

"(ii) the various systems and means of resource conservation,

"(iii) the various systems and technologies for collection, transport, storage, treatment, and final disposition of solid waste, and

"(iv) other aspects of solid waste and hazardous solid waste management.

Such central reference library shall also contain, but not be limited to, the model codes and model accounting systems developed under this section, the information collected under subsection (d), and, subject to any applicable requirements of confidentiality, information respecting any aspect of solid waste provided by officers and employees of the Environmental Protection Agency which has been acquired by them in the conduct of their functions under this Act and which may be of value to Federal, State, and local authorities and other persons.

"(2) Information in the central reference library shall, to the extent practicable, be collated, analyzed, verified, and published and shall be made available to State and local governments and other persons at reasonable times and subject to such reasonable charges as may be necessary to defray expenses of making such information available.

"(c) Model Accounting System.—In order to assist State and local governments in determining the cost and revenues associated with the collection and disposal of solid waste and with resource recovery operations, the Administrator shall develop and publish a recommended model cost and revenue accounting system applicable to the solid waste management functions of State and local governments. Such system shall be in accordance with generally accepted accounting principles. The Administrator shall periodically, but not less frequently than once every five years, review such accounting system and revise it as necessary.

"(d) Model Codes.—The Administrator is authorized, in cooperation with appropriate State and local agencies, to recommend model codes, ordinances, and statutes, providing for sound solid waste management.

"(e) Information Programs.—(1) The Administrator shall implement a program for the rapid dissemination of information on solid waste management, hazardous waste management, resource conservation, and methods of resource recovery from solid waste, including the results of any relevant research, investigations, experiments, surveys, studies, or other information which may be useful in the implementation of new or improved solid waste management practices and methods and information on any other technical, managerial, financial, or market aspect of resource conservation and recovery facilities.

"(2) The Administrator shall develop and implement educational programs to promote citizen understanding of the need for environmentally sound solid waste management practices.

"(f) Coordination.—In collecting and disseminating information under this section, the Administrator shall coordinate his actions and cooperate to the maximum extent possible with State and local authorities.

"(g) Special Restriction.—Upon request, the full range of alternative technologies, programs or processes deemed feasible to meet the resource recovery or resource conservation needs of a jurisdiction shall be

described in such a manner as to provide a sufficient evaluative basis from which the jurisdiction can make its decisions, but no officer or employee of the Environmental Protection Agency shall, in an official capacity, lobby for or otherwise represent an agency position in favor of resource recovery or resource conservation, as a policy alternative for adoption into ordinances, codes, regulations, or law by any State or political subdivision thereof.

### "Full-Scale Demonstration Facilities

"Sec. 8004. (a) Authority.—The Administrator may enter into contracts with public agencies or authorities or private persons for the construction and operation of a full-scale demonstration facility under this Act, or provide financial assistance in the form of grants to a full-scale demonstration facility under this Act only if the Administrator finds that—

"(1) such facility or proposed facility will demonstrate at full scale a new or significantly improved technology or process, a practical and significant improvement in solid waste management practice, or the technological feasibility and cost effectiveness of an existing, but unproven technology, process, or practice, and will not duplicate any other Federal, State, local, or commercial facility which has been constructed or with respect to which construction has begun (determined as of the date action is taken by the Administrator under this Act),

"(2) such contract or assistance meets the requirements of section 8001 and meets other applicable requirements of the Act,

"(3) such facility will be able to comply with the guidelines published under section 1008 and with other laws and regulations for the protection of health and the environment,

"(4) in the case of a contract for construction or operation, such facility is not likely to be constructed or operated by State, local, or private persons or in the case of an application for financial assistance, such facility is not likely to receive adequate financial assistance from other sources, and

"(5) any Federal interest in, or assistance to, such facility will be disposed of or terminated, with appropriate compensation, within such period of time as may be necessary to carry out the basic objectives of this Act.

"(b) Time Limitation.—No obligation may be made by the Administrator for financial assistance under this subtitle for any full-scale demonstration facility after the date ten years after the enactment of this section. No expenditure of funds for any such full-scale demonstration facility under this subtitle may be made by the Administrator after the date fourteen years after such date of enactment.

"(c) Cost Sharing.—Wherever practicable, in constructing, operating, or providing financial assistance under this subtitle to a full-scale demonstration facility, the Administrator shall endeavor to enter into agreements and make other arrangements for maximum practicable cost sharing with other Federal, State, and local agencies, private persons, or any combination thereof.

"(2) The Administrator shall enter into arrangements, wherever practicable and desirable, to provide monitoring of full-scale solid waste facilities (whether or not constructed or operated under this Act) for purposes of obtaining information concerning the performance, and other aspects, of such facilities. Where the Administrator provides only monitoring and evaluation instruments or personnel (or both) or funds for such instruments or personnel and provides no other financial assistance to a facility, notwithstanding section 8001(c)(3), title to any invention made or conceived of in the course of developing, constructing, or operating such facility shall not be required to vest in the United States and patents respecting such invention shall not be required to be issued to the United States.

"(d) Prohibition.—After the date of enactment of this section, the Administrator shall not construct or operate any full-scale facility (except by contract with public agencies or authorities or private persons).

## "Special Study and Demonstration Projects on Recovery of Useful Energy and Materials

"Sec. 8005. (a) Studies.—The Administrator shall conduct studies and develop recommendations for administrative or legislative action on—

"(1) means of recovering materials and energy from solid waste, recommended uses of such materials and energy for national or international welfare, including identification of potential markets for such recovered resources, the impact of distribution of such resources on existing markets, and potentials for energy conservation through resource conservation and resource recovery;

"(2) actions to reduce waste generation which have been taken voluntarily or in response to governmental action, and those which practically could be taken in the future, and the economic, social, and environmental consequences of such actions;

"(3) methods of collection, separation, and containerization which will encourage efficient utilization of facilities and contribute to more effective programs of reduction, reuse, or disposal of wastes;

"(4) the use of Federal procurement to develop market demand for recovered resources;

"(5) recommended incentives (including Federal grants, loans, and other assistance) and disincentives to accelerate the reclamation or recycling of materials from solid wastes, with special emphasis on motor vehicle hulks;

"(6) the effect of existing public policies, including subsidies and economic incentives and disincentives, percentage depletion allowances, capital gains treatment and other tax incentives and disincentives, upon the recycling and reuse of materials, and the likely effect of the modification or elimination of such incentives and disincentives upon the reuse, recycling and conservation of such materials;

"(7) the necessity and method of imposing disposal or other charges on packaging, containers, vehicles, and other manufactured goods, which charges would reflect the cost of final disposal, the value of recoverable components of the item, and any social costs associated with nonrecycling or uncontrolled disposal of such items; and

"(8) the legal constraints and institutional barriers to the acquisition of land needed for solid waste management, including land for facilities and disposal sites;

"(9) in consultation with the Secretary of Agriculture, agricultural waste management problems and practices, the extent of reuse and recovery of resources in such wastes, the prospects for improvement, Federal, State, and local regulations governing such practices, and the economic, social, and environmental consequences of such practices; and

"(10) in consultation with the Secretary of the Interior, mining waste management problems, and practices, including an assessment of existing authorities, technologies, and economics, and the environmental and public health consequences of such practices.

"(b) Demonstration.—The Administrator is also authorized to carry out demonstration projects to test and demonstrate methods and techniques developed pursuant to subsection (a).

"(c) Application of Other Sections.—Section 8001 (b) and (c) shall be applicable to investigations, studies, and projects carried out under this section.

## "Grants for Resource Recovery Systems and Improved Solid Waste Disposal Facilities

"Sec. 8006. (a) Authority.—The Administrator is authorized to make grants pursuant to this section to any State, municipal, or interstate or intermunicipal agency for the demonstration of resource recovery systems or for the construction of new or improved solid waste disposal facilities.

"(b) Conditions.—(1) Any grant under this section for the demonstration of a resource recovery system may be made only if it (A) is consistent with any plans which meet the requirements of subtitle D of this Act; (B) is consistent with the guidelines

recommended pursuant to section 1008 of this Act; (C) is designed to provide area-wide resource recovery systems consistent with the purposes of this Act, as determined by the Administrator, pursuant to regulations promulgated under subsection (d) of this section; and (D) provides an equitable system for distributing the costs associated with the construction, operation, and maintenance of any resource recovery system among the users of such system.

"(2) The Federal share for any project to which paragraph (1) applies shall not be more than 75 percent.

"(c) Limitations.—(1) A grant under this section for the construction of a new or improved solid waste disposal facility may be made only if—

"(A) a State or interstate plan for solid waste disposal has been adopted which applies to the area involved, and the facility to be constructed (i) is consistent with such plan, (ii) is included in a comprehensive plan for the area involved which is satisfactory to the Administrator for the purpose of this Act, and (iii) is consistent with the guidelines recommended under section 1008, and

"(B) the project advances the state of the art by applying new and improved techniques in reducing the environmental impact of solid waste disposal, in achieving recovery of energy or resources, or in recycling useful materials.

"(2) The Federal share for any project to which paragraph (1) applies shall be not more than 50 percent in the case of a project serving an area which includes only one municipality, and not more than 75 percent in any other case.

"(d) Regulations.—(1) The Administrator shall promulgate regulations establishing a procedure for awarding grants under this section which—

"(A) provides that projects will be carried out in communities of varying sizes, under such conditions as will assist in solving the community waste problems of urban-industrial centers, metropolitan regions, and rural areas, under representa-

tive geographic and environmental conditions; and

"(B) provides deadlines for submission of, and action on, grant requests.

"(2) In taking action on applications for grants under this section, consideration shall be given by the Administrator (A) to the public benefits to be derived by the construction and the propriety of Federal aid in making such grant; (B) to the extent applicable, to the economic and commercial viability of the project (including contractual arrangements with the private sector to market any resources recovered); (C) to the potential of such project for general application to community solid waste disposal problems; and (D) to the use by the applicant of comprehensive regional or metropolitan area planning.

"(e) Additional Limitations.—A grant under this section—

"(1) may be made only in the amount of the Federal share of (A) the estimated total design and construction costs, plus (B) in the case of a grant to which subsection (b)(1) applies, the first-year operation and maintenance costs;

"(2) may not be provided for land acquisition or (except as otherwise provided in paragraph (1)(B)) for operating or maintenance costs;

"(3) may not be made until the applicant has made provision satisfactory to the Administrator for proper and efficient operation and maintenance of the project (subject to paragraph (1)(B)); and

"(4) may be made subject to such conditions and requirements, in addition to those provided in this section, as the Administrator may require to properly carry out his functions pursuant to this Act.

For purposes of paragraph (1), the non-Federal share may be in any form, including, but not limited to, lands or interests therein needed for the project or personal property or services, the value of which shall be determined by the Administrator.

"(f) Single State.—(1) Not more than 15 percent of the total of funds authorized to be appropriated for any fiscal year to carry

out this section shall be granted under this section for projects in any one State.

"(2) The Administrator shall prescribe by regulation the manner in which this subsection shall apply to a grant under this section for a project in an area which includes all or part of more than one State.

### "Authorization of Appropriations

"Sec. 8007. There are authorized to be appropriated not to exceed $35,000,000 for the fiscal year 1978 to carry out the purposes of this subtitle (except for section 8002).".

### Solid Waste Cleanup on Federal Lands in Alaska

Sec. 3. [Repealed by PL 96-482]

Sec. 4. (a) In order to demonstrate effective means of dealing with contamination of public water supplies by leachate from abandoned or other landfills, the Administrator of the Environmental Protection Agency is authorized to provide technical and financial assistance for a research program to control leachate from the Llangollen Landfill in New Castle County, Delaware.

(b) The research program authorized by this section shall be designed by the New Castle County areawide waste treatment management program, in cooperation with the Environmental Protection Agency, to develop methods for controlling leachate contamination from abandoned and other landfills that may be applied at the Llangollen Landfill and at other landfills throughout the Nation. Such research program shall investigate all alternative solutions or corrective actions, including—

(1) hydrogeologic isolation of the landfill combined with the collection and treatment of leachate;

(2) excavation of the refuse, followed by some type of incineration;

(3) excavation and transportation of the refuse to another landfill; and

(4) collection and treatment of contaminated leachate or ground water.

Such research program shall consider the economic, social, and environmental consequences of each such alternative.

(c) The Administrator of the Environmental Protection Agency shall make available personnel of the Agency, including those of the Solid and Hazardous Waste Research Laboratory (Cincinnati, Ohio), and shall arrange for other Federal personnel to be made available, to provide technical assistance and aid in such research. The Administrator may provide up to $250,000, of the sums appropriated under the Solid Waste Disposal Act, to the New Castle County areawide waste treatment management program to. conduct such research, including obtaining consultant services.

(d) In order to prevent further damage to public water supplies during the period of this study, the Administrator of the Environmental Protection Agency shall provide up to $200,000 in each of fiscal years 1977 and 1978, of the sums appropriated under the Solid Waste Disposal Act for the operating costs of a counter-pumping program to contain the leachate from the Llangollen Landfill.

### "Energy and Materials Conservation and Recovery

Sec. 32. (a) The Congress finds that—

(1) significant savings could be realized by conserving materials in order to reduce the volume or quantity of material which ultimately becomes waste;

(2) solid waste contains valuable energy and material resources which can be recovered and used thereby conserving increasingly scarce and expensive fossil fuels and virgin materials;

(3) the recovery of energy and materials from municipal waste, and the conservation of energy and materials contributing to such waste streams, can have the effect of reducing the volume of the municipal waste stream and the burden of disposing of increasing volumes of solid waste;

(4) the technology to conserve resources exists and is commercially feasible to apply;

(5) the technology to recover energy and materials from solid waste is of demonstrated commercial feasibility; and

(6) various communities throughout the nation have different needs and different potentials for conserving resources and for utilizing techniques for the recovery of energy and materials from waste, and Federal assistance in planning and implementing such energy and materials conservation and recovery programs should be available to all such communities on an equitable basis in relation to their needs and potential.

[Sections 32 and 33 added by PL 96–482]

## National Advisory Commission on Resource Conservation and Recovery

Sec. 33. (a)(1) There is hereby established in the executive branch of the United States the National Advisory Commission on Resource Conservation and Recovery, hereinafter in this section referred to as the "Commission."

(2) The Commission shall be composed of nine members to be appointed by the President. Such members shall be qualified by reason of their education, training, or experience to represent the view of consumer groups, industry associations, and environmental and other groups concerned with resource conservation and recovery and at least two shall be elected or appointed State or local officials. Members shall be appointed for the life of the Commission.

(3) A vacancy in the Commission shall be filled in the manner in which the original appointment was made.

(4) Five members of the Commission shall constitute a quorum for transacting business of the Commission except that a lesser number may hold hearings and conduct information-gathering meetings.

(5) The Chairperson of the Commission shall be designated by the President from among the members.

(6) Upon the expiration of the two-year period beginning on (A) the date when all initial members of the Commission have been appointed or when (B) the date when initial funds become available to carry out

this section, whichever is later, the Commission shall transmit to the President, and to each House of the Congress, a final report containing a detailed statement of the findings and conclusions of the Commission, together with such recommendations as it deems advisable.

(7) The Commission shall submit an interim report on February 15, 1982, and the Commission may also submit, for legislative and administrative actions relating to the Solid Waste Disposal Act, other interim reports prior to the submission of its final report.

(8) The Commission shall cease to exist 30 days after submission of its final report.

(b) The Commission shall—

(1) after consultation with the appropriate Federal agencies, review budgetary priorities relating to resource conservation and recovery, determine to what extent program goals relating to resource conservation and recovery are being realized, and make recommendations concerning the appropriate program balance and priorities;

(2) review any existing or proposed resource conservation and recovery guidelines or regulations;

(3) determine the economic development or savings potential of resource conservation and recovery, including the availability of markets for recovered energy and materials, for economic material savings through conservation, and make recommendations concerning the utilization of such potential;

(4) identify, and make recommendations addressing, institutional obstacles impeding the development of resource conservation and resource recovery; and

(5) evaluate the status of resource conservation and recovery technology and systems including both materials and energy recovery technologies, recycling methods, and other innovative methods for both conserving energy and materials extractable from solid waste.

The review referred to in paragraph (1) should include but not be limited to an

assessment of the effectiveness of the technical assistance panels, the public participation program and other program activities under the Solid Waste Disposal Act.

(c)(1) Members of the Commission while serving on business of the Commission, shall be compensated at a rate not to exceed the rate specified at the time of such service for grade GS–16 of the General Schedule for each day they are engaged in the actual performance of Commission duties, including travel time; and while so serving away from their homes or regular places of business, all members of the Commission may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of title 5, United States Code, for persons in Government service employed intermittently.

(2) Subject to such rules as may be adopted by the Commission, the Chairperson, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, shall have the power to—

(A) appoint a Director, who shall be paid at a rate not to exceed the rate of basic pay for level I, GS–16 of the General Schedule; and

(B) appoint and fix the compensation of not more than 5 additional staff personnel.

(3) This Commission is authorized to procure temporary and intermittent services of experts and consultants as are necessary to the extent authorized by section 3109 of title 5, United States Code, but at rates not to exceed the rate specified at the time of such service for grade GS–16 in section 5332 of such title. Experts and consultants may be employed without compensation if they agree to do so in advance.

(4) Upon request of the Commission, the head of any Federal agency is authorized to detail on a reimbursable or nonreimbursable basis any of the personnel of such agency to the Commission to assist the Commission in carrying out its duties under this section.

(5) The Commission is exempt from the requirements of sections 4301 through 4308 of title 5, United States Code.

(6) The Commission is authorized to enter into contracts with Federal and State agencies, private firms, institutions, and individuals for the conduct of research or surveys, the preparation of reports, and other activities necessary to the discharge of its duties and responsibilities.

(7) In order to expedite matters pertaining to the planning for, and work of, the Commission, the Commission is authorized to make purchases and contracts without regard to section 252 of title 41 of the United States Code, pertaining to advertising and competitive bidding, and may arrange for the printing of any material pertaining to the work of the Commission without regard to the Government Printing and Binding Regulations and any related laws or regulations.

(8) The Commission may use the United States mail in the same manner and under the same conditions as other departments and agencies of the United States.

(9) The Commission may secure directly from any department or agency of the United States information necessary to enable it to carry out its duties and functions. Upon request of the Chairperson, the head of any such Federal agency shall furnish such information to the Commission subject to applicable law.

(10) Financial and administrative services (including those related to budget and accounting, financial reporting, personnel, and procurement) shall be provided to the Commission by the General Services Administration for which payment shall be made in advance, or by reimbursement, from funds of the Commission, in such amounts as may be agreed upon by the Chairperson of the Commission and the Administrator of General Services.

(d) In carrying out its duties under this section the Commission, or any duly authorized committee thereof, is authorized to

hold such hearings and take testimony, with respect to matters to which it has a responsibility under this section as the Commission may deem advisable. The Chairperson of the Commission or any member authorized by him may administer oaths or affirmations to witnesses appearing before the Commission or before any committee thereof.

(e) From the amounts authorized to be appropriated under the Solid Waste Disposal Act for the fiscal years 1981 and 1982, not more than $1,000,000 may be used to carry out the provisions of this section.

### Used Oil Recycling Act of 1980

[See editor's note at 71:3101]

### Short Title

Section 1. This Act may be cited as the "Used Oil Recycling Act of 1980."

### Findings

Sec. 2. The Congress finds and declares that—

(1) used oil is a valuable source of increasingly scarce energy and materials;

(2) technology exists to re-refine, reprocess, reclaim, and otherwise recycle used oil;

(3) used oil constitutes a threat to public health and the environment when reused or disposed of improperly; and

that, therefore, it is in the national interest to recycle used oil in a manner which does not constitute a threat to public health and the environment and which conserves energy and materials.

Sec. 4. (c) Before the effective date of the labeling standards required to be prescribed under section 383(d)(1)(A) of the Energy Policy and Conservation Act, no requirement of any rule or order of the Federal Trade Commission may apply, or remain applicable, to any container of recycled oil (as defined in section 383(b) of such Act) if such requirement provides that the container must bear any label referring to the fact that it has been derived from previously used oil. Nothing in this subsection shall be construed to affect any labeling requirement applicable to recycled oil under any authority of law to the extent such requirement relates to fitness for intended use or any other performance characteristic of such oil or to any characteristic of such oil other than that referred to in the preceding sentence.

### Used Oil As a Hazardous Waste

"Sec. 8. Not later then ninety days after the date of the enactment of this Act, the Administrator of the Environmental Protection Agency shall—

(1) make a determination as to the applicability to used oil of the criteria and regulations promulgated under subsections (a) and (b) of section 3001 of the Solid Waste Disposal Act relating to characteristics of hazardous wastes, and

(2) report to the Congress the determination together with a detailed statement of the data and other information upon which the determination is based.

In making a determination under paragraph (1), the Administrator shall ensure that the recovery and reuse of used oil are not discouraged.

### Study

Sec. 9. The Administrator of the Environmental Protection Agency, in cooperation with the Secretary of Energy, the Federal Trade Commission, and the Secretary of Commerce, shall conduct a study—

(1) assessing the environmental problems associated with the improper disposal or reuse of used oil;

(2) addressing the collection cycle of used oil prior to recycling;

(3) analyzing supply and demand in the used oil industry, including (A) estimates of the future supply and quality of used oil feedstocks for purpose of re-refining and (B) estimates of the future supply of virgin crude oil available for refining for purposes of producing lubricating oil;

(4) comparing the energy savings associated with re-refining used oil and the energy savings associated with other uses of used oil; and

(5) recommending Federal, State, and local policies to encourage methods for envi-

ronmentally sound and economically feasible recycling of used oil.

Where appropriate, for purposes of the study under this section, the Administrator may utilize and update information and data previously collected by the Administrator and by other agencies, departments, and instrumentalities of the United States. The Administrator shall submit to Congress a report containing the results of the study under this section not later than one year after the date of the enactment of this Act.